**ORIGINAL**

1  KAREN MATTESON, Cal. Bar No. 102103
   Email: mattesonk@sec.gov
2  DONALD W. SEARLES, Cal. Bar No. 135705
   Email: searlesd@sec.gov
3  VICTORIA A. LEVIN, Cal. Bar No. 166616
   Email: levinv@sec.gov
4  JANET E. MOSER, Cal. Bar No. 199171
   Email: moserj@sec.gov
5  DOHOANG T. DUONG, Cal. Bar No. 219127
   Email: duongdo@sec.gov
6
   Attorneys for Plaintiff
7  Securities and Exchange Commission
   Rosalind R. Tyson, Regional Director
8  Andrew G. Petillon, Associate Regional Director
   John M. McCoy III, Regional Trial Counsel
9  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
10 Telephone:(323) 965-3998
   Facsimile: (323) 965-3908

FILED

2008 SEP -4 PM 12: 24

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

'08 CV 1620 WQH RBB

11

12           UNITED STATES DISTRICT COURT

13          SOUTHERN DISTRICT OF CALIFORNIA

14  SECURITIES AND EXCHANGE              Case No.
    COMMISSION,
15                                       **COMPLAINT**
16            Plaintiff,

17       vs.

18  RETAIL PRO, INC. (fka Island Pacific, Inc.),
    BARRY M. SCHECHTER, RAN H. FURMAN,
19  and HARVEY BRAUN,

20            Defendants.

21

22

23

24

25

26

27

28

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### JURISDICTION AND VENUE

1.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78(d)(3)(A), 78u(e) & 78aa.  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in or in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

2.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because the defendants reside and/or transact business in this district and certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district.

### SUMMARY

3.    This case involves a fraudulent scheme by Island Pacific, Inc. ("Island Pacific" or the "Company") and its then senior management to overstate the Company's financial results for the quarters ended September 30, 2003 ("Q2 2004"), and December 31, 2003 ("Q3 2004"), and its fiscal year ended March 31, 2004 ("FY 2004").  The Company's senior management responsible for the fraud were defendants Barry M. Schechter ("Schechter"), a controlling person and de facto officer; Ran H. Furman ("Furman"), the Chief Financial Officer; and Harvey Braun ("Braun"), the Chief Executive Officer.

4.    In Q2 2004, Schechter, Furman and Braun caused Island Pacific to improperly record and report $3.9 million in revenue from a sham transaction with an Australian software company, QQQ Systems Pty Limited ("QQQ").  The transaction had no economic substance or business purpose and instead was entered into in order to artificially inflate Island Pacific's revenues reported in its financial statements.  Subsequently, in the third quarter, Island Pacific improperly recorded an offsetting transaction whereby it purchased from QQQ $3.9 million of

1  software.  In fact, no contract finalizing this offsetting transaction was signed until the fourth

2  quarter.  Island Pacific and QQQ never exchanged any money as a result of these offsetting

3  agreements.  In addition, neither Island Pacific nor QQQ made any effort to sell the other's

4  software or to determine the fair value of their software licensing rights as required by applicable

5  accounting principles.

6       5.     As a result of improperly recognizing and reporting the $3.9 million as revenue,

7  Island Pacific overstated its revenues by 140% for Q2 2004, 29% for the nine months ending Q3

8  2004, and 22% for the 2004 fiscal year, and reported a small profit instead of a massive loss for

9  Q2 2004.  The defendants also failed to disclose the sham nature of the QQQ transaction and

10  actively concealed their fraud from Island Pacific's outside auditors, and the public, by creating

11  forged and/or fabricated documents which they used in an attempt to demonstrate that the

12  recognition of revenue from the transaction was proper.  Additionally, Furman fired a company

13  whistleblower who expressed concern in an email that the offsetting transactions were

14  "structured in a manner that is intended to inflate revenues for the purpose of boosting the

15  corporation's share price."

16       6.     As part of the fraudulent scheme, Schechter sold 637,750 shares of Island Pacific

17  stock, receiving $488,410 in ill-gotten gains.

18       7.     By engaging in this conduct, the defendants variously violated and aided and

19  abetted violations of the antifraud, issuer reporting and record-keeping, internal controls, and

20  prohibition against misrepresentations to accountants provisions of the federal securities laws.

21  The Commission seeks to obtain injunctions from future violations, civil penalties, and officer

22  and director bars against Schechter, Furman, and Braun, and additionally to obtain disgorgement

23  of ill-gotten gains from Schechter.

24       **DEFENDANTS**

25       8.     **Retail Pro, Inc., formerly known as Island Pacific, Inc. ("Island Pacific")**, is a

26  Delaware corporation.  At all relevant times, Island Pacific was headquartered in Irvine,

27  California, and also had offices in La Jolla, California.  During all relevant times, Island Pacific

28  developed and sold software to the retail industry.  Its common stock is registered with the

2

1  Commission pursuant to Section 12(b) of the Exchange Act, traded on the American Stock

2  Exchange until it was delisted on October 25, 2005 as a result of the company's failure to file

3  periodic reports, and currently trades through the Pink Sheets (RTPR.PK).  On December 21,

4  2007, Island Pacific sold its Island Pacific division to an Australian company and renamed the

5  unsold portion of the company Retail Pro, Inc.

6     9.    **Barry M. Schechter** is a resident of La Jolla, California.  He founded Island

7  Pacific in 1994 and, at various times, has been its Chief Executive Officer ("CEO") (February

8  1994 to January 2001, October 2001 to June 2003, and April 2005 to June 2008) and its

9  Chairman of the Board of Directors (February 1994 to July 2003).  During the period of the

10  fraud, Schechter was designated as a consultant to Island Pacific but, in fact, was a controlling

11  person and *de facto* officer of Island Pacific and controlled a substantial number of Island Pacific

12  shares.  Schechter was a Chartered Accountant in South Africa from 1979 to 1989, when he

13  immigrated to the United States and allowed his accounting license to lapse.

14     10.    **Ran H. Furman** is a resident of San Diego, California.  Furman was the Chief

15  Financial Officer ("CFO") of Island Pacific from September 2003 to January 2005.  Furman is

16  currently the CFO and a director of Osage Exploration and Development, Inc., an oil and gas

17  company that trades through the Pink Sheets.  Furman was a CPA in Washington State but allowed

18  his CPA license to expire in 1993.

19     11.    **Harvey Braun** is a resident of Livingston, New Jersey.  Braun was an Island

20  Pacific division president from January 2003 to April 2003, its CEO from April 2003 to April

21  2004, and the Chairman of the Board of Directors from July 2003 to February 2004.  Braun is

22  currently self-employed and consults for retail and consumer products companies.

23                    **THE FRAUDULENT SCHEME**

24  **A.    The Defendants Cause Island Pacific To Fraudulently Recognize Revenue For Its
         Second Quarter 2004 From A Sham Transaction**

25     **1.    Island Pacific Purportedly Sells Software To QQQ**

26     12.    In late September 2003, Schechter negotiated a software license agreement (the

27  "License Agreement") between Island Pacific and QQQ, an Australian start-up company.  The

28  License Agreement, which QQQ's CEO and Furman signed on or about September 29, 2003,

                              3

one day before the quarter closed, granted QQQ a license to distribute Island Pacific's "Host" software in Australia and New Zealand. According to the terms of the agreement executed by QQQ, QQQ agreed to pay Island Pacific, at QQQ's option, *either*: (1) $3.25 million in two equal installments of $1.625 million on November 15, 2003 and December 31, 2003; *or* (2) 20% of QQQ's net sublicensing fees to a maximum of $4 million. Pursuant to that agreement, on September 30, 2003, the last day of the quarter, Island Pacific shipped software to QQQ.

13.     In September 2003, prior to signing the License Agreement, QQQ's CEO received a letter (the "Side Letter") from Island Pacific, signed by Braun at Schechter's direction, confirming that, in addition to the License Agreement, Island Pacific and QQQ were simultaneously negotiating, among other things, Island Pacific's purchase of QQQ's "Pyramid" software. The Side Letter also stated that "the payment terms extended to QQQ [in the License Agreement] will be changed to coincide with the closing of the other transactions contemplated in this letter, when completed."

14.     On October 3, 2003, Schechter and Furman caused Island Pacific to recognize $3.25 million in revenue from the License Agreement and to record a $3.25 million account receivable from QQQ, both as of September 30, 2003.

### 2.     Schechter And Furman Fabricate A Modification To The License Agreement And Fraudulently Cause Recognition Of Additional Revenue

15.     On October 10, 2003, Schechter and Furman, without QQQ's knowledge, changed three critical terms of the License Agreement -- what was being sold, the price, and the payment terms. They modified the License Agreement to grant QQQ a license to distribute two Island Pacific programs, "Host" and "Direct," and to provide that QQQ agreed to pay Island Pacific $3.25 million for Host and $650,000 for Direct, payable in two equal installments due on November 15, and December 31, 2003, *plus* 10% of QQQ's net sublicensing fees.

16.     On October 13, 2003, Schechter and Furman caused Island Pacific to record as of September 30, 2003, an additional $650,000 in revenue and account receivable, for a total of $3.9 million in revenue and as an account receivable from the QQQ transaction.

17.     QQQ's CEO never signed, saw, or agreed to the modified License Agreement.

4

1    Moreover, QQQ had no ability to make a $3.9 million payment because QQQ's total revenues

2    for the year were less than $4 million.

3        **3.**    <u>**The License Agreement Revenue Was Improperly Recognized**</u>

4        18.    The License Agreement did not qualify for revenue recognition in Q2 2004 under

5    Island Pacific's own revenue recognition policy or under GAAP.  Specifically, Island Pacific

6    represented in its 2003 Form 10-K filed on or about June 26, 2003, its Q2 and Q3 2004 Forms

7    10-Q filed on or about November 12, 2003, and February 17, 2004, respectively, and its 2004

8    Form 10-K filed on or about June 29, 2004, that it recognized revenue when it licensed software

9    and provided related services in accordance with American Institute of Certified Public

10   Accountants ("AICPA") Statement of Position 97-2 ("SOP 97-2"), "Software Revenue

11   Recognition," which provides that revenue recognition is proper only when: (1) persuasive

12   evidence of an arrangement exists; (2) delivery has occurred; (3) the vendor's fee is fixed and

13   determinable; and (4) collectibility is probable.  SOP 97-2 ¶ .08.  In fact, Island Pacific's revenue

14   recognition policy was more stringent and specific than SOP 97-2 in that Island Pacific

15   specifically represented in its Forms 10-K and 10-Q that its conditions for recognizing revenue

16   included "when a license agreement has been signed," rather than merely requiring persuasive

17   evidence of an arrangement.  As explained below, with the sole exception that Island Pacific had

18   delivered the software to QQQ, the License Agreement failed to satisfy any of the above

19   elements of SOP 97-2.

20       **a.**    <u>**There Was No Persuasive Evidence Of An Arrangement**</u>

21       19.    First, as a threshold matter, there was no persuasive evidence of an arrangement

22   because the Side Letter provided that QQQ's payment terms would be changed at some point in

23   the future to coincide with other transactions being negotiated between the parties.  In addition,

24   QQQ was unaware of the "modified" License Agreement, and never agreed to its terms requiring

25   that it pay Island Pacific additional monies.  Not only was there no persuasive evidence of an

26   arrangement, but there was no signed modified License Agreement.  Accordingly, the

27   representation in Island Pacific's Forms 10-Q and 10-K that a signed license agreement was a

28   precondition for recognizing revenue was false.

### b.  The Fee To Be Charged By Island Pacific Was Not Fixed Or Determinable

20.    Second, in the version of the License Agreement executed by QQQ, the vendor's fee was not fixed and determinable.  GAAP provides that "*any* extended payment terms in software licensing arrangements may indicate that the fee is not fixed or determinable" and "if payment of a significant portion of the software licensing fee is not due until more than 12 months after delivery, the licensing fee should be *presumed* not to be fixed or determinable." SOP 97-2 ¶ .28 (emphasis in original).  Here, the License Agreement signed by QQQ provided for no fixed payments, and allowed QQQ to make royalty payments to Island Pacific on sublicensing fees QQQ earned from sales to end users over a 36-month period.  Because the number of sales was unknown at the time the License Agreement was entered into, and because royalty fees remained due for more than twelve months, it was improper to recognize any revenue from the License Agreement in Q2 2004.  Additionally, Schechter and Furman had fabricated the "modified" version of the License Agreement which, unbeknownst to QQQ, obligated QQQ to pay substantial and additional monies to Island Pacific.

### c.  Collectibility From QQQ Was Not Probable

21.    Finally, it was not probable that Island Pacific would collect the $3.9 million provided for in the fabricated modified agreement because QQQ did not have the financial means to make such a payment, and because QQQ was completely unaware of and had not agreed to the terms of the "modified" License Agreement requiring two installment payments totaling $3.9 million plus 10% of QQQ's net sublicensing fees.  Moreover, the License Agreement executed by QQQ permitted it to make no upfront payment and required it to pay a royalty fee only upon the future sale of the product.  Under SOP 97-2, because the License Agreement signed by QQQ allowed it to pay Island Pacific a royalty fee upon the sale of software, Island Pacific could have recognized revenue only upon payment from QQQ.  As QQQ never sold the product to an end user, no royalties ever became due or payable, and, hence, no revenue could be properly recognized by Island Pacific.

///

///

**4.    Defendants Furman And Braun Sign A False Management Representation Letter To Island Pacific's Auditors**

22.    On or about November 11, 2003, defendants Furman and Braun signed, and caused to be transmitted to Island Pacific's auditors in connection with their review of the Company's financial statements for its quarter ended September 30, 2003, a management representation letter.  In the letter, Furman and Braun represented, among other things, that:

  a.    The interim financial information was presented in accordance with GAAP applied on a basis substantially consistent with the same period in the prior year, the immediately preceding quarter, and the prior fiscal year.

  b.    They had no knowledge of any fraud or suspected fraud affecting the company involving management or employees who had significant roles in internal controls.

  c.    There were no material transactions that had not been properly recorded in the accounting records underlying the interim financial information.

These representations were all materially false in light of the improper recording of $3.9 million revenue from the purported sale to QQQ.

**5.    The Defendants Announce Island Pacific's Overstated Q2 2004 Financial Results**

23.    After the market closed on November 12, 2003, at or about 4:00 p.m. Eastern Standard Time ("EST"), Island Pacific announced its Q2 2004 financial results in a press release headlined "Company Reports 76% Increase in Revenues," which represented that it earned $6.7 million in revenues -- a 76% increase over revenues of $3.8 million for the same period in the previous year.  Island Pacific also reported gross profit (revenues minus cost of goods sold) of $5.6 million, and income from continuing operations of $699,000.  Additionally, the press release stated that the Company reiterated its previous guidance for fiscal 2004.  Schechter, Furman, and Braun participated in reviewing and editing the press release, and Braun was quoted in the press release.  By improperly including the License Agreement revenue, Schechter, Furman and Braun caused Island Pacific to overstate revenues by $3.9 million, or 140%;

1  overstate gross profit by $3.8 million, or 214%; and to not report its $3.1 million loss from

2  continuing operations.

3      24.    Later on November 12, 2003, at or about 4:30 p.m. EST, Island Pacific broadcast

4  an earnings conference call with securities analysts and shareholders over the Internet.

5  Schechter, Furman and Braun participated in reviewing and editing the earnings conference call

6  script. Furman and Braun also each were present and spoke during the earnings conference call.

7  Furman stated, in part:

8          We reported revenues of approximately $6.7 million, a 75.9% increase versus
        revenues of $3.8 million for the year earlier period. . . .  The increase in gross profit
9          [from $2.2 million in the same quarter in the prior year to $5.6 million] is due
        primarily to an increase in higher margin software sales and a reduction in
10          professional services. . . .

11  In addition, Braun represented:

12          We showed solid sequential revenue growth during the second quarter even while
        we took important steps to position the company for the second half of the year to
13          ensure that we meet the Fiscal 2004 guidance we outlined in the first quarter and
        are reaffirming today. . . . [W]e expect to report annual sales revenues of $31 to $33
14          million. . . which is the same guidance we announced during our first quarter call.
        Obviously this implies that we will generate significant third and fourth quarter
15          revenues to reach this target.  We are comfortable with those expectations. . . .

16      25.    In the press release and the earnings conference call, Island Pacific, Schechter,

17  Furman and Braun attributed the positive financial results to new products, customer acceptance

18  of those new products, and several new distribution partners, among other things.  They also

19  noted that one of the highlights of the quarter was entering into a distribution agreement with a

20  different, well known software reseller.

21      26.    In the press release and earnings conference call, Island Pacific, Schechter,

22  Furman and Braun failed to disclose the License Agreement with QQQ and that revenue from

23  that contract accounted for 58% of the quarter's revenues and 68% of the quarter's gross profit.

24  They also failed to disclose that under the terms of the License Agreement executed by QQQ,

25  QQQ was not obligated to make a fixed and determinable payment, but, rather, had the option of

26  paying *either* $3.25 million *or* a 20% royalty fee on future sales, if any.   In the press release and

27  earnings conference call, Island Pacific, Schechter and Furman also failed to disclose that they

28  had unilaterally modified critical terms of the License Agreement, after the quarter had ended, to

8

1  change the products being licensed, the price being paid, and the payment terms, without QQQ's

2  knowledge or consent.

3     27.    Also on November 12, 2003, Island Pacific filed its quarterly report on Form 10-

4  Q with the Commission for its quarter ended September 30, 2003.  Furman and Braun signed the

5  Form 10-Q, and signed a required certification which falsely asserted that to their knowledge, the

6  Form 10-Q fairly presented, in all material respects, the Company's financial condition and

7  results of operations.

8     28.    Island Pacific's Q2 2004 Form 10-Q disclosed that it had recognized $3.9 million

9  in revenue from the License Agreement and represented that the License Agreement was a one-

10  time transaction.  This statement was materially misleading as the recognition of revenue from

11  the License Agreement violated Island Pacific's revenue recognition policy and SOP 97-2.  In

12  the Q2 2004 Form 10-Q, Island Pacific, Schechter and Furman also failed to disclose that under

13  the terms of the License Agreement executed by QQQ, QQQ was not obligated to make a fixed

14  and determinable payment, but, rather, had the option of paying *either* $3.25 million *or* a 20%

15  royalty fee on future sales, if any.  In the Q2 2004 Form 10-Q, Island Pacific, Schechter and

16  Furman also failed to disclose that they had unilaterally modified critical terms of the License

17  Agreement, after the quarter had ended, to modify the products being licensed, the price being

18  paid, and the payment terms, without QQQ's knowledge or consent.

19     29.    On November 13, the day following the positive earnings release, Island Pacific's

20  stock closed at $2.25, up 8.2% from the prior day's close, and trading volume increased to 1.75

21  million shares, up sharply from the prior five day average trading volume of 100,160 shares.

22  **B.    Schechter Negotiates A Purchase By Island Pacific From QQQ To Offset Island
       Pacific's $3.9 Receivable From QQQ And Furman Causes The Arrangement To Be
23     Prematurely Recorded In The Third Quarter**

24     **1.    Schechter Negotiates An Offsetting Sublicense Agreement With QQQ**

25     30.    In the quarter ended March 31, 2004 ("Q4 2004"), Schechter negotiated an

26  agreement (the "Sublicense Agreement") between Island Pacific and QQQ under which Island

27  Pacific agreed to purchase from QQQ a sublicense to market QQQ's "Pyramid" software.  Under

28  the Sublicense Agreement, Island Pacific agreed to pay QQQ a $3.9 million upfront payment

9

1   plus future royalty payments. At the time of Sublicense Agreement, however, the U.S. version

2   of QQQ's Pyramid software was still under development and would not be marketable for the

3   foreseeable future.

4        31.    Schechter, Furman and Braun all knew that the Sublicense Agreement was not

5   finalized or signed by the parties until late January or early February 2004, in Q4 2004, when

6   Steven Beck, Island Pacific's president and a director, signed the agreement as a director on

7   behalf of Island Pacific.

8        **2.**    **Furman Causes The Sublicense Agreement To Be Improperly Recorded**

9        32.    Even though the Sublicense Agreement was not executed until February 2004,

10   Island Pacific, at Furman's direction, recorded it as a Q3 2004 transaction by booking the

11   sublicense as a $3.9 million asset and crediting (*i.e.*, eliminating) the $3.9 million account

12   receivable from QQQ based on the License Agreement. Schechter and Braun also knew that the

13   Sublicense Agreement had been improperly recorded as a Q3 2004 transaction.

14        33.    Under Accounting Principles Board Opinion No. 29 (APB 29), Accounting for

15   Nonmonetary Transactions, ¶¶ 1, 3 & 18, nonmonetary transactions must be accounted for based

16   on the fair value of the assets exchanged, with gain or loss recognized on the exchange. Under

17   APB 29 ¶ 20, no revenue may be recognized if the fair values of exchanged assets are not

18   determinable within reasonable limits; the transaction is an exchange of a product held for sale in

19   the ordinary course of business for sale in the same line of business; or the exchange lacks

20   commercial substance. All three exclusions under APB 29 applied. Accordingly, the Sublicense

21   Agreement should not have been booked as an asset and the account receivable should not have

22   been credited.

23        **3.**    **Furman Terminates A Whistleblower Who Detects The Fraud**

24        34.    On February 4, 2004, Island Pacific's Contract Administrator, who was

25   responsible, among other things, for the internal review of software license agreements prior to

26   their distribution to Island Pacific's internal accounting department, wrote an email to Furman,

27   who was his immediate supervisor, as well as to Schechter, Braun and others within Island

28   Pacific's management. The subject of the Contract Administrator's email was entitled "Revenue

Recognition." The Contract Administrator's email detailed his concerns "that certain transactions involving the company QQQ appear to be structured in a manner that is intended to inflate revenues for the purpose of boosting the corporation's share price." The Contract Administrator specifically challenged both the License Agreement and the Sublicense Agreement. After detailing the terms of both transactions, including explaining that the Sublicense Agreement should be reported in Q4 rather than Q3, the Contract Administrator stated that "the totality of the circumstances creates the appearance that the transactions were intended merely to boost the reportable revenue of Island Pacific in the quarter ended September 2003."

35. The following day, Furman fired the Contract Administrator. However, even though the Contract Administrator had only worked for Island Pacific for five months, Furman signed a Separation Agreement and General Release of Claims whereby Island Pacific agreed to pay the Contract Administrator a lump sum equaling four months salary (minus taxes) within eight days of execution of the Separation Agreement. In exchange, the Contract Administrator agreed to maintain "absolute confidentiality" of the Separation Agreement, and not to make or publish "derogatory" statements about the Company. One week later, Island Pacific announced its Q3 2004 financial results, which continued to include the revenues from the License Agreement.

**4.    Furman And Braun Sign Another False Management Representation Letter To Island Pacific's Auditors**

36. On or about February 12, 2004, Furman and Braun signed, and caused to be transmitted to Island Pacific's auditors in connection with their review of the Company's financial statements for its quarter ended December 31, 2003, a management representation letter. In the letter, Furman and Braun repeated the same false representations that they had made in their November 11, 2003, management representation letter. Again, these representations were all materially false in light of both the improper recording of $3.9 million revenue from the purported sale to QQQ, which was improperly included in Island Pacific's nine-month summary for the period ended December 31, 2003, and the improper recording of the

1   Sublicensing Agreement.

2         37.    Additionally, Furman and Braun falsely represented in the February 12, 2004

3   letter that:

4              a.      There were no significant deficiencies, including material weaknesses, in the

5                   design or operation of internal controls.

6              b.      They had no knowledge of any allegations of fraud or suspected fraud

7                   affecting the Company received in communications from, among others,

8                   employees.

9   These additional representations were false in light of the Contract Administrator's February 4,

10  2004 email to Furman and Braun, among others, which detailed his concerns about fraudulent

11  revenue recognition with regard to the License Agreement and Sublicense Agreement with QQQ.

12  **5.     The Defendants Announce Island Pacific's Overstated Q3 2004 Financial
    Results**

13

14        38.    On February 13, 2004, Island Pacific announced its Q3 2004 financial results in a

15  press release. In the press release, Island Pacific reported, for the three months ending December

16  31, 2003, revenues of $5.1 million and a loss from continuing operations of $346,000.

17  Additionally, Island Pacific reported, for the nine months ending December 31, 2003, revenues

18  of $17.3 million and income from continuing operations of $688,000. Schechter, Furman, and

19  Braun participated in reviewing and editing the press release, and Braun was quoted in the press

20  release. By improperly including the License Agreement revenue in its nine-month summary,

21  Schechter, Furman and Braun caused Island Pacific to overstate revenues by $3.9 million, or

22  29%, and not to report its $3.2 million loss from continuing operations.

23        39.    Also on February 13, 2004, at or about 9:00 a.m. EST, Island Pacific broadcast an

24  earnings conference call with securities analysts and shareholders over the Internet. Schechter,

25  Furman and Braun participated in reviewing and editing the earnings conference call script.

26  Furman and Braun also each were present and spoke during the earnings conference call.

27  Furman stated, in part:

28        We reported revenues of approximately $5.1 million. . . .

1    We reported a loss from continuing operations of $346,000. . .

2    We reported gross profits of $3.7 million. . . As a percentage of revenues, gross
     profit increased to 72.5% from 69.5% in the year earlier period. The increase in
3    gross profit is due primarily to a better mix of higher margin software sales and a
     reduction in professional services. . . .
4

5    For the 9 months ended December 31, 2003, we reported revenues of $17.3
     million, a 9.3% increase versus the same period in fiscal 2003. We reported
6    income from continuing operations of $638,000 versus a loss from continuing
     operations of $4 million for the same period last year. . . .
7

8    In addition, Braun represented:

9    In the cost [sic] of this fiscal year we have created a new Island Pacific. When I
     spoke to you in 2003 I mentioned that we were going [t]o launch several new
     products which would likely yield revenues during the second half of the calendar
10   year. We have done that. We remain very confident that we will generate
     significant revenue from new and existing products. . . .
11

12   Now I would like to address our financial guidance for the balance of our fiscal
     year. We expect to report fourth quarter revenues of $7 to $8 million and net
13   income of 2 to 3 cents per diluted share. . . .

14   In closing, I take responsibility and am personally disappointed in the
     performance of the group for the third quarter. . . . It is imperative that you and
15   the stockholders understand that this is a bump in the road. . . . To put the
     situation in perspective, Island Pacific lost over $40 million during a recent 3 year
16   period and our performance over the first 9 months of this year reflects a $4
     million plus swing in profitability. . . .

17       40.    The representations made in the earnings conference call regarding Island

18   Pacific's quarterly and nine-month financial results were materially false and misleading because

19   Island Pacific had improperly included the License Agreement revenue in its nine-month

20   summary. Braun's statement that the Company's financial results were "a bump in the road,"

21   contrasting a loss of "over $40 million during a recent 3 year period," with "our performance

22   over the first 9 months of this year reflect[ing] a $4 million plus swing in profitability" further

23   materially misrepresented Island Pacific's financial results.

24       41.    In addition to materially overstating Island Pacific's revenues over a nine month

25   period, in the press release and earnings call, Island Pacific, Schechter, Furman, and Braun failed

26   to disclose that during Q4, in February 2004, Island Pacific had entered into a Sublicense

27   Agreement with QQQ to purchase licensing rights for Pyramid software for $3.9 million and that

28   Island Pacific had improperly recorded the Sublicense Agreement as a Q3 2004 transaction in

13

1  order to eliminate the $3.9 million account receivable from the License Agreement without

2  receiving any cash from QQQ.

3       42.    Also on or about February 17, 2004, Island Pacific filed its quarterly report on

4  Form 10-Q with the Commission for its quarter ended December 31, 2003.  Furman and Braun

5  signed the Form 10-Q, and signed a required certification in which they falsely asserted that to

6  their knowledge, the Form 10-Q fairly presented, in all material respects, the Company's

7  financial condition and results of operations.

8       43.    In the Q3 Form 10-Q, Island Pacific, Furman, and Braun made the same false

9  representations regarding the company's financial condition that were made in the press release

10  and the conference call.  Additionally, in the Form 10-Q, Island Pacific, Furman and Braun falsely

11  represented that in December 2003, Island Pacific had entered into an agreement to purchase

12  software from QQQ for $3.9 million and that the $3.9 million purchase price was paid by

13  offsetting it against the account receivable due from QQQ.  In fact, the Sublicense Agreement was

14  not finalized until early February 2004, well after the close of Q3 2004.  Island Pacific, Furman

15  and Braun also did not disclose in the Form 10-Q that the Sublicense Agreement was improperly

16  recorded in December 2003 to eliminate the $3.9 million account receivable from QQQ.

17       44.    Between Island Pacific's announcements of its Q2 2004 and Q3 2004 financial

18  results, Island Pacific stock had traded between $1.75 and $2.90.  On February 13, the day of the

19  third quarter earnings announcement, Island Pacific's stock closed at $1.43, down 32.5% from

20  the prior day's close of $2.12, and more than 4.8 million shares traded.  On February 14, the

21  stock fell to $1.37, with more than 2.4 million shares traded.  Island Pacific's stock price

22  continued to decline and was trading below $1 by May 2004.

23  **C.    Schechter Profits From The Fraud**

24       45.    Schechter profited from the fraudulent scheme by selling Island Pacific stock

25  during the fraud through the Ivanhoe Irrevocable Trust, which held 2,008,237 Island Pacific

26  shares at March 31, 2003.  At Schechter's instruction and through a brokerage account he opened

27  and controlled, Ivanhoe sold 637,750 shares of Island Pacific stock between November 13, 2003

28  (after Island Pacific announced its Q2 2004 results) and February 12, 2004 (one day before

Island Pacific announced its Q3 2004 results). The proceeds from these sales were then transferred to an Ivanhoe bank account over which Schechter exercised control. Schechter received $488,410 in ill-gotten gains as a result of these sales.

**D.   Schechter, Furman And Braun Make Misrepresentations To Island Pacific's Auditors And Island Pacific Announces Its Overstated FY 2004 Financial Results**

   **1.   The Individual Defendants Make Misrepresentations To The Auditors**

      **a.   Schechter Forwards Forged And Fabricated Documents To The Auditors**

46.   In connection with the FY 2004 audit, in or about mid-April 2004, Schechter forwarded to the auditors: (1) a confirmation dated March 9, 2004, purportedly signed on April 12, 2004, by QQQ's CEO, that represented, among other things, that the purchase price under the License Agreement was a total of $3.9 million; (2) a confirmation dated April 12, 2004, purportedly signed by QQQ's CEO that he had provided QQQ the "required financial support it needed" to pay the $3.9 million; (3) an unsigned letter dated April 12, 2004, purportedly from QQQ's CEO describing his negotiations to acquire Island Pacific's software and confirming that QQQ had the ability to meet its financial commitments under the License Agreement; and (4) an unsigned letter purportedly from QQQ's CEO confirming that QQQ could pay the $3.9 million purchase price.

47.   The signatures on the confirmations and the unsigned letters purportedly from QQQ's CEO were all forged. QQQ's CEO never signed the confirmations and had not written the letters. Moreover, the statements in all four documents falsely represented the substance of the transactions with QQQ.

      **b.   Braun Makes Misrepresentations In An Email And Memorandum To The Auditors**

48.   During the FY 2004 audit, on or about April 14, 2004, in response to specific auditor questions, Braun caused an email to be sent to the audit manager falsely representing that the License Agreement and the Sublicense Agreement were not connected. Braun, however, had signed the Side Letter (which was never disclosed to the auditors) stating that "the payment terms extended to QQQ [in the License Agreement] will be changed to coincide with the closing

1  of the other transactions contemplated in this letter, when completed."

2           c.        **Furman Authors, And Braun Signs, A Memorandum From Furman To The Auditors Misrepresenting That The QQQ Transactions Are Unrelated**

4      49.     On or about May 12, 2004, in response to the auditors' question as to why QQQ

5  failed to make the first payment under the License Agreement, Braun signed a memorandum

6  authored by and from Furman to the auditors falsely stating that QQQ had intended to pay the

7  first $1.95 million installment but was unable to do so because QQQ had inadvertently placed the

8  funds into a money market account and would incur a substantial penalty for early withdrawal

9  and that the parties then agreed in December to offset the payment against amounts QQQ owed

10  Island Pacific in connection with the Sublicense Agreement "as a matter of convenience." The

11  memorandum also falsely stated that Island Pacific entered into an agreement with QQQ to

12  acquire the Pyramid software in December 2003, during Q3 2004, when in fact the agreement

13  was not signed until February 2004, in Q4 2004. Braun signed the memorandum below a

14  statement that said "Please sign below to attest that you have read the document and it accurately

15  captures the details regarding the consummation of the two separate transactions."

16           d.        **Furman Signs A Third False Management Representation Letter**

17      50.     On or about July 11, 2004, Furman signed a management representation letter to

18  the auditors. The letter falsely represented that:

19           a.        Island Pacific's financial statements were fairly presented in conformity

20                     with GAAP.

21           b.        "We have no knowledge of fraud or suspected fraud affecting the entity

22                     involving" management or employees who have significant roles in the

23                     internal control.

24           c.        "We have no knowledge of any allegations of fraud or suspected fraud

25                     affecting the Company received in communications from employees,

26                     former employees, analysts, regulators, short sellers or others," when, in

27                     fact, Island Pacific's Contract Administrator had emailed Furman on or

28                     about February 4, 2004, expressing his concerns that the QQQ transaction

was "structured in a manner that is intended to inflate revenues for the purpose of boosting the corporation's share price."

    d.    There were no significant deficiencies in the design or operation of internal controls.

    e.    The company was accounting for its software revenues in accordance with SOP 97-2 and Staff Accounting Bulletin ("SAB") 104, including that there were no side agreements for any sales, when, in fact, the QQQ transaction in Q2 2004 was not recorded in accordance with SOP 97-2 or SAB 104, and it included a Side Agreement.

    f.    There were no material transactions not properly recorded in the accounting records underlying the financial statements.

    g.    The transactional history provided to the auditors resulting in the recording of the $3.9 million in revenues from the sale to QQQ "has been accurately presented to you and is properly reflected in the financial statements under the applicable revenue recognition criteria."

**2.    Island Pacific Announces Its Overstated FY 2004 Financial Results**

51.    Island Pacific announced its FY 2004 financial results in a June 29, 2004 press release, earnings call, and Form 10-K, for its fiscal year ended March 31, 2004. Schechter and Furman participated in reviewing and editing the press release and the earnings conference call script. Furman was also present and spoke during the earnings conference call, broadcast over the Internet at or about 4:30 p.m. EDT. Furman signed the Form 10-K, and signed a certification that to his knowledge, the Form 10-K fairly presented, in all material respects, the Company's financial condition and results of operations. Furman additionally certified, among other things, that he had reviewed the Form 10-K and that:

    a.    The Form 10-K did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the annual report.

b.   That he was responsible for establishing and maintaining internal control over financial reporting and had designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

c.   That he had disclosed any fraud, whether or not material, that involved management.

These representations were false, in that the Form 10-K contained material misrepresentations regarding the financial condition of Island Pacific and failed to disclose the fraudulent scheme by Schechter, Furman and Braun to inflate Company revenues.

52.   Specifically, in its press release, earnings call and 2004 Form 10-K, Island Pacific reported revenues of $21.7 million, gross profit of almost $16.5 million, and a loss from continuing operations of $4.2 million. By improperly including the License Agreement revenue in those announcements and causing it to be recorded in the financial statements included in the Form 10-K, Schechter and Furman caused Island Pacific to overstate revenues by $3.9 million, or 22%, and gross profit by $3.8 million, or 30%, and to understate its loss by $3.8 million, or 47%.

53.   Island Pacific and Furman failed to disclose in the press release and earnings call the License Agreement with QQQ and that revenue from that contract accounted for $3.9 million (or 18%) of the year's revenues. In the press release, earnings call, and 2004 Form 10-K, Island Pacific and Furman also failed to disclose that the revenue from the License Agreement should not have been included in Island Pacific's year end financials, as the recognition of revenue from the License Agreement violated Island Pacific's revenue recognition policies, SOP 97-2, and APB 29, for the reasons previously set forth.

**E.   The Parties Abandon The QQQ Transaction**

54.   Island Pacific and QQQ did nothing to carry out the terms of the License and Sublicense Agreements. Neither party sold or marketed the other's software, and Island Pacific never demanded QQQ's payment of the $3.9 million or any of the installment payments when they became due. In the fall of 2004 after inquiries from the Commission and Company auditors, at Furman's direction, Island Pacific reversed entries on its books reflecting the

18

modified License Agreement and Sublicense Agreement, and restated its Q2, Q3 and fiscal year 2004 financial statements.

### FIRST CLAIM FOR RELIEF
#### Fraud In The Offer Or Sale Of Securities
**Violations of Section 17(a) of the Securities Act**
**(Against Schechter)**

55.     The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

56.     Schechter, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a.     with scienter, employed devices, schemes, or artifices to defraud;

    b.     obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

57.     By engaging in the conduct described above, Schechter violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### SECOND CLAIM FOR RELIEF
#### Fraud In Connection With The Purchase Or Sale Of Securities
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against All Defendants)**

58.     The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

59.     The defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

1   exchange, with scienter:

2          a.    employed devices, schemes, or artifices to defraud;

3          b.    made untrue statements of a material fact or omitted to state a material fact

4                necessary in order to make the statements made, in light of the

5                circumstances under which they were made, not misleading; or

6          c.    engaged in acts, practices, or courses of business which operated or would

7                operate as a fraud or deceit upon other persons.

8          60.    By engaging in the conduct described above, the defendants violated, and unless

9   restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §

10  78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

11                         **THIRD CLAIM FOR RELIEF**
                        **Violations Of Issuer Reporting Requirements**
12                         **Section 13(a) of the Exchange Act,**
                        **and Rules 12b-20, 13a-1 and 13a-13 thereunder**
13                         **(Against Defendant Island Pacific)**
                        **Aiding and Abetting Issuer Reporting Violations**
14                         **(Against Schechter, Furman and Braun)**

15         61.    The Commission realleges and incorporates by reference paragraphs 1 through 54

16  above.

17         62.    Defendant Island Pacific violated Section 13(a) of the Exchange Act, 15 U.S.C. §

18  78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 15 U.S.C. §§ 240.12b-20, 240.13a-1 &

19  240.13a-13, by filing with the Commission required periodic reports for the second and third

20  quarters of its fiscal year 2004 which failed to include material information necessary to make

21  the required statements, in light of the circumstances under which they were made, not

22  misleading.

23         63.    Defendants Schechter, Furman and Braun, and each of them, knowingly provided

24  substantial assistance to Island Pacific's violation of Section 13(a) of the Exchange Act and

25  Rules 12b-20 and 13a-13 thereunder; and defendants Schechter and Furman, and each of them,

26  knowingly provided substantial assistance to Island Pacific's violation of Section 13(a) of the

27  Exchange Act and Rules 12b-20 and 13a-1 thereunder.

28  ///

64.    By engaging in the conduct described above, defendant Island Pacific violated, and unless restrained and enjoined will continue to violate, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 15 U.S.C. §§ 240.12b-20, 240.13a-1 & 240.13a-13.

65.    By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendants Schechter, Furman and Braun aided and abetted Island Pacific's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-13; and defendants Schechter and Furman aided and abetted Island Pacific's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-1 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-1.

### FOURTH CLAIM FOR RELIEF
#### Record-Keeping Violations
**Violations of Section 13(b)(2)(A) of the Exchange Act**
**(Against Defendant Island Pacific)**
**Violations of Rule 13b2-1 thereunder**
**(Against Defendants Schechter, Furman and Braun)**

66.    The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

67.    By engaging in the conduct described above, defendant Island Pacific violated Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), by failing to make or keep books, records and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.   Unless restrained and enjoined, defendant Island Pacific will continue to violate Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78(b)(2)(A).

68.    By engaging in the conduct described above, defendants Schechter, Furman and Braun violated Exchange Act Rule 13b2-1 by, directly or indirectly, falsifying or causing to be falsified Island Pacific's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act.   Unless restrained and enjoined, defendants Schechter, Furman and Braun will

1    continue to violate Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

2                              **FIFTH CLAIM FOR RELIEF**
                              **Misrepresentations To Accountants**
3                          **Violations of Exchange Act Rule 13b2-2**
                       **(Against Defendants Schechter, Furman and Braun)**
4

5        69.    The Commission realleges and incorporates by reference paragraphs 1 through 54

6    above.

7        70.    Defendants Schechter, Furman and Braun, by engaging in the conduct described

8    above, directly or indirectly:

9            a.    made or caused to be made materially false or misleading statements to

10                accountants in connection with; or

11           b.    omitted to state, or caused another person to omit to state, material facts

12                necessary in order to make statements made, in light of the circumstances

13                under which such statements were made, not misleading, to accountants in

14                connection with:

15                i.    an audit, review or examination of the financial statements of the

16                      issuer required to be made; or

17                ii.   the preparation or filing of a document or report required to be

18                      filed with the Commission.

19       71.    By engaging in the conduct described above, defendants Schechter, Furman and

20   Braun violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule

21   13b2-2, 17 C.F.R. § 240.13b2-2.

22                              **SIXTH CLAIM FOR RELIEF**
                              **Internal Control Violations**
23                    **Violations of Section 13(b)(2)(B) of the Exchange Act**
                              **(Against Defendant Island Pacific)**
24                    **Violations of Section 13(b)(5) of the Exchange Act**
                       **(Against Defendants Schechter, Furman and Braun)**
25

26       72.    The Commission realleges and incorporates by reference paragraphs 1 through 54

27   above.

28       73.    Defendant Island Pacific, by engaging in the conduct described above, failed to

                                            22

1 devise and maintain a system of internal accounting controls sufficient to provide reasonable

2 assurances that:

3       a.    transactions were executed in accordance with management's general or

4                specific authorization;

5       b.    transactions were recorded as necessary (i) to permit preparation of

6                financial statements in conformity with generally accepted accounting

7                principles or any other criteria applicable to such statements, and (ii) to

8                maintain accountability for assets;

9       c.    access to assets was permitted only in accordance with management's

10                general or specific authorization; and

11       d.    the recorded accountability for assets was compared with the existing

12                assets at reasonable intervals and appropriate action was taken with respect

13                to any differences.

14     74.    Defendants Schechter, Furman and Braun, by engaging in the conduct described

15 above, knowingly circumvented or knowingly failed to implement a system of internal

16 accounting controls or knowingly falsified books, records, or accounts described in Section

17 13(b)(2) of the Exchange Act.

18     75.    By engaging in the conduct described above, defendant Island Pacific violated,

19 and unless restrained and enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange

20 Act, 15 U.S.C. § 78m(b)(2)(B); and defendants Schechter, Furman and Braun violated, and

21 unless restrained and enjoined will continue to violate, Section 13(b)(5) of the Exchange Act, 15

22 U.S.C. § 78m(b)(5).

**SEVENTH CLAIM FOR RELIEF**
**False Certification Violations**
**Violations of Exchange Act Rule 13a-14**
**(Against Defendants Furman and Braun)**

26     76.    The Commission realleges and incorporates by reference paragraphs 1 through 54

27 above.

28     77.    Defendants Furman and Braun, by engaging in the conduct described above,

1  falsely certified, among other things, that Island Pacific's 2004 second and third quarter Forms

2  10-Q fully complied with the requirements of the Exchange Act and fairly presented, in all

3  material respects, the financial condition and results of operations of the Company, when, in fact,

4  the reports contained untrue statements of material fact and omitted material information

5  necessary to make the reports not misleading.

6      78.    By engaging in the conduct described above, defendants Furman and Braun

7  violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13a-14,

8  17 C.F.R. § 240.13a-14.

## PRAYER FOR RELIEF

10     WHEREFORE, the Commission respectfully requests that the Court:

### I.

12     Issue findings of fact and conclusions of law that defendants committed the alleged

13  violations.

### II.

15     Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining

16  defendant Island Pacific, Inc., and its officers, agents, servants, employees and attorneys, and

17  those persons in active concert or participation with any of them, who receive actual notice of the

18  judgment by personal service or otherwise, from violating Sections 10(b), 13(a), 13(b)(2)(A) and

19  13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) & 78m(b)(2)(B),

20  and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20,

21  240.13a-1 & 240.13a-13.

### III.

23     Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining

24  defendant Schechter and his agents, servants, employees and attorneys, and those persons in

25  active concert or participation with any of them, who receive actual notice of the judgment by

26  personal service or otherwise, from violating Section 17(a) of the Securities Act, 15 U.S.C. §

27  77q(a), and Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78m(b)(5),

28  and Rules 10b-5, 13b2-1 and 13b2-2 thereunder, 17 C.F.R. §§ 240.10b-5, 240.13b2-1 &

240.13b2-2, and from aiding and abetting any violation of Section 13(a) of the Exchange Act, 15

U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20,

240.13a-1 & 240.13a-13.

**IV.**

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining

defendant Furman and his agents, servants, employees and attorneys, and those persons in active

concert or participation with any of them, who receive actual notice of the judgment by personal

service or otherwise, from violating Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C.

§§ 78j(b) & 78m(b)(5), and Rules 10b-5, 13b2-1, 13b2-2 and 13a-14 thereunder, 17 C.F.R.

§§ 240.10b-5, 240.13b2-1, 240.13b2-2 & 240.13a-14, and from aiding and abetting any violation

of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13

thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-13.

**V.**

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining

defendant Braun and his agents, servants, employees and attorneys, and those persons in active

concert or participation with any of them, who receive actual notice of the judgment by personal

service or otherwise, from violating Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C.

§§ 78j(b) & 78m(b)(5), and Rules 10b-5, 13b2-1, 13b2-2 and 13a-14 thereunder, 17 C.F.R.

§§ 240.10b-5, 240.13b2-1, 240.13b2-2 & 240.13a-14, and from aiding and abetting any violation

of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-13

thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-13.

**VI.**

Order defendant Schechter to disgorge all ill-gotten gains from his illegal conduct,

together with prejudgment interest thereon.

**VII.**

Order defendant Schechter to pay civil penalties under Section 20(d) of the Securities

Act, 15 U.S.C. § 77t(d), and defendants Schechter, Furman and Braun to pay civil penalties

under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

25

**VIII.**

Enter an order against defendant Schechter pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and defendants Schechter, Furman and Braun pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting each of them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

**IX.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**X.**

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  September 4, 2008

JANET E. MOSER
Attorney for Plaintiff
Securities and Exchange Commission

**ORIGINAL**

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED

**I. (a) PLAINTIFFS**

SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**

2008 SEP 14 PM 12: 21

RETAIL PRO, INC. (fka Island Pacific, Inc.), BARRY M. SCHECHTER, RAN H. FURMAN, and HARVEY BRAUN

**(b)** County of Residence of First Listed Plaintiff _____

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  San Diego County

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

DEPUTY

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Karen Matteson and/or Donald W. Searles    (323) 965-3998
Securities and Exchange Commission
5670 Wilshire Blvd., 11th Floor, Los Angeles, CA 90036

Attorneys (If Known)

See attachment '08 CV 1620 WQH RBB

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | | | |
|---|---|---|---|
| ☒ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ 1 | Original Proceeding | ☐ 2 | Removed from State Court | ☐ 3 | Remanded from Appellate Court | ☐ 4 | Reinstated or Reopened | ☐ 5 | Transferred from another district (specify) | ☐ 6 | Multidistrict Litigation | ☐ 7 | Appeal to District Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
See attachment.

Brief description of cause:
The Complaint alleges violations of the federal securities laws.

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 09/04/2008

SIGNATURE OF ATTORNEY OF RECORD
Karen Matteson

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.     **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.     **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.     **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**           Example:           U.S. Civil Statute: 47 USC 553
                                                                  Brief Description: Unauthorized reception of cable service

VII.     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.     **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

<u>**SEC v. Retail Pro, Inc., et al.**</u>
**United States District Court – Southern District of California**
**(LA-3093)**

<u>Attachment to Civil Cover Sheet</u>

**I(c)**    <u>**Attorneys for Defendants**</u>

Robert A. Robertson, Esq.
Dechert LLP
4675 MacArthur Court, Suite 1400
Newport Beach, CA 92660-8842
Telephone: (949) 442-6000
*Attorney for Defendant Retail Pro, Inc.*

John W. Cotton, Esq.
Cotton & Gundzik LLP
624 S. Grand Avenue, 22nd Floor
Los Angeles, CA 90017
Telephone: (213) 312-1330
*Attorney for Defendant Barry Schechter*

Michael A. Piazza, Esq.
Dorsey & Whitney LLP
38 Technology Drive, Suite 100
Irvine, CA 92618-5310
Telephone: (949) 932-3600
*Attorney for Defendant Ran H. Furman*

Michael H. Diamond, Esq.
Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017-5735
Telephone: (213) 892-4000
*Attorney for Defendant Harvey Braun*

**VI.**    <u>**Cause of Action (U.S. Civil Statute)**</u>

15 U.S.C. § 77q(a) (against Schechter); 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 thereunder (against all Defendants); 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-13 thereunder (against Retail Pro) and aiding and abetting issuer reporting violations (against Schechter, Furman and Braun); 15 U.S.C. § 78m(b)(2)(A) (against Retail Pro) and 17 C.F.R. § 240.13b2-1 thereunder (against Schechter, Furman and Braun); 17 C.F.R. § 240.13b2-2 (against Schechter, Furman and Braun); 15 U.S.C. § 78m(b)(2)(B) (against Retail Pro) and 15 U.S.C. § 78m(b)(5) (against Schechter, Furman and Braun); and 17 C.F.R. § 240.13a-14 (against Furman and Braun)