1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  SECURITIES AND EXCHANGE
    COMMISSION,                                    CASE NO. 08cv1620-WQH-RBB
12
                              Plaintiff,           ORDER
13
          vs.
14  RETAIL PRO, INC. (fka Island Pacific,
    Inc.), BARRY M. SCHECHTER, RAN
15  H. FURMAN, and HARVEY BRAUN,

16                            Defendants.

HAYES, Judge:

17
          The matter before the Court is the Motion for Summary Judgment filed by Plaintiff
18
    Securities and Exchange Commission ("SEC" or "Commission") against Defendant Ran H.
19
    Furman.  (Doc. # 33).
20
**I.      Background**
21
          On September 4, 2008, the SEC initiated this action by filing a Complaint in this Court.
22
    (Doc. # 1).  The Complaint alleges:
23
                3.      This case involves a fraudulent scheme by Island Pacific, Inc.
24          ('Island Pacific' or the 'Company') and its then senior management to overstate
            the Company's financial results for the quarters ended September 20, 2003 ('Q2
25          2004'), and December 31, 2003 ('Q3 2004'), and its fiscal year ended March 31,
            2004 ('FY 2004').  The Company's senior management responsible for the fraud
26          were defendants Barry M. Schechter ..., a controlling person and *de facto*
            officer; Ran H. Furman ..., the Chief Financial Officer; and Harvey Braun ..., the
27          Chief Executive Officer.
28                4.      In Q2 2004, Schechter, Furman and Braun caused Island Pacific
            to improperly record and report $3.9 million in revenue from a sham transaction

- 1 -                                              08cv1620-WQH-RBB

with an Australian software company, QQQ Systems Pty Limited ('QQQ'). The transaction had no economic substance or business purpose and instead was entered into in order to artificially inflate Island Pacific's revenues reported in its financial statements. Subsequently, in the third quarter, Island Pacific improperly recorded an offsetting transaction whereby it purchased from QQQ $3.9 million of software. In fact, no contract finalizing this offsetting transaction was signed until the fourth quarter. Island Pacific and QQQ never exchanged any money as a result of these offsetting agreements. In addition, neither Island Pacific nor QQQ made any effort to sell the other's software or to determine the fair market value of their software licensing rights as required by applicable accounting principles.

5.     As a result of improperly recognizing and reporting the $3.9 million as revenue, Island Pacific overstated its revenues by 140% for Q2 2004, 29% for the nine months ending Q3 2004, and 22% for the 2004 fiscal year, and reported a small profit instead of a massive loss for Q2 2004. The defendants also failed to disclose the sham nature of the QQQ transaction and actively concealed their fraud from Island Pacific's outside auditors, and the public, by creating forged and/or fabricated documents which they used in an attempt to demonstrate that the recognition of revenue from the transaction was proper. Additionally, Furman fired a company whistleblower who expressed concern in an email that the offsetting transactions were 'structured in a manner that is intended to inflate revenues for the purpose of boosting the corporation's share price.'

6.     As part of the fraudulent scheme, Schechter sold 637,750 shares of Island Pacific stock, receiving $488,410 in ill-gotten gains.

7.     By engaging in this conduct, the defendants variously violated and aided and abetted violations of the antifraud, issuer reporting and record-keeping, internal controls, and prohibition against misrepresentations to accountants provisions of the federal securities laws. The Commission seeks to obtain injunctions from future violations, civil penalties, and officer and director bars against Schechter, Furman, and Braun, and additionally to obtain disgorgement of ill-gotten gains from Schechter.

(Doc. # 1 ¶¶ 3-7). The Complaint alleges the following claims: (1) fraud in the offer or sale of securities against Schechter pursuant to 15 U.S.C. § 77q(a); (2) fraud in connection with the purchase or sale of securities against all Defendants pursuant to 15 U.S.C. § 78j(b); (3) violations of issuer reporting requirements against Defendant Retail Pro, Inc. formerly known as Island Pacific, Inc. ("Island Pacific") and aiding and abetting issuer reporting violations against the individual Defendants pursuant to 15 U.S.C. § 78m(a); (4) record-keeping violations against all Defendants pursuant to 15 U.S.C. § 78m(b)(2)(A) and related regulations; (5) misrepresentations to accountants against the individual Defendants pursuant to 17 C.F.R. § 240.13b2-2; (6) internal control violations against all Defendants pursuant to 15 U.S.C. § 78m(b)(2)(B) and related regulations; and (7) false certification violations against Furman and

Braun pursuant to 17 C.F.R. § 240.13a-14.

On September 4, 2008, Defendants Schechter, Braun and Island Pacific each entered appearances, waived service of process, and consented to the entry of final judgment. (Doc. # 3, 4, 5). The consent to the entry of final judgment signed by Schechter states:

> Without admitting or denying the allegations of the complaint ..., Defendant hereby consents to the entry of the Final Judgment in the form attached hereto ..., which ... permanently enjoins and restrains Defendant from [Securities Act] violation[s] ...; ... orders Defendant to pay disgorgement in the amount of $488,410 ...; ... orders Defendant to pay a civil penalty in the amount of $120,000 ...; and ... bars Defendant from serving as an officer or director of a public company for a period of ten years....

(Doc. # 5 ¶ 2). The consent to the entry of final judgment signed by Braun states:

> Without admitting or denying the allegations of the complaint ..., Defendant hereby consents to the entry of the Final Judgment in the form attached hereto ..., which ... permanently enjoins and restrains Defendant from [Securities Act] violation[s] ...; ... orders Defendant to pay a civil penalty in the amount of $75,000 ...; and ... bars Defendant from serving as an officer or director of a public company for a period of five years....

(Doc. # 4 ¶ 2). The consent to the entry of final judgment signed by Island Pacific's general counsel states: "Without admitting or denying the allegations of the complaint ..., Defendant hereby consents to the entry of the Final Judgment in the form attached hereto ..., which ... permanently enjoins and restrains Defendant from [Securities Act] violation[s] ...." (Doc. # 3 ¶ 2).

On October 8, 2008, Furman filed an Answer to the Complaint and Jury Demand. (Doc. # 9).

On October 15, 2008, the Court entered final judgments against Island Pacific, Schechter and Braun, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. (Doc. # 12, 14, 16).

On August 10, 2009, the SEC filed the Motion for Summary Judgment against Furman, the sole remaining Defendant. (Doc. # 33).

On September 14, 2009, Furman filed a response in opposition to the Motion for Summary Judgment. (Doc. # 36). On September 16, 2009, Furman filed Objections to the SEC's evidence proffered in support of the Motion for Summary Judgment. (Doc. # 40).

On September 25, 2009, the SEC filed a reply. (Doc. # 41).

On October 13, 2009, the Court heard oral argument on the Motion for Summary Judgment.  (Doc. # 43).

## II.    Facts

### A.    The Parties

At all relevant times, Island Pacific, a Delaware Corporation, was headquartered in Irvine, California, and also had offices in La Jolla, California.  (Undisputed Fact # 5).[1]  During all relevant times, Island Pacific developed and sold computer software to the retail industry. (*Id.*)  During the relevant period, Island Pacific's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the American Stock Exchange.  (*Id.*)

Defendant Schechter founded Island Pacific (then known as SVI Solutions, Inc.) in 1994 and, at various times, has been its Chief Executive Officer ("CEO") and its Chairman of the Board of Directors.  (Undisputed Fact # 6).  During the relevant period, Schechter was designated as a consultant to Island Pacific.  (*Id.*)  Defendant Braun was Island Pacific's CEO from April 2003 to April 2004, and the Chairman of the Board of Directors from July 2003 to February 2004.  (Undisputed Fact # 7).  Braun and Steven Beck, Island Pacific's President, were the "daily operators" of Island Pacific during the relevant time.  (Furman Test. at 52, Furman Ex. 77).

Defendant Furman was a CPA in Washington State but allowed his CPA license to expire in 1993.  (Undisputed Fact # 3).  From 1990 to 1992, Furman worked for the accounting firm Deloitte & Touche, where he participated in audits of public companies.  (*Id.*)  From approximately 2001 to 2003, Furman was Chief Financial Officer ("CFO") of Edigital, a public company.  (Undisputed Fact # 2).  Furman was the CFO of Island Pacific from September 2003 to January 2005.  (Undisputed Fact # 1).

---

[1]  In support of the Motion for Summary Judgment, the SEC submitted a Statement of Material Facts in a numbered-paragraph format.  (Doc. # 33-3).  Furman submitted a Statement of Genuine Issues of Material Fact responding to each numbered paragraph in the SEC's Statement of Material Facts.  (Doc. # 36-2).  Any paragraph in the Statement of Material Facts which is not disputed by Furman and is supported by the cited evidence is cited herein as an "Undisputed Fact."

**B.     License Agreement**

In September 2003, Island Pacific and QQQ, a newly-formed Australian corporation, negotiated a software license agreement (the "License Agreement"). (Furman Decl., Doc. # 36-3, ¶ 16; Furman Dep. at 74, Pl.'s Ex. 3).[2]  Defendant Schechter negotiated the License Agreement on behalf of Island Pacific, and Shaun Rosen, the CEO of QQQ, negotiated the License Agreement on behalf of QQQ. (Rosen Dep. at 43, Furman Ex. 3; Furman Decl., Doc. # 36-2, ¶ 16).  Furman had no involvement in the negotiation of the License Agreement. (Rosen Dep. at 43-44, Furman Ex. 3; Furman Decl. ¶ 16, Doc. # 36-2).

On September 25, 2003, Defendant Braun sent Rosen a letter, which states:

> This letter serves to confirm that Island Pacific is currently in negotiations with QQQ to acquire the rights to certain intellectual property owned and held by QQQ.
>
> Island Pacific is simultaneously negotiating the sale of its point of sale division to QQQ and has completed the sale of an unrestricted license to QQQ of Island Pacific's enterprise application, version 1.5.
>
> This letter further confirms that the payment terms extended to QQQ for the sale of version 1.5 will be changed to coincide with the closing of the other transactions  contemplated in this letter, when completed.

(Pl.'s Ex. 10 at 222; Rosen Dep. at 75, Pl.'s Ex. 6).  Schechter asked Braun to sign the letter; Braun "presume[d]" that the letter was drafted by Schechter. (Braun Dep. at 17-18, Moser Decl. Ex. 2, Doc. # 41-4).  Rosen testified that he has never spoken to Braun, and he has not had "any contact whatsoever with Furman." (Rosen Dep. at 44, 76, Pl.'s Ex. 6).  Furman states in his affidavit:

> In 2003, I had no knowledge of a letter dated September 25, 2003 from Braun to Shaun Rosen.... I was never told that there was an agreement or letter sent to Mr. Rosen that indicated payments due from QQQ would coincide with payments due to QQQ.  The first time I saw or had knowledge of such a letter ... was when the SEC presented it to me for review while taking my investigative testimony in March 2007.

(Furman Decl., Doc. # 36-3, ¶ 14).

Furman signed a version of the License Agreement on behalf of Island Pacific. (Pl.'s

---

[2]  All cited exhibits submitted by the SEC are cited as "Pl.'s Ex." and are located at Docket number 34.  All cited exhibits submitted by Furman are cited as "Furman Ex." and are located at Docket number 36.

Ex. 8 at 197; Furman Dep. at 79-80, Pl.'s Ex. 3). The version of the License Agreement signed by Furman granted QQQ a non-exclusive license to distribute Island Pacific's "Host Retail Merchandising Program" software ("Host software") in Australia and New Zealand.[3] (Pl.'s Ex. 8 at 194-98).

The SEC contends:

> Although Furman, on behalf of Island Pacific, and Shaun Rosen ..., on behalf of QQQ, signed the same signature page of the License Agreement, Rosen signed a different version of the License Agreement than the one pursuant to which revenue was recognized by Island Pacific. Specifically, according to the terms of the License Agreement executed by QQQ, QQQ agreed to pay Island Pacific, at QQQ's option, *either*: (1) $3.25 million in two equal installments of $1.625 million on November 15, 2003, and December 31, 2003; or (2) 20% of QQQ's net sublicensing fees to a maximum of $4 million. In contrast, Exhibit B to the License Agreement which bears the signatures of both Rosen and Furman provided that QQQ would pay *both* (1) $3.25 million in two equal installments of $1.625 million on November 15, 2003 and December 31, 2003; *and* (2) per copy royalty payments for a period of thirty-six months. Unlike the rest of the License Agreement, Exhibit B to the latter version does not bear the fax footprint which is on each of the remaining pages, and which sets forth the date of September 29, 2003, the name "Shaun Rosen," and Rosen's home fax number. In fact, Rosen never agreed to the terms set forth in this version of Exhibit B.

(SEC's Statement of Material Facts ¶ 10 (emphasis in original) (citing Pl.'s Ex. 6, Rosen Dep. at 50-51, 67-69; Pl's Ex. 7; Pl.'s Ex. 8), Doc. # 33-3).

Furman contends:

> Shaun Rosen ... in fact did agree to the terms requiring payment of (1) $3.25M *and* (2) royalty payments of 10% for 36 mos. as evidenced by his signature to the ... License ... Agreement entered into September 19, 2003. [Pl.'s Ex. 8] is a separate agreement from [Pl.'s Ex. 7] evidenced by the fact that there is no colon after the word 'By' on the signature page of [Pl.'s Ex. 8], while there is a colon in the same location in [Pl.'s Ex. 7]. Furman is certain that when [Island Pacific] recorded revenue for the License Agreement for the quarter ended September 30, 2003, that [Island Pacific] had a signed agreement documenting the $3.9 million sale price.

(Furman's Statement of Genuine Issues at 5 (emphasis in original) (citing Pl's Ex. 7; Pl.'s Ex. 8; Furman Decl. ¶ 13 ("When [Island Pacific] recorded revenue for the Second Quarter 2004, I believed that [Island Pacific] had an agreement signed during that quarter documenting the

---

[3] According to Rosen, the Host software is the software referenced in Braun's September 25, 2003 letter as "Island Pacific's enterprise application, version 1.5." (Rosen Dep. at 76, Pl.'s Ex. 6). Rosen testified that he envisioned QQQ distributing Island Pacific's Host software to the largest retailers in Australia. (Rosen Dep. at 46-47, Furman Ex. 3).

$3.9 million sale price."), Doc. # 36-2; Pl.'s Ex. 35)).[4]

On September 30, 2003, Island Pacific shipped software to QQQ in accordance with the License Agreement.  (Rosen Dep. at 62, Pl's Ex. 6.)  Furman believed this shipment included "both the Host Retail Merchandise Software and the Direct Software," and "the cost of the shipment was included in the $3.9 million dollar software sales price."  (Furman Decl., ¶ 15, Doc. # 36-3).

On October 3, 2003, Furman sent an email to Schechter and Braun with a subject line, "Revenue forecast for Q2," which states: "Currently, we have booked $5.22mm revenues for the quarter (including $3.25mm for QQQ)."  (Pl.'s Ex. 11).

On October 10, 2003, Furman sent an email to Schechter.  (Pl.'s Ex. 12).  Attached to the email is an unsigned copy of the License Agreement, which grants QQQ a license to distribute two Island Pacific programs, "Host" and "Direct," and provides that QQQ agrees to pay Island Pacific $3.05 million for Host and $650,000 for Direct, payable in two equal installments due on November 15, and December 31, 2003, plus 10% of QQQ's net sublicensing fees.  (Pl.'s Ex. 12 at 233).  Furman's email to Schechter states:

> Barry, in the spirit (and language) of the original executed document, the only thing we did was change Exhibit A and B to broaden the definition of 'Software' to include Direct, in addition to [Island Pacific] Host.  Exhibit B (License and Royalties) also has 2 sections to it - [Island Pacific] Host and Direct.  Since everything else is the same and consistent, this is the easiest and I believe the cleanest way to do this.  If you want us to change it, please let us know.

(Pl.'s Ex. 12 at 227).

October 10, 2003, Joseph Dietzler, Island Pacific's Contract Administrator, sent an email to Furman and Schechter stating, "Gents, Please ensure that the attached version of the QQQ license is used.  The only changes are to the Exhibits and the exec summary.  No one had advised me that the Merchandising license fee was increased from 3,050,000 to 3,250,000.

---

[4]  Plaintiff's Exhibit 7 is a copy of the License Agreement signed only by Rosen and providing that QQQ agreed to pay Island Pacific "a one time License Fee of $3,250,000 either (A) in two equal installments of $1,625,000 each or (B) for a period of 36 months a royalty fee if 20% of QQQ's sublicensing fee[s] ... to a maximum of $4 million."  (Pl.'s Ex. 7 at 184).  Plaintiff's Exhibit 8 is a copy of the License Agreement signed by both Rosen and Furman and providing that QQQ would pay "a one time License Fee of $3,250,000 in two installments of $1,625,000 each, and for a period of 36 months an additional per copy royalty fee of 10% of QQQ's sublicensing fee to its customers."  (Pl.'s Ex. 8 at 193).

1  When I added the Direct program to the license, I was using a draft with the old figure for

2  Merchandising." (Furman Ex. 71 at 1098; Dietzler Test. at 17-18, Pl.'s Ex. 30). Furman

3  responded with an email to Schechter and Dietzler: "Thanks. Barry [Schechter], from my side,

4  we have already booked $3.25mm and I plan to book the additional $650k as well. Please

5  make sure these are correct." (Furman Ex. 71 at 1098).

6      On Friday, October 10, 2003 at 4:41 p.m., Jacqueline Tran, Island Pacific's Controller,

7  sent an email to Furman stating, "When can we book the additional revenue?" (Pl.'s Ex. 13A

8  at 234; Tran Decl. ¶¶ 2-3). Furman replied to Tran three minutes later, stating: "We amended

9  the agreement." (Pl.'s Ex. 13A at 234). On Monday, October 13, 2003, Tran replied: "Do you

10 have the revised agreement?" (*Id.*) On October 13, 2003, Furman replied: "This should have

11 both parts." (*Id.*) Attached to Furman's October 13, 2003 email was an unsigned copy of the

12 License Agreement, with the same provisions as the copy attached to Furman's October 10,

13 2003 email to Schechter, except QQQ is required to pay Island Pacific $3.25 million for Host

14 and $650,000 for Direct, payable in two equal installments due on November 15, and

15 December 31, 2003, plus 10% of QQQ's net sublicensing fees. (Pl.'s Ex. 13A at 241).

16     Furman testified that it was his understanding that the final "sale price of $3,900,000"

17 in the License Agreement "was arrived at prior to the close of September 30, 2003." (*Id.* at

18 98). When asked if the "final sale price" was "documented as of September 30, 2003,"

19 Furman responded, "That I'm not sure of." (*Id.*) Furman states in his affidavit:

20        I understood the document marked as [Pl's Ex. 8] to be the authoritative license
          agreement, as of September 30, 2003, between [Island Pacific] and QQQ
21        Systems Pty Limited ..., with the exception that [Pl's Ex. 8] <u>did not</u> accurately
          represent the details of the License Agreement as negotiated between [Island
22        Pacific] and QQQ, while [Pl's Ex. 13A, i.e., the version of the License
          Agreement attached to Furman's October 13, 2003 e-mail to Tran] <u>did</u> present
23        the details of the License Agreement between [Island Pacific] and QQQ as of
          September 20, 2003.... The License Agreement granted QQQ a license to
24        distribute both Host Retail Merchandise Software ... and the Direct Software....
          Specifically, I understood the agreed upon terms of the License Agreement, as
25        of September 30, 2003, granted QQQ a license to distribute both Host and Direct
          software, and required that QQQ pay [Island Pacific] $3.25 million for Host and
26        $650,000 for Direct (payable in two equal installments due on November 15,
          and December 31, 2003), plus 10% of QQQ's net sublicensing fees.... When
27        [Island Pacific] recorded revenue for the Second Quarter 2004, I believed [Island
          Pacific] had an agreement signed during that quarter documenting the $3.9
28        million sale price.

(Furman Decl. ¶¶ 11-13 (emphasis in original), Doc. # 36-3).

"As far as [Furman] knew," QQQ was a newly formed corporation with no payment history with Island Pacific.  (Furman Dep. at 74, Pl.'s Ex. 3).  Furman did not review QQQ's financial statements or perform any other due diligence to determine whether QQQ had any ability to pay the $3.9 million.  (Furman Dep. at 19, 22 & 40, Pl.'s Ex. 3.)  Instead, Furman relied on representations by Schechter that the funds were collectable from QQQ.  (*Id*. at 20-21; Furman Decl., Doc. # 36-3, ¶ 16).  In September 2003, Schechter told Furman:

> (1) that he had known Mr. Rosen (the CEO of QQQ) and the principals of QQQ for many years, and that they had done business together; (2) that Mr. Rosen was a majority shareholder in QQQ and had made a large investment into QQQ; (3) that Mr. Rosen was a very wealthy individual; and (4) that QQQ was looking to grow into a larger company.

(Furman Decl., Doc. # 36-3, ¶ 16).  "As of September 2003, [Furman] believed that (1) QQQ had access to sufficient funds to honor the terms of the License Agreement on the required due dates, (2) ... QQQ intended to pay, and (3) ... Rosen had the ability to pay on behalf of QQQ, if needed."  (*Id*. ¶ 17).  Rosen testified that he could not recall having entered into an agreement with Island Pacific to pay $650,000 for Island Pacific's Direct software.  (Rosen Dep. at 73, Pl.'s Ex. 6).  Rosen testified that QQQ "never had that kind of cash" necessary to pay a $3.9 million invoice.  (*Id*. at 66).

On November 11, 2003, Braun, Furman and Tran signed a management representation letter sent to Island Pacific's auditors in connection with the auditors' review of the Company's financial statements for its quarter ended September 30, 2003 (i.e., Q2 2004).  (Furman Dep. at 168-69; Pl.'s Ex. 19.)  The letter states:

> We confirm, to the best of our knowledge and belief, the following representations made to you during your review:
>
> 1.   The interim financial information ... is presented in accordance with accounting principles generally accepted in the United States ....
>
> 6.   We have no knowledge of any fraud or suspected fraud affecting the Company involving Management ... [or] Employees who have significant roles in internal controls....
>
> 12.   There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information....

(Pl.'s Ex. 19 at 801-02).

On November 12, 2003, Island Pacific filed its quarterly report on Form 10-Q with the SEC for its quarter ended September 30, 2003 (i.e., Q2 2004). (Pl.'s Ex. 15). Tran provided "the numbers that [Island Pacific] put in the [Form 10-Q]" and then Furman supplied "pretty much all the verbiage" in Island Pacific's Form 10-Q. (Furman Test. at 57, Pl.'s Ex. 4). Furman signed the Form 10-Q, and signed a required certification which asserted that to his knowledge: (1) the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading; and (2) the Form 10-Q fairly presented, in all material respects, Island Pacific's financial condition and results of operations. (*Id.* at 180-81; Pl.'s Ex. 15 at 416-17, 419). Island Pacific's Q2 2004 Form 10-Q disclosed that the transaction with QQQ accounted for 46% of Island Pacific's accounts receivable, and 32% of Island Pacific's net sales for the six months ended September 30, 2003, and represented that the License Agreement was a one-time transaction. (Pl.'s Ex. 15 at 368, 395).

After the market closed on November 12, 2003, at or about 4:00 p.m. Eastern Standard Time ("EST"), Island Pacific announced its Q2 2004 financial results in a press release headlined "Company Reports 76% Increase in Revenues," which represented that Island Pacific earned $6.7 million in revenues—a 76% increase over revenues of $3.8 million for the same period in the previous year. (Pl.'s Ex. 20; Undisputed Fact # 31). Island Pacific also reported gross profit (revenues minus cost of goods sold) of $5.6 million, and income from continuing operations of $699,000. (Undisputed Fact # 31).

When Island Pacific issued a press release "that had some numbers attached to them," Tran "supplied the numbers to [Furman] ... and then a lot of times [Furman wrote] a lot of the verbiage concerning ... just the numbers themselves." (Furman Dep. at 68, Pl.'s Ex. 4). In his affidavit, Furman states:

> I was only partially involved in the drafting of the [earnings] press releases, as I received input, assistance and final approval from other parties.... Any figures I inserted into [Island Pacific]'s press releases for [Island Pacific]'s Second Quarter 2004, Third Quarter 2004 and Fiscal Year End 2004 were those taken from the financial statements, account reconciliations and/or draft 10-Qs or 10-Ks that had already been reviewed and signed off by the auditors....

As another 'check and balance,' [Island Pacific]'s Chief Executive Officer, attorneys, [Island Pacific] audit committee, auditors at SingerLewak and others would review and sign-off on both the earnings press releases and final 10-Qs and 10-Ks prior to publication. The figures inserted into IP's Second Quarter 2004, Third Quarter 2004 and Fiscal Year End 2004 public filings were all reviewed and signed-off on by the auditors and all of the above listed, including Mr. Schechter and Harvey Braun.

(Furman Decl. ¶¶ 9-10, Doc. # 36-3; *see also* Tran Decl. ¶¶ 5-6, Doc. # 36-4 (same)).

On November 12, 2003, at 4:30 p.m. EST, Island Pacific broadcast an earnings conference call with securities analysts and shareholders over the Internet. (Compl. ¶ 24, Doc. # 1; Furman Answer ¶ 24, Doc. # 9.) Furman was present and spoke during the earnings conference call. Furman spoke from a script, which he drafted. (Furman Test. at 69, Pl.'s Ex. 4). Furman stated, in part:

We reported revenues of approximately $6.7 million, a 75.9% increase versus revenues of $3.8 million for the year-earlier period.... The increase in gross profit [from $2.2 million in the same quarter in the prior year to $5.6 million] is due primarily to an increase in higher margin software sales and a reduction in professional services....

(Pl.'s Ex. 21 at 2-3; *see also* Furman Test. at 177, Pl.'s Ex. 4). During the November 12, 2003 earnings conference call, Braun stated:

We showed solid sequential revenue growth during the second quarter even while we took important steps to position the company for the second half of the year to ensure that we meet the Fiscal 2004 guidance we outlined in the first quarter and are reaffirming today.... [W]e expect to report annual sales revenues of $31 to $33 million ... which is the same guidance we announced during our first quarter call. Obviously this implies that we will generate significant third and fourth quarter revenues to reach this target. We are comfortable with those expectations....

(Pl.'s Ex. 21 at 5 & 8). Braun's comments were also from a script, which Furman, among others, reviewed in advance of the call. (Furman Test. at 70, Pl.'s Ex. 4). The QQQ transaction was not mentioned during the conference call. (Furman Test. at 178, Pl.'s Ex. 4).

On November 13, the day following the positive earnings release, Island Pacific's stock closed at $2.25, up 8.2% from the prior day's close, and trading volume increased to 1.75 million shares, up from the prior five-day average trading volume of 100,160 shares. (Undisputed Fact # 37).

## C.   Sublicense Agreement

Island Pacific and QQQ negotiated an agreement ("Sublicense Agreement") whereby

Island Pacific agreed to purchase a sublicense to market QQQ's "Pyramid" software for $3.9 million "payable on the Effective Date in the form of a set off against indebtedness of QQQ to [Island Pacific], plus revenue sharing...." (Undisputed Fact # 38; Pl.'s Ex. 24 at 858). The Sublicense Agreement is signed by Rosen on behalf of QQQ and Steven Beck, Island Pacific's President, on behalf of Island Pacific. (Pl.'s Ex. 24 at 867). The Sublicense Agreement is dated December 14, 2003, and states that its effective date is December 31, 2003. (*Id*. at 854-55).

As early as August 26, 2003 (prior to Furman joining Island Pacific), Schechter and Beck were interested in pursuing the Pyramid software for Island Pacific. (Furman Ex. 59). By September of 2003, Beck was directing Island Pacific employees to include the Pyramid software in Island Pacific's proposals to potential clients. (Furman Ex. 60, 61; Malik Dep. at 183, Furman Ex. 58). On September 16, 2003, Defendant Braun, Island Pacific's CEO, sent an email to multiple Island Pacific employees (but not Furman) referencing the "under development" "Pyramid system," and stating that Beck "is going to drive this oppty [sic]." (Furman Ex. 65 at 1065). According to Rosen, Island Pacific was selling the Pyramid software "into Island Pacific's customer base even before the [Sublicense] [A]greement was finalized." (Rosen Dep. at 195, Furman Ex. 3). QQQ's Pyramid software, version 1.0 was released in March of 2004. (Pl.'s Ex. 46 at 1408). As of March of 2004, version 1.1 of the Pyramid software, known as "The Island Pacific Version," was due in November of 2004. (*Id*.) However, "in the software industry people sell software that they don't have [because it's still under development]." (Malik Dep. at 181-82, Furman Ex. 58).

On January 16, 2004, Rosen sent Schechter an email, which stated: "1st draft of pyramid technology agreement[.] [L]et me have your comments." (Pl.'s Ex. 23 at 837). Attached to the email is an undated and unsigned version of the Sublicense Agreement, which contains different terms from the signed version dated December 14, 2003. (*Id*.). The "Sub-Licensing Fee" in the unsigned version is twenty million South African Rands. (*Id*. at 843).

On January 28, 2004, Tran, Island Pacific's Controller, sent Furman an email, with the subject "QQQ", which stated: "Do you have the latest copy so we can prepare the journal

entry?" (Pl.'s Ex. 26 at 879). On the same day, Furman forwarded Tran's email to Joseph Dietzler, Island Pacific's Contract Administrator, and asked him to forward "what you have for QQQ [to Tran] so she can book it"; and Dietzler responded to Tran, copying Furman, by forwarding an unsigned copy of the Sublicense Agreement (which is dated December 14, 2003 and contains the same terms as the signed version of the Sublicense Agreement). (*Id*.)

Furman testified that, "based on" the evidence recounted above, it does not "seem possible that there could have been a final agreement on December 31, 2003." (Furman Test. at 143, Pl.'s Ex. 5). However, Furman states in his affidavit: "I believed that the Technology Purchase Agreement between QQQ and [Island Pacific] ('Pyramid Sublicense Agreement') dated December 14, 2003 was finalized prior to December 31, 2003.... I was not aware that a 'first draft' of the Pyramid Sublicense Agreement was being circulated in January 2004." (Furman Decl. ¶¶ 18-19, Doc. # 36-3).

In a note initialed by auditors Sally Aubury and Marc Abrams on February 11, 2004, Aubrey wrote that "On 12/31/03 QQQ sold the licensing rights to market and sell Pyramid POS software in Europe and the U.S. to [Island Pacific]," and "Consideration was as follows[:] $3.9M (Paid by offsetting cost of technology against O/S." (Furman Ex. 25 at 482; Aubury Dep. at 108-11, Furman Ex. 13).

The Sublicense Agreement was recorded in Island Pacific's books and records as a $3.9 million asset, crediting (i.e., eliminating) the $3.9 million account receivable from QQQ based on the License Agreement. (Furman Test. at 137, Pl.'s Ex. 5). At the time, Furman thought "[i]t was odd" that "the product that Island Pacific was acquiring from QQQ was worth 3.9 million, which was the same amount as what Island Pacific was selling to QQQ." (Furman Dep. at 39-40, Pl.'s Ex. 3). According to Furman, "[a]t the same time, there was an agreement with QQQ on the Pyramid [software] ... that spelled it out that Island Pacific is buying this for 3.9 million." (*Id*. at 40). Furman states in his affidavit:

> The License Agreement and the Pyramid Sublicense Agreement were independent and separate agreements. When [Island Pacific] booked the License Agreement, I understood the transaction to be a firm and final sale not contingent on any other agreements. When [Island Pacific] purchased the Pyramid software via the Pyramid License Agreement, I believed that [Island Pacific] was acquiring an asset to be marketed internationally.

(Furman Decl. ¶ 20, Doc. # 36-3).

Joseph Dietzler was Island Pacific's Contract Administrator from September 2003 through February 2004. (Dietzler Test. at 17-18, Pl.'s Ex. 30). Dietzler was licensed as an attorney in Illinois, although he was not employed by Island Pacific as an attorney and he had no accounting expertise. (*Id*. at 17; Dietlzer Dep. at 33-34, Furman Ex. 78). Dietzler reported directly to Furman. (Dietzler Test. at 22, Pl.'s Ex. 30; Furman Test. at 155, Pl.'s Ex. 5). On multiple occasions, Dietzler disagreed with Steven Beck, Island Pacific's President. (Dietlzer Dep. at 55-56, Furman Ex. 78). Dietzler testified that "Steve was a hothead and I will pound anybody who is a hothead.... If you're being irrational, I'm going to tell you, 'You're out of line. You're irrational and you need to start thinking correctly.'" (*Id.* at 55).

On February 4, 2004, Dietzler, wrote an email to Furman, Schechter, Braun, Beck and one other Island Pacific employee. (Pl.'s Ex. 28). The subject of Dietzler's email was "Revenue Recognition." (*Id*. at 906). The email states:

> I have continuing concern[] that certain transactions involving the company QQQ appear to be structured in a manner that is intended to inflate revenues for the purpose of boosting the corporation's share price. The 'sale' to QQQ under the agreement entered into in late September 2003 creates such an appearance for the following reasons:
>
> - Substantial up-front fee for a distribution license, rather than a royalty stream
> - Revenue from the transaction comprises approximately 50% of entire quarter's revenue
> - Entered into at the close of a quarter in which revenues would have been far short of estimates, if not for the single transaction with QQQ
> - Extended payment terms were granted
> - To date, no payments have been received and are well past due
>
> Under another transaction, QQQ is selling product ownership and distribution rights to Island Pacific, and QQQ is to be compensated, in part, through debt forgiveness in amount roughly equal to the amount of the uncollected revenue that was recognized from the September sale to QQQ. Irrespective of the legitimacy of the foregoing transactions, the totality of the surrounding circumstances creates the appearance that the transactions were intended merely to boost  the reportable revenue of Island Pacific in the quarter ended September 2003. Further, the timing of the second QQQ transaction is in fact in the current quarter, not the quarter ended December 31, 2003. While the second transaction is not revenue, it must be reported in the current quarter (ending March 31, 2004), as it substantially impacts the corporation's receivables.
>
> To ensure compliance with financial reporting rules, it would seem

prudent that revenue recognition policies err on the conservative side, so as to avoid even the appearance of irregularity. Such practices will help ensure that the activities of the company do not precipitate potential allegations of improper accounting. I believe the transactions involving QQQ should be restructured in a manner that makes each entirely independent of the other. As payment has not [been] received for the September 2003 sale, that situation should be dealt with in accordance with routine accounting standards. I recommend that these transactions be given careful reconsideration by both senior management and the company's outside audit firm prior to release of any earnings report for the quarter ended December 31, 2003.

(*Id*.) "Prior to ... writing the e-mail," Dietzler "made it clear to" Furman "that [Dietzler] felt uncomfortable with all the negotiations that were happening between Island Pacific and QQQ." (Furman Test. at 156, Pl.'s Ex. 5). Furman understood that Dietzler was "alleging that there was a potential fraud." (Furman Dep. at 78, Pl.'s Ex. 3). Furman testified: "[Dietzler] talks about irrespective of [the] legitimacy of the foregoing transactions. ... [Dietzler] brought up the fact that ... it looks weird rather than these are just made-up transactions." (*Id*.)

On the day Deitzler sent this email, Schechter sent an email to each of the recipients of Dietzler's email stating that Schechter and Furman "are taking care of this." (Pl.'s Ex. 29 at 907). In his email, Schechter "asks that you do nothing until [Schechter] is able to speak with you personally." (*Id*.)

Furman testified that, on February 5, 2004 (i.e., the day after Dietzler sent his email), Dietzler "gave ... notice and I believe we actually ended up laying him off to make sure he collect[ed] unemployment when he left." (Furman Test. at 166, Pl.'s Ex. 5). On February 5, 2004, Furman signed a Separation Agreement and General Release of Claims whereby Island Pacific agreed to pay Dietzler a lump sum equaling four months salary (minus taxes) within eight days of execution of the Separation Agreement. (Furman Test. at 168, Pl.'s Ex. 5; Pl.'s Ex. 31 at 917.) In exchange, Dietzler agreed to release all claims against Island Pacific, to maintain "absolute confidentiality" of the Separation Agreement, and not to make or publish "derogatory" statements about Island Pacific. (Pl.'s Ex. 31at 917, 919.)

On February 12, 2004, Braun (Island Pacific's CEO), Furman and Tran (Island Pacific's Controller) signed a management representation letter which was sent to Island Pacific's auditors, SingerLewak, in connection with the auditors' review of the Island Pacific's financial statements for its quarter ended December 31, 2003 (i.e., Q3 2004). (Furman Test. at 57, Pl.'s

Ex. 5; Pl.'s Ex. 32).  The letter states:

> We confirm, to the best of our knowledge and belief, the following representations made to you during your review:
>
> 1.      The interim financial information ... is presented in accordance with accounting principles generally accepted in the United States ....
>
> 4.      There are no significant deficiencies, including material weaknesses, in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report interim financial data....
>
> 6.      We have no knowledge of any fraud or suspected fraud affecting the Company involving Management ... [or] Employees who have significant roles in internal controls....
>
> 7.      We have no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees....
>
> 12.     There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information....

(Pl.'s Ex. 32 at 923-24).

On February 13, 2004, Island Pacific announced its Q3 2004 financial results in a press release.  (Pl.'s Ex. 33).  In the press release, Island Pacific reported, for the three months ending December 31, 2003, revenues of $5.1 million and a loss from continuing operations of $346,000.  (*Id*. at 927).  In addition, Island Pacific reported, for the nine months ending December 31, 2003, revenues of $17.3 million and income from continuing operations of $688,000. (*Id*.)  Furman participated in reviewing and editing the press release; in particular, Furman provided the above-quoted numbers.  (Furman Test. at 67-68, Pl.'s Ex. 5).  Island Pacific included the $3.9 million License Agreement revenue in its nine-month summary. (Compl. ¶ 38, Doc. 1; Furman Answer ¶ 38, Doc. # 9).

On February 13, 2004, at 9:00 a.m. EST, Island Pacific broadcast an earnings conference call with securities analysts and shareholders over the Internet.  (Undisputed Fact # 55).  Furman and Braun each spoke during the earnings conference call, and Furman participated in reviewing and editing the earnings conference call script.  (*Id*.)  Furman stated:

> We reported revenues of approximately $5.1 million....
>
> We reported a loss from continuing operations of $346,000....

> We reported gross profits of $3.7 million.... As a percentage of revenues, gross profit increased to 72.5% from 69.5% in the year earlier period. The increase in gross profit is due primarily to a better mix of higher margin software sales and a reduction in professional services....

> For the 9 months ended December 31, 2003, we reported revenues of $17.3 million, a 9.3% increase versus the same period in fiscal 2003. We reported income from continuing operations of $638,000 versus a loss from continuing operations of $4 million for the same period last year....

(*Id.*; Pl.'s Ex. 34 at 932-33). During the same call, Braun stated:

> I take responsibility and am personally disappointed in the performance of the group for the third quarter.... It is imperative that you and the stockholders understand that this is a bump in the road.... To put the situation in perspective, Island Pacific lost over $40 million during a recent 3 year period and our performance over the first 9 months of this year reflects a $4 million plus swing in profitability....

(Pl.'s Ex. 34 at 933, 935-36).

On or about February 13, 2004, Island Pacific filed its quarterly report on Form 10-Q with the SEC for its third quarter ended December 31, 2003 (i.e., Q3 2004). (Pl.'s Ex. 16; Furman Test. at 58-59, Pl.'s Ex. 5). The February 13, 2004 Form 10-Q included revenues from the License Agreement. (Pl.'s Ex. 16 at 420, 428-29). Specifically, in a paragraph that Furman either drafted or reviewed, the Form 10-Q states that in December 2003, Island Pacific entered into an agreement to purchase software from QQQ for $3.9 million and that the $3.9 million purchase price was paid by offsetting it against the account receivable due from QQQ. (*Id.*; Furman Test. at 59-60, Pl.'s Ex. 5). Furman signed the Form 10-Q, and signed a required certification which asserted, that to his knowledge, (1) the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading; and (2) the Form 10-Q fairly presented, in all material respects, Island Pacific's financial condition and results of operations. (Pl.'s Ex. 16 at 490-91; Furman Test. at 59, Pl.'s Ex. 5).

Between Island Pacific's announcements of its Q2 2004 and Q3 2004 financial results, Island Pacific stock had traded between $1.75 and $2.90. (Undisputed Fact # 60). On February 13, the day of the third quarter earnings announcement, Island Pacific's stock closed at $1.43, down 32.5% from the prior day's close of $2.12, and more than 4.8 million shares

traded. (*Id.*). On February 17, the stock fell to $1.37, with more than 2.4 million shares traded. (*Id.*). Island Pacific's stock price continued to decline and was trading below $1 by May 2004. (*Id.*).

On March 9, 2004, Tran (Island Pacific's Controller) sent an unsigned copy of the License Agreement (which states the license fee for the Host and Direct software to be $3.9 million plus royalties) and the Sublicense Agreement (which is dated December 14, 2003) to an auditor at SingerLewak. (Pl.'s Ex. 9).

On March 18, 2004, Beck (Island Pacific's President) stated in an email that, "[t]he fact of the matter is that we got an incredible bargain on" QQQ's Pyramid software. (Furman Ex. 62 at 1057; Malik Dep. at 90-91, Furman Ex. 58). On April 7, 2004, an Island Pacific employee sent an email to Beck and others, indicating Island Pacific was still working with the Pyramid software. (Furman Ex. 63). Furman states in his Declaration: "To my knowledge, QQQ actively marketed [Island Pacific]'s product (obtained pursuant to the License Agreement) and negotiating with a larger retailer in Australia who was interested in using the product." (Furman Decl. ¶ 21, Doc. # 36-3).

On May 12, 2004, at the request of Island Pacific's auditors, Furman authored a memorandum to Island Pacific's Board of Directors to "document [Furman's] understanding of the QQQ transactions." (Furman Test. at 229, Pl.'s Ex. 5; Pl.'s Ex. 35). The memorandum begins:

> We've spent a lot of time detailing the events surrounding the sale of [Island Pacific] software to QQQ in September 2003 and the purchase of the Pyramid software from QQQ in December 2003. As you recall, the transactions were recorded as follows: (i) $3.9mm in license revenues in Q2 (we had a receivable at the end of Q2) and (ii) capitalization of $3.9mm for the Pyramid assets purchased (the receivable went down to zero while the capitalized assets increased to $3.9mm).

(Pl.'s Ex. 35 at 945). The memorandum then details the history of Harvey Braun (CEO of Island Pacific) and Steven Beck (President of Island Pacific) joining Island Pacific in 2002, and Schechter and QQQ negotiating the License Agreement in 2003. (*Id.* at 945-46). The memorandum continues:

> In anticipation of the first payment [under the License Agreement], [Rosen] informed [Beck] in early September that he had transferred money into QQQ.

During November, [Rosen] called to tell [Beck] that his controller had erroneously placed the funds he had transferred into a money market account that had a fixed redemption date of December 15, 2003. If he broke the term of this transaction he would have to pay an expensive penalty, greater than the interest earned. [Beck] calculated that we would lose the equivalent of $38,000 in interest by a late penalty, but agreed to the late payment provided that QQQ grant us at least $50,000 in support and development costs. [Rosen] agreed to provide 200 hours of such services to us, and [Beck], in turn, granted the extension to him.

In December, we agreed as a matter of convenience, to offset the $1.95mm payment due from QQQ totaling $3.9mm against the amount we owed to QQQ for the acquisition of the Pyramid software. ....

(*Id.* at 946). The memorandum details the history of the Pyramid software, and then states:

[Island Pacific] entered into an agreement with QQQ to acquire the Pyramid software in December 2003 for $3.9mm. During the first week of December, ... it appeared that the negotiations to acquire the Pyramid software would drag into the middle/end of December. As discussed previously, we decided to offset the purchase price of the Pyramid software against the amount QQQ owed us. This was documented in the purchase agreement....

(*Id.* at 947). Braun, Beck and the other two members of Island Pacific's Board of Directors signed the memorandum below a statement that said, "Please sign below to attest that you have read the document and it accurately captures the details regarding the consummation of the two separate transactions." (*Id.*; Furman Test. at 230-31, Pl.'s Ex. 5). Furman faxed the signed memorandum to the auditors on July 30, 2004. (Furman Test. at 230-31, Pl.'s Ex. 5).

"Most of the information" in the memorandum came from Braun and Beck. (Furman Test. at 229, Pl.'s Ex. 5; Furman Ex. 6). On May 3, 2004, Furman emailed to Schechter three sentences from the memorandum, including the sentence related to QQQ erroneously placing funds into a money market account, to "see if [Schechter] can fill in some of the blanks." (Furman Ex. 69 at 1088). Beside another sentence from the memorandum, Furman wrote to Schechter, "IS THIS ACCURATE." (*Id.*) Furman stated in an affidavit:

I, on behalf of [Island Pacific], demanded payment of QQQ via invoice after QQQ failed to make their first payment in November 2003, pursuant to the terms of the License Agreement. I also had at least one, if not more follow-up discussions with Mr. Schechter about the missed/late payment. Mr. Schechter told me that we had nothing to worry about and that QQQ would pay.

(Furman Decl. ¶ 21, Doc. # 36-3; see also Furman Dep. at 30, Furman Ex. 1). Furman testified that "around the November/December [2003] timeframe," he was first told that QQQ could not make the first payment according to the License Agreement because QQQ's controller had

erroneously deposited the funds into a money market account.  (Furman Test. at 233, Pl.'s Ex. 5).  Rosen testified that the statements in the memorandum indicating that QQQ erroneously placed funds into a money market account were false.  (Rosen Dep. at 74-75, Pl.'s Ex. 6).

Island Pacific announced its FY 2004 financial results in a June 29, 2004, press release, earnings call, and Form 10-K, for its fiscal year ended March 31, 2004.  (Pl.'s Ex. 37 (Earnings Release); Pl.'s Ex. 38 (earnings call transcript); Pl.'s Ex. 17 (2004 10-K)).  Furman participated in reviewing and editing the press release and the earnings conference call script.  (Furman Test. at 68-70, Pl.'s Ex. 4.)  Michael Tomczak, Island Pacific's new President and Chief Operating Officer, and Furman spoke during the earnings conference call, broadcast over the Internet at or about 4:30 p.m. EDT.  (Pl.'s Ex. 38 at 960-62).[5]  Furman signed the Form 10-K, and signed a certification that to his knowledge, the Form 10-K fairly presented, in all material respects, the Company's financial condition and results of operations.  (Furman Test. at 233-34, Pl.'s Ex 5; Pl.'s Ex. 17 at 617).  Furman certified that he had reviewed the Form 10-K and that:

> 2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
>
> 3.  Based on my knowledge, the financial statements and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of [Island Pacific] ... for the periods presented in this annual report;
>
> 4.  [Island Pacific]'s other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures ... to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements ... in accordance with generally accepted accounting principles....
>
> 5.  [Island Pacific]'s other certifying officers and I have disclosed ... to [Island Pacific]'s auditors ... any fraud, whether or not material, that involves management....

(Pl.'s Ex. 17 at 744-45).  In its press release, earnings call and 2004 Form 10-K, Island Pacific reported revenues of $21.7 million, gross profit of almost $16.5 million, and a loss from continuing operations of $4.2 million.  (Pl.'s Ex. 37 (Earnings Release) 956, 958; Pl.'s Ex. 38

---

[5]  Michael Tomczak joined Island Pacific "about a month" prior to the June 29, 2004 earnings conference call.  (Pl.'s Ex. 38 at 962).

(earnings call transcript) 961-62 (stating a "gross profit of $15.5 million"); Pl.'s Ex. 17 at 527). Island Pacific included the $3.9 million from the License Agreement as reported revenue in the 2004 Form 10-K.  (Pl.'s Ex. 42 at 1316-17).

On July 11, 2004, Furman and Tran signed a management representation letter which was sent to the auditors.  (Furman Test. at 234-35, Pl.'s Ex. 5; Pl.'s Ex. 36).  The letter stated:

1. The financial statements ... are fairly presented in conformity with accounting principles generally accepted in the United States....
3. We have no knowledge of fraud or suspected fraud affecting the entity involving ... management or employees who have significant roles in the internal control....
5. We have no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees....
6. There are no significant deficiencies ... in the design or operation of internal controls....
9. .... The Company is accounting for its software revenues in accordance with Statement of Position 97-2 ... and Staff Accounting Bulletin No. 104....  In addition ...there are no side agreements for any sales....
11. There are no ... material transactions that have not been properly recorded in the accounting records underlying the financial statements....
24. We confirm that the transactional history which has resulted in the recording of revenues from QQQ systems of $3.9m has been accurately presented to you and is properly reflected in the financial statements under the applicable revenue recognition criteria....

(Pl.'s Ex. 36 at 951-55).

Every quarterly statement Island Pacific prepared was "signed off on" and approved by outside auditors, SingerLewak, confirming that Island Pacific was using the correct accounting methods.  (Silverman Dep. at 77, Furman Ex. 64; Furman Decl. ¶ 7, Doc. # 36-3).  With respect to the QQQ transactions, the SingerLewak audit paperwork states: "[SingerLewak] notes that such related party transactions are not always properly recorded. [SingerLewak] will specifically review all three transactions identified to ensure that the revenue recognition criteria ... are met..., assets are not overstated, i.e. that all balances due are collectible (notes receivable), and capitalized costs are properly recorded...." (Aubury Dep. at 176-77, Furman Ex. 13).  In connection with SingerLewak's 2004 annual audit, the SingerLewak audit paperwork indicates that SingerLewak performed "revenue testing."  (*Id.* at 179-80).

Island Pacific represented in its Q2 2004 and Q3 2004 Forms 10-Q filed on or about November 12, 2003, and February 17, 2004, respectively, and its 2004 Form 10-K filed on or

about June 29, 2004, that "[w]e recognize revenue [when licensing software] in accordance with Statement of Position 97-2 ..., Software Revenue Recognition, ... issued ... by the American Institute of Certified Public Accountants."  (Pl.'s Ex. 15 at 377 (Q2 2004 Form 10-Q); Pl.'s Ex. 16 at 449 (Q3 2004 Form 10-Q); Pl.'s Ex. 17 at 555 (2004 Form 10-K)). Statement of Position 97-2 provides that software revenue recognition is proper only when: (1) "persuasive evidence of an arrangement exists," (2) "delivery has occurred," (3) "the vendor's fee is fixed and determinable," and (4) "collectability is probable."  (Pl.'s Ex. 18 at 749-50 (SOP 97-2 ¶ .08)).  In its Forms 10-Q and Form 10-K, Island Pacific states: "Software license revenue is generally recognized when a license agreement has been signed, the software product has been delivered, there are no uncertainties surrounding product acceptance, the fees are fixed and determinable, and collection is considered probable." (Pl.'s Ex. 15 at 377 (Q2 2004 Form 10-Q); Pl.'s Ex. 16 at 449 (Q3 2004 Form 10-Q); Pl.'s Ex. 17 at 555 (2004 Form 10-K)).

During the Summer of 2004, Schechter asked Rosen to meet with Michael Tomczak, the new Chief Operating Officer of Island Pacific.  (Rosen Dep. at 57, Furman Ex. 3). "[T]hings became acrimonious between [Tomczak] and [Rosen] in that meeting, and ... [Rosen] told [Tomczak] that [QQQ] would not continue to do anything with Island Pacific thereafter." (*Id*. at 58).  Prior to that time, QQQ had not sold any licenses for Island Pacific's "Host software" pursuant to the License Agreement because at the time of Rosen and Tomczak's meeting, QQQ was "still ramping up, ... getting the software loaded, getting our people educated, [and] getting accreditation from IBM on the equipment...." (*Id*. at 59).  Rosen testified that prior to Tomczak joining Island Pacific in approximately May or June of 2004, QQQ and Island Pacific had "a very cooperative and friendly relationship, but it was always at arm's length.  I was always trying to make the most money I could for myself." (*Id*. at 207). But then Tomczak told Rosen that Island Pacific was "not going to resell Pyramid any longer" and "[Tomczak] was planning to go behind our back" to sell Island Pacific's Host software in Australia.  (*Id*. at 59, 207-08).  Rosen felt that "Tomczak was a dishonest guy, and I felt he ... wasn't going to honor the agreements as they were struck...." (*Id*. at 210).

On September 24, 2004, an accountant with the SEC sent Furman a letter stating that the SEC had reviewed Island Pacific's financial statements for Q3 2004 and fiscal year 2004. (Pl.'s Ex. 39). The SEC accountant makes numerous requests, including a request for additional information on the QQQ transactions and "how your accounting for this contract complies with [Statement of Position] 97-2." (*Id.* at 970, 972).

On November 15, 2004, Island Pacific reversed entries on its books reflecting the License Agreement and Sublicense Agreement, and restated its Q2 2004, Q3 2004 and fiscal year 2004 financial statements. (Pl.'s Ex. 40-42; Furman Test. at 148-49, Pl.'s Ex. 5). Each of the restated reports were filed with the SEC and signed by Furman and Michael Tomczak, Island Pacific's Chief Operating Officer. (Furman Test. at 238, 243-44, Pl.'s Ex. 5; Pl.'s Ex. 42 at 1370, 1372 (2004 10-KA); Pl.'s Ex. 40 at 1058, 1060 (Q2 10-QA); Ex. 41 at 1146, 1148 (Q3 10-QA)). The amended fiscal year 2004 financial statement states:

> In September 2003, we signed a Source Code License ... agreement with QQQ Systems Pty Limited ... for the sale of software technology rights and exclusivity to use our Host Retail Merchandising Software (our core product) and Direct Software (Market Place System) for the Australasia market. Our management at the time did not see the Australasia market as a viable market for our products and therefore decided to sell the license rights to that market. We recorded this as revenue and an account receivable in the quarter ended September 30, 2003 as a persuasive evidence of an arrangement existed, the software had been delivered to and accepted by QQQ, the price was fixed and the collectibility was reasonably assured. The total license fee was $3.9 million and was to be paid $1.95 million on November 15, 2003 and $1.95 million on December 31, 2003. In addition, we would be entitled to a 10% royalty on QQQ's net sublicensing revenues for a period of 36 months from the date of the contract.... In December 2003, we entered into a separate agreement to purchase from QQQ exclusive ownership and rights to use, market, reproduce and license QQQ's point of sale software ... in Europe and North and South America for the purchase price of $3.9 million. ... Initially, the $3.9 million purchase price was paid by offsetting the purchase price amount against the outstanding account receivable due to us from QQQ. Accordingly, in the quarter ended December 31, 2003, the receivable of $3.9 million was eliminated and we recorded the $3.9 million as an asset. However, subsequent to entering into these transactions, certain facts and circumstances relating to these transactions have changed. The management of QQQ has indicated that it does not desire to actively pursue opportunities for the [Island Pacific] products in Australia, while at the same time[,] our current management has initiated discussions with a major Australian retailer about a sale of our products and now considers the Australian market a viable market for our products. As QQQ has an exclusive license for the Australian market, we are currently in negotiations with them to allow us to directly sell to this Australian retailer. As part of the restatement of the financial statements in this Form 10-K/A, we have reversed the revenue and account receivable recognized at September 30, 2003 on this one time sale. Also, as part of the restatement, we have reversed the purchase of the technology recognized at December 31, 2003

as we cannot assign a value to the technology and eliminated the $3.9 million asset from the balance sheet....

(Pl.'s Ex. 42 at 1316-17).   Furman testified that the reason Island Pacific "restate[d] its September and December 2003 quarters and actually reversed the QQQ transactions" was because "we never received payment from QQQ and at that time [we] looked at it as a transaction that should not have been recorded in the first place." (Furman Test. at 148, Pl.'s Ex. 5).

## II.        Contentions of the Parties

The SEC contends that the evidence demonstrates as a matter of law that:

[d]uring his short tenure as CFO, Furman cooked the company's books by causing it to overstate its second quarter 2004 revenues by 140%, resulting in overstatements of its third quarter and annual revenues as well.  Furman did so by booking a $3.9 million sham sale of software to an Australian start-up company, QQQ....  When payment was not made by QQQ, Furman caused an offsetting transaction to be prematurely booked the next quarter, and eliminated the $3.9 million receivable.  Furman then lied in management representation letters to Island Pacific's auditors, in company filings with the Commission, in company earnings releases, and in company conference calls with analysts about the company's financial results, and omitted disclosure of material facts concerning the sham transaction.

(Doc. # 33-2 at 1).  The SEC contends that, as a matter of law, Furman violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  In addition, the SEC contends that Furman's actions, as a matter of law, constituted falsification of company books and records, circumvention of company internal controls and making false representations to company auditors in violation of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5) and Exchange Act Rules 13b2-1 and 13b2-2, 17 C.F.R. §§ 240.13b2-1 & 13b2-2; false certification of the accuracy of company Form 10-Qs in violation of Commission Rule 13a-14, 17 C.F.R. § 240-13a-14; and aiding and abetting Island Pacific's violations of the issuer reporting requirements of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 13a-1 & 13a-13.  According to the SEC:

Furman's fraudulent acts were repeated, egregious, and intentional.   The Commission accordingly seeks by this motion entry of a final judgment against Furman permanently enjoining him from future violations of the above statutory

1  and regulatory provisions, ordering him to pay a civil penalty of $120,000, and
2  permanently barring him from acting as an officer or director of a public
   company.

3  (Doc. # 33-2 at 3).

4       Furman asserts that "[t]he SEC simply has no evidence that demonstrates Furman acted

5  with scienter with respect to any of the allegations of securities fraud.  The SEC also ignores

6  the fact that its own summary judgment record is full of contradictory evidence—from multiple

7  versions of contracts to inconsistent statements by witnesses."  (Doc. # 36 at 1).  Furman

8  contends that there is "credible evidence" that the "September 30, 2003 License Agreement"

9  and the "December 31, 2003 Sublicense Agreement" were "real, arms-length business

10  agreements."  (*Id.*)  Furman asserts:  "The SEC glosses over this evidence and concludes both

11  were sham arrangements.  The SEC further turns a blind eye to evidence that demonstrates

12  Furman had no motive to participate in any scheme to inflate [Island Pacific]'s revenue, real

13  or imagined by the Commission."  (*Id.*)  According to Furman:

14       [N]oticeably absent from the SEC's moving papers is any discussion of the
         detailed review—quarter-by-quarter and at year-end—of IP's accounting by its
15       independent outside auditors, SingerLewak....  Moreover, credible, admissible
         evidence shows that the accounting for the two questioned transactions was
16       appropriate; that Furman had no reason to believe otherwise; that he believed
         proper disclosure was made in periodic filings; and that full disclosure of facts
17       relevant to the transactions was made to the outside independent auditing firm
         SingerLewak.
18
19  (*Id.* at 1-2).  Furman contends:

20       There is also credible, admissible evidence that at the time the transactions were
         entered into between IP and QQQ, both companies were working to implement
21       and fully perform on those agreements, and that only a subsequent change in
         leadership at IP caused those agreements to fall into disfavor (because the new
22       CEO of IP changed the strategic direction of the company and decided to
         compete head-to-head with QQQ in QQQ's own markets).

23  (*Id.* at 2).  Accordingly, Furman asserts: "Given the conflicting testimony, various versions of

24  contracts, differing interpretations of significant events and absolute lack of motive or other

25  evidence of scienter on Furman's part, there are substantial genuine issues of material fact that

26  simply cannot be decided on summary judgment."  (*Id.*)

27  **III.   Standard of Review**

28       Summary judgment is proper when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *See id.* at 248.

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (quotation omitted). "Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation omitted).

"In ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quotation omitted). At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035-36 (9th Cir. 2005) ("The district court ... improperly dismissed Dominguez's allegations as consisting of nothing more than 'self-serving statements in her own deposition and affidavit.' Such observations go to whether Dominguez is credible, a determination that is exclusively within the province of the factfinder at trial, not the district court on summary judgment....").

**IV.  Discussion**

**A.  Section 10(b) and Rule 10b-5**

Section 10(b) of the Securities Exchange Act is "the central antifraud provision of the

Securities Exchange Act." *SEC v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996). Section 10(b) makes it unlawful "for any person, directly or indirectly":

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 further defines the conduct prohibited under Section 10(b), making it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"[T]he SEC must prove four elements to establish a misrepresentation violating Rule 10b-5...: (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, [and] (4) use of the jurisdictional means...." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993) (citations omitted); *see also S.E.C. v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007) ("Section 10(b) of the 1934 Act, and Rule 10b-5 forbid making [1] a material misstatement or omission [2] in connection with the offer or sale of a security [3] by means of interstate commerce.... Violations of ... Section 10(b) and Rule 10b-5 require scienter.").

"Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Rana Research*, 8 F.3d at 1362 (citation omitted); *see also id.* ("We have said that the 'in connection with' requirement is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'") (quoting *SEC v. Clark*, 915 F.2d 439, 449 (9th Cir. 1990)).

The SEC has produced evidence of alleged misstatements concerning the License Agreement and the Sublicense Agreement made in annual and quarterly reports (Forms 10-K and 10-Q), press releases and conference calls.

The primary issue in dispute is whether, as a matter of law, Furman made material misrepresentations or omissions with scienter. "Materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact. However, summary judgment may be granted in appropriate cases." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) (citations omitted); *see also Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) ("Whether an omission is material is a determination that requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.... Generally, scienter should *not* be resolved by summary judgment.") (quotation omitted).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Section 10(b) context, scienter requires "proof that the defendant acted knowingly or recklessly." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir.1990) (en banc). Recklessness is defined as:

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id*. at 1569 (quotation omitted). "Reckless conduct must be something more egregious than even 'white heart/empty head' good faith and represents an extreme departure from the standards of ordinary care such that the defendant must have been aware of it." *SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003) (citing *Hollinger*, 914 F.2d at 1570). "Recklessness satisfies the scienter requirement only 'to the extent that it reflects some degree of intentional or conscious misconduct.'" *Id*. at 1094-95 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999)).

The SEC contends that Furman "cooked the company's books" by "booking a $3.9 million sham sale of software," which caused Island Pacific to materially overstate its second

and third quarter revenues, as well as its annual revenues.  (Doc. # 33-2 at 1).  However, the record contains sufficient evidence for a jury to find that the transactions with QQQ were legitimate, viable transactions.  (Rosen Dep. at 62, Pl's Ex. 6 (on September 30, 2003, Island Pacific shipped software to QQQ in accordance with the License Agreement); Furman Ex. 59 (Schechter and Beck were interested in pursuing the Pyramid software for Island Pacific); Furman Exs. 60, 61 (Beck directed Island Pacific employees to include the Pyramid software in Island Pacific's proposals to potential clients); Furman Ex. 65 at 1065 (Braun referenced the Pyramid software and stated that Beck "is going to drive this oppty"); Rosen Dep. at 195, Furman Ex. 3 (Rosen testified that Island Pacific was selling the Pyramid software "into Island Pacific's customer base even before the [Sublicense] [A]greement was finalized"); Pl.'s Ex. 24 at 858 (Sublicense Agreement) (Rosen and Beck acknowledging that QQQ owed $3.9 million to Island Pacific); Furman Ex. 62 at 1057 (Beck stating in an email that, "[t]he fact of the matter is that we got an incredible bargain on" QQQ's Pyramid software); Furman Ex. 63 (an April 7, 2004 email from an Island Pacific employee to Beck and others, indicating that Island Pacific was still working with the Pyramid software); Rosen Dep. at 59, Furman Ex. 3 (QQQ was "ramping up, ... getting the [Island Pacific 'Host'] software loaded, getting our people educated, [and] getting accreditation from IBM on the equipment")).

Alternatively, the record contains sufficient evidence for a reasonable jury to find that if the QQQ transactions represented a "sham sale of software" (Doc. # 33-2 at 1), Furman was misled into believing they were legitimate transactions by Schechter, Braun and/or Beck. Furman, who joined Island Pacific in September 2003, had no involvement in the negotiation of the License Agreement.  (Furman Decl. ¶ 16, Doc. # 36-2; Rosen Dep. at 44, Furman Ex. 3).  At least twice, Furman sought assurances from Schechter—who negotiated the License Agreement—in an effort to verify that Furman's understanding of the terms of the License Agreement was correct.  (Rosen Dep. at 43-44, Furman Ex. 3 (Schechter negotiated the License Agreement); Pl.'s Ex. 12 at 227 (Furman emailed Schechter a version of the License Agreement and Furman stated, "If you want us to change it, please let us know."); Furman Ex. 71 at 1098 (Furman emailed Schechter regarding the License Agreement: "Barry, from my

side, we have already booked $3.25mm and I plan to book the additional $650k as well. *Please make sure these are correct*.") (emphasis added)).  Furman relied upon Schechter for assurance that QQQ would pay the money due under the License Agreement.  (Furman Decl. ¶ 16, Doc. # 36-3 (Schechter reassured Furman that QQQ would pay the amounts due under the License Agreement); *see also* Furman Test. at 233, Pl.'s Ex. 5 (Furman was told that QQQ could not make the first payment according to the License Agreement because QQQ's controller had erroneously deposited the funds into a money market account)).  When Furman drafted the May 12, 2004 memorandum to the auditors concerning the QQQ transactions, Furman relied upon information provided by Braun, Beck and Schechter.  (Pl.'s Ex. 35 at 247, Furman Test. at 230-31, Pl.'s Ex. 5 (Beck, Braun and two other members of Island Pacific's Board of Directors signed Furman's May 12, 2004 memorandum to the auditors, stating that the memorandum "accurately captures the details regarding the consummation of the two separate transactions"); Furman Test. at 229, Pl.'s Ex. 5 ("most of the information" in the memorandum came from Braun and Beck); Furman Ex. 69 at 1088 (Furman relied on Schechter to "fill in some of the blanks" in the memorandum and verify the accuracy of some of the information in the memorandum)).  The Court concludes that the evidence is insufficient to demonstrate as a matter of law that Furman acted with scienter.

In its Reply Brief, the SEC contends that Furman does not offer evidence to dispute the following:

(1) emails [Furman] authored establishing that he modified the License Agreement after quarter end but nevertheless caused Island Pacific to improperly record revenue of $3.9 million in Q2 2004 (see Facts ¶¶ 14-15, 17 & 29 & SEC Exhs. 5, 11, 12 ("the only thing we did was change Exhibit A and B") & 13 ("We amended the agreement."));

(2) emails establishing that he knew that the Sublicense Agreement was not finalized by quarter end but nevertheless caused Island Pacific to improperly record the transaction in Q3 2004 and eliminate the $3.9 million receivable (see Facts ¶¶ 42 & 46-50); and

(3) emails and testimony establishing that he knew that an employee, Dietzler, had alleged potential fraud with regard to the two transactions in a detailed email to him, but that he nevertheless falsely represented to the auditors just days later that he had no knowledge of any allegations of fraud (see Facts ¶¶ 46-53).

(Doc. # 41 at 5).

### 1.     Statement of Position 97-2

The first two categories of emails cited by the SEC in its Reply Brief support the SEC's contention that post-quarter contract modifications were made to the License Agreement and the Sublicense Agreement, and therefore Furman knowingly or recklessly failed to recognize revenue in accordance with generally accepted accounting principles ("GAAP")—specifically, Statement of Position ("SOP") 97-2.  SOP 97-2 provides that software revenue recognition is proper only when: (1) "persuasive evidence of an arrangement exists," (2) "delivery has occurred," (3) "the vendor's fee is fixed and determinable," and (4) "collectability is probable." (Pl.'s Ex. 18 at 749-50 (SOP 97-2 ¶ .08)).  In its Forms 10-Q and Form 10-K, Island Pacific represented: "Software license revenue is generally recognized when a license agreement has been signed, the software product has been delivered, there are no uncertainties surrounding product acceptance, the fees are fixed and determinable, and collection is considered probable."  (Pl.'s Ex. 15 at 377 (Q2 2004 Form 10-Q); Pl.'s Ex. 16 at 449 (Q3 2004 Form 10-Q); Pl.'s Ex. 17 at 555 (2004 Form 10-K)).  Furman testified that for "GAAP purposes," to record revenue on a software transaction, "a contract, a written agreement" is necessary. (Furman Test. at 99, Pl.'s Ex. 5).  He also testified that Island Pacific considered "evidence of an arrangement" to be a contract signed by both parties "as of the quarter end or the year end." (*Id.*)

In the Ninth Circuit, "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (citing, inter alia, *Vosgerichian v. Commodore Int'l*, 832 F. Supp. 909, 915 n.8 (E.D. Pa. 1993) ("The ... complaint charges that [the accountants] ... violated GAAP and GAAS, but clearly, even deliberate violations of those guidelines, without more, do not amount to fraud.") (collecting cases)).  A showing of scienter requires "specific facts that shed light on the mental state of [the defendant]."  *Id.*; *see also id.* at 1425 (granting summary judgment for defendant in spite of testimony from plaintiffs' expert that the defendant accounting firm had improperly recognized revenue in violation of GAAP and the failure "was so obvious that ... [the defendant accounting firm] must have been aware

of it").

### a. First Element of SOP 97-2: Persuasive Evidence of an Arrangement

#### i. License Agreement

The earliest documentary evidence in the record of a version of the License Agreement which contains a $3.9 million purchase price are emails between Dietzler, Furman and Schechter, dated October 10, 2003—ten days after the end of Q2 2004. (Furman Ex. 71 at 1098; *see also* Pl.'s Ex. 13A at 234, 241 (October 13, 2003 email from Furman to Tran, with an attached unsigned copy of the License Agreement containing a $3.9 million purchase price)). In his portion of this email chain, Furman wrote: "Barry [Schechter], from my side, we have already booked $3.25mm and I plan to book the additional $650k as well. Please make sure these are correct." (Furman Ex. 71 at 1098). In an earlier email on October 10, 2009, Furman sent Schechter a version of the License Agreement with a *$3.7* million purchase price (i.e., $200,000 less than the final purchase price), and wrote to Schechter:

> Barry, in the spirit (and language) of the original executed document, the only thing we did was change Exhibit A and B to broaden the definition of 'Software' to include Direct, in addition to [Island Pacific] Host. Exhibit B (License and Royalties) also has 2 sections to it - [Island Pacific] Host and Direct.
>
> Since everything else is the same and consistent, this is the easiest and I believe the cleanest way to do this.
>
> If you want us to change it, please let us know.

(Pl.'s Ex. 12 at 227).

Furman testified that it was his understanding that the final "sale price of $3,900,000" in the License Agreement "was arrived at prior to the close of September 30, 2003." (Furman Test. at 98, Pl.'s Ex. 5). When asked if the "final sale price" was "documented as of September 30, 2003," Furman responded, "That I'm not sure of." (*Id.*) Furman states in his affidavit:

> I understood the agreed upon terms of the License Agreement, as of September 30, 2003, granted QQQ a license to distribute both Host and Direct software, and required that QQQ pay [Island Pacific] $3.25 million for Host and $650,000 for Direct (payable in two equal installments due on November 15, and December 31, 2003), plus 10% of QQQ's net sublicensing fees.... When [Island Pacific] recorded revenue for the Second Quarter 2004, I believed [Island Pacific] had an agreement signed during that quarter documenting the $3.9

1    million sale price.

2    (Furman Decl. ¶¶ 12-13, Doc. # 36-3).

3                    **ii.    Sublicense Agreement**

4    With respect to the Sublicense Agreement, on January 16, 2004, Rosen sent Schechter

5    an email, which stated: "1st draft of pyramid technology agreement[.] [L]et me have your

6    comments." (Pl.'s Ex. 23 at 837). Attached to the email is an undated and unsigned version

7    of the Sublicense Agreement, which contains different terms from the signed version dated

8    December 14, 2003. On January 28, 2004, Tran sent Furman an email, with the subject

9    "QQQ", which stated: "Do you have the latest copy so we can prepare the journal entry?"

10   (Pl.'s Ex. 26 at 879). On the same day, Furman forwarded Tran's email to Joseph Dietzler,

11   Island Pacific's Contract Administrator, and asked him to forward "what you have for QQQ

12   [to Tran] so she can book it." (*Id.*) Dietzler responded to Tran, copying Furman, by

13   forwarding an unsigned copy of the Sublicense Agreement, which is dated December 14, 2003

14   and contains the same terms as the signed version of the Sublicense Agreement. (*Id.*).

15   Furman testified that, "based on" the January 16, 2004 email from Rosen to Schechter

16   (with a "1st draft" of the Sublicense Agreement attached), it does not "seem possible that there

17   could have been a final agreement on December 31, 2003." (Furman Test. at 143, Pl.'s Ex. 5).

18   However, Furman states in his affidavit: "I believed that the Technology Purchase Agreement

19   between QQQ and [Island Pacific] ('Pyramid Sublicense Agreement') dated December 14,

20   2003 was finalized prior to December 31, 2003.... I was not aware that a 'first draft' of the

21   Pyramid Sublicense Agreement was being circulated in January 2004." (Furman Decl. ¶¶ 18-

22   19, Doc. # 36-3).

23                  **iii.    "Sham" Affidavit Caselaw**

24   In its Reply Brief, the SEC contends: "Furman's broad and vague assertions [in his

25   affidavit] lack sufficient specificity to create a genuine issue of material fact, particularly when

26   the assertions are contradicted by documentary evidence and his own prior testimony. *See*

27   *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)...." (Doc. # 41 at 5; *see*

28   *also id.* at 8).

In *Kennedy*, the Ninth Circuit stated: "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy*, 952 F.2d at 266 (citing *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543-44 (9th Cir. 1975)).  However, "the *Radobenko* court was concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment.  Therefore, before applying the *Radobenko* sanction, the district court must make a factual determination that the contradiction was actually a 'sham.'" *Kennedy*, 952 F.2d at 267.

The Court does not find that Furman's affidavit "flatly contradicts" his earlier deposition testimony, nor does the Court find that Furman's affidavit testimony is a "sham." *Id*.  Viewing all reasonable inferences in Furman's favor, Furman's affidavit indicates that, *as of the date Island Pacific recorded the revenue*, Furman believed the respective agreements with QQQ were finalized in writing.  By contrast, approximately three years after Island Pacific recorded the revenue, Furman testified that, *as of the date of his testimony*, he was "not sure" if the License Agreement was "documented as of September 30, 2003," and it does not "seem possible that there could have been a final [Sublicense] agreement on December 31, 2003."  (Furman Test. at 98, 143, Pl.'s Ex. 5).

Furman's testimony that it does not "seem possible that there could have been a final [Sublicense] agreement on December 31, 2003," was "based on" Rosen's January 16, 2004 email to Schechter with a "1st draft" of the Sublicense Agreement attached.  (*Id.* at 143).  Furman's affidavit states: "I was not aware that a 'first draft' of the Pyramid Sublicense Agreement was being circulated in January 2004."  (Furman Decl. ¶ 19, Doc. # 36-3).  In an affidavit, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition." *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995).  It can be reasonably inferred that Furman's affidavit statement that he was unaware of a first draft being circulated in January explains or clarifies his prior testimony that it does not seem possible that there could have been a final Sublicense Agreement on December 31, 2003.

The Court may not disregard Furman's sworn testimony and/or sworn affidavit even if they are directly contradicted by unsworn, pre-litigation emails. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) ("Leslie's letters to ICA appear to contradict his assertion of a contract entitling him to a percentage fee. This is different, however, from our 'sham affidavit' cases, because Leslie's deposition testimony and sworn declaration in this case are consistent and are contradicted only by Leslie's unsworn letters.") (citing *Shockley v. City of Newport News*, 997 F.2d 18, 23 (4th Cir. 1993) ("Chief Carey's letter was not the equivalent of deposition testimony. In writing the letter, Chief Carey did not testify under oath, nor was he subject to cross-examination. In these circumstances, the district court should not have disregarded Chief Carey's affidavit on the sole basis that it contradicted his earlier letter.")). "[A]t summary judgment, ... if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citations omitted). Likewise, the Court may not "disregard direct evidence on the ground that no reasonable jury would believe it." *Leslie*, 198 F.3d at 1158 (citing *T.W. Elec. Serv.*, 809 F.2d at 631 n.3); *see also McLaughlin v. Liu*, 849 F.2d 1205, 1207-08 (9th Cir. 1988) (reversing a district court's summary judgment in favor of the plaintiff where the court disregarded the defendant's sworn declaration and sworn answers to interrogatories as "implausible").

Furman's affidavit and testimony create an issue of fact as to whether Furman believed that "persuasive evidence of an arrangement exist[ed]" (i.e., the first element of SOP 97-2) when Island Pacific recognized revenue from the QQQ transactions. (Pl.'s Ex. 18 at 749-50 (SOP 97-2 ¶ .08)). Furman's beliefs may have been negligent and unreasonable, but in light of the evidence of Furman's reliance on Schechter and other more-senior members of Island Pacific's management team, the Court cannot find as a matter of law that it shows "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see also Rubera*, 350 F.3d at 1094-95 ("Recklessness satisfies the scienter requirement *only* to the extent that it reflects some degree of intentional or conscious

1   misconduct.") (emphasis added) (quotation omitted).

2                                **iv.    Materiality**

3          Even if the SEC had demonstrated, as a matter of law, Furman's scienter on the issue

4   of whether there was "persuasive evidence of an arrangement" as of the last day of Q2 2004

5   and Q3 2004, there would be an issue of fact as to whether the alleged misstatement that

6   revenue was recognized in accordance with SOP 97-2 was material.

7          "The antifraud provisions' materiality element is satisfied only if there is a substantial

8   likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

9   investor as having significantly altered the total mix of information made available." *SEC v.*

10  *Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quotations omitted).  "Determining materiality in

11  securities fraud cases 'should ordinarily be left to the trier of fact.'" *Id.* (quoting *In re Apple*

12  *Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).  "The determination [of

13  materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would

14  draw from a given set of facts and the significance of those inferences to him, and these

15  assessments are peculiarly ones for the trier of fact.  Only if the established omissions are so

16  obviously important to an investor, that reasonable minds cannot differ on the question of

17  materiality is the ultimate issue of materiality appropriately resolved as a matter of law by

18  summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

19         In *TSC Industries*, the Supreme Court held that the materiality of the difference between

20  payment in warrants worth $5.25 each and warrants worth $3.50 each was a question of fact

21  for the jury.  *See id.* at 459-60.  In *Phan*, the Ninth Circuit reversed a grant of summary

22  judgment for the SEC on a Section 10(b) claim:

23              Although financial logic dictates that a $1.25 million promissory note is less
                valuable than $1.25 million in cash, given the risks inherent in a loan and the
24              time value of money, the record contains no evidence about the value of this
                $1.25 million note at the time the transaction was restructured.  Therefore, we
25              have no way to know if Hartcourt's decision to accept a loan as payment was the
                equivalent of agreeing to get nothing close to full payment for the shares, or
26              represented only a minor decrease in payment that might well be an
                inconsequential change in the risk that investors already realized they faced by
27              investing in the unproven company.  Accordingly, we cannot say as a matter of
                law, unaided by any evidence in the record, that an investor would view the total
28              mix of information about Hartcourt as significantly altered by this misstatement,
                standing alone.

1   *Phan*, 500 F.3d at 911 (quotation omitted).

2          The SEC contends that the "overstatements of revenue [in] Island Pacific's financial

3   statements during its second and third quarter fiscal 2004 and for its fiscal 2004 were material

4   because they misrepresented and concealed Island Pacific's true (poor) financial performance."

5   (Doc. # 33-2 at 6). Although "the materiality of information relating to financial condition,

6   solvency and profitability is not subject to serious challenge," *SEC v. Murphy*, 626 F.2d 633,

7   653 (9th Cir. 1980) (citation omitted), the record contains sufficient evidence for a reasonable

8   jury to find either that the QQQ transactions were legitimate transactions or that Furman was

9   misled into believing them to be legitimate transactions, as discussed above.

10          The issue at this stage is whether an investor would consider the recognition of

11   revenue—*as to otherwise legitimate transactions*—at least 13 days prior to the License

12   Agreement being put in writing and at least 28 days prior to the Sublicense Agreement being

13   put in writing to be material. (Pl.'s Ex. 13A at 234, 241 (October 13, 2003 email from Furman

14   to Tran with an attached copy of the License Agreement containing a $3.9 million purchase

15   price); Pl.'s Ex. 26 at 879 (January 28, 2004 email from Dietzler to Tran and Furman with an

16   attached copy of the Sublicense Agreement)). There also is an issue as to whether an investor

17   would consider the difference between the $3.25 million License Agreement which a jury

18   could find was signed by both parties as of the end of Q2 2004 (Pl.'s Ex. 8) and the $3.9

19   million License Agreement which ultimately was recognized by Island Pacific in Q2 2004.[6]

20          The SEC has submitted no evidence demonstrating the materiality of recognizing

21   revenue approximately a month earlier than GAAP would allow or the difference between a

22   $3.25 million License Agreement and a $3.9 million License Agreement. *See Phan*, 500 F.3d

23   at 910-11 ("The SEC, which both bears the burden of proof and is the party moving for

24

_____

25          [6] The difference between the $3.25 million License Agreement signed prior to the end of Q2 2004 and the $3.9 million License Agreement ultimately recognized by Island Pacific

26   as revenue is the addition of the $650,000 "Direct" software to the License Agreement. (*Compare* Pl.'s Ex. 8 at 198-99 (version of the License Agreement signed by both parties,

27   referencing only the "Host" software, with a $3.25 million licensing fee), *with* Pl.'s Ex. 13A at 240-41 (unsigned version of the License Agreement emailed by Furman on October 13,

28   2003, referencing the "Host" software, with a $3.25 licensing fee, and the "Direct" software, with a $650,000 licensing fee)).

summary judgment, submitted no evidence to the district court demonstrating the materiality of the misstatement about the payment terms....  We would have to engage in rank speculation to determine the inference that investors would have drawn....").  Based upon the evidence in the record, the Court cannot find as a matter of law that the alleged misstatements at issue were material.

### b.    Remaining Elements of SOP 97-2

The record contains sufficient evidence to create an issue of fact as to whether Furman believed the final three elements of SOP 97-2 were satisfied at the time Island Pacific recognized revenue for the QQQ transactions.  There is evidence from which a reasonable jury could find that Furman believed that (1) delivery had occurred (Furman Decl. ¶ 15, Doc. # 36-3 (Furman believed Island Pacific shipped both the Host and Direct software); Rosen Dep. at 62, Pl.'s Ex. 6 (Island Pacific shipped software to QQQ)); (2) the vendor's fee was fixed and determinable (Furman Decl. ¶ 13, Doc. # 36-3 (Furman believed the License Agreement had a $3.9 million sales price); Furman Ex. 71 at 1098 (Furman and Dietzler emails indicating that the fee according to the License Agreement was $3.9 million); cf. Pl.'s Ex. 24 at 858 (executed Sublicense Agreement references QQQ's $3.9 million indebtedness to Island Pacific));[7] and (3) collectability was probable (Furman Decl. ¶¶ 16-17, 21, Doc. # 36-3 (Furman received assurances from Schechter about QQQ's ability and willingness to pay according to the License Agreement); Furman Test. at 233, Pl.'s Ex. 5 (Furman was told that QQQ could not make the first payment according to the License Agreement because QQQ's controller had erroneously deposited the funds into a money market account); Pl.'s Ex. 35 at 946 (memorandum stating Beck granted an extension to QQQ to make the first payment according to the License Agreement); Furman Test. at 229, Pl.'s Ex. 5 ("most of the information" in the memorandum came from Beck and Braun)).

---

[7]    SOP 97-2 provides that "*any* extended payment terms in software licensing arrangements may indicate that the fee is not fixed or determinable," and "if payment of a significant portion of the software licensing fee is not due until more than 12 months after delivery, the licensing fee should be *presumed* not to be fixed or determinable." (Pl.'s Ex. 18 at 755, SOP 97-2 ¶ .28 (emphasis in original)).  There is no evidence that, at the time revenue was recognized or thereafter, either party envisioned the royalty payments to be a "significant portion" of the licensing fees for either the License Agreement or the Sublicense Agreement.

## 2.    Dietzler's Email

The SEC has produced uncontroverted evidence establishing that Furman knew that Dietzler had alleged "potential fraud" with regard to the QQQ transactions (Furman Dep. at 78, Pl.'s Ex. 3), but Furman nevertheless represented to the auditors eight days later that he had no knowledge of any allegations of "suspected fraud ... received in communications from employees [or] former employees." (Pl.'s Ex. 32 at 923). This evidence warrants summary judgment on the SEC's books and records claims against Furman, *see infra*, and prevents application of the defense of reliance on professional assistance, *see SEC v. Goldfield Mines*, 758 F.2d 459, 467 (9th Cir. 1985) (in order to establish the defense, a defendant must show he "made complete disclosure" to the professional). However, it is insufficient to establish, as a matter of law, scienter for the SEC's Section 10(b) and Rule 10b-5 claim against Furman.

Viewing the evidence in the light most favorable to Furman, Dietzler's February 4, 2004 email recognizes that the QQQ transactions might be legitimate; Dietzler was concerned about the "avoid[ing] even the appearance of irregularity." (Pl.'s Ex. 28 at 906). Dietzler wrote:

> *Irrespective of the legitimacy of the foregoing transactions*, the totality of the surrounding circumstances creates the appearance that the transactions were intended merely to boost the reportable revenue of Island Pacific in the quarter ended September 2003. Further, the timing of the second QQQ transaction is in fact in the current quarter, not the quarter ended December 31, 2003.... To ensure compliance with financial reporting rules, it would seem prudent that revenue recognition policies err on the conservative side, so as to avoid even the appearance of irregularity.

*Id*. (emphasis added). In a conversation with Furman prior to sending the February 4, 2004 email, Dietzler "brought up the fact that ... it looks weird rather than these are just made-up transactions." (Furman Dep. at 78, Pl.'s Ex. 3).

As set forth above, a reasonable jury could find that the QQQ transactions were legitimate, and that Furman *believed* that the revenue related to the transactions were recognized in the proper quarter. Furman was Dietzler's supervisor and Furman had more contact with Schechter, Braun and Beck than did Dietzler. Furman might reasonably believe that he knew more about the QQQ transactions than Dietzler, and therefore Furman's beliefs about the legitimacy of the QQQ transactions and the timing of the revenue recognition were

more accurate than Dietzler's.  A reasonable jury could find that, despite Furman's misrepresentation to the auditors regarding Dietzler's email, Furman did not make misrepresentations with scienter in Island Pacific's annual and quarterly reports (Forms 10-K and 10-Q), press releases and conference calls.

Even if Furman acted with scienter when he made the alleged misrepresentations that revenue was recognized in accordance with GAAP, there is an issue of fact as to the materiality of the alleged misrepresentations.  Alternatively, there is an issue of fact as to the materiality of the difference between the $3.25 million License Agreement which a jury could find was signed by both parties as of the end of Q2 2004 (Pl.'s Ex. 8) and the $3.9 million License Agreement which was recognized by Island Pacific in Q2 2004.

Finally, as discussed below, Furman's misrepresentation to the auditors that he had no knowledge of any allegations of "suspected fraud ... received in communications from employees [or] former employees" (Pl.'s Ex. 32 at 923) warrants summary judgment on the SEC's books and records claims against Furman.  The "in connection with the purchase or sale of any security" requirement for Section 10(b) and Rule 10b-5 liability can satisfied by "fraud ... involv[ing] *public* dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely...." *Rana Research*, 8 F.3d at 1362 (emphasis added); *see also S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Even though the transaction registered by the S-8 form did not involve distribution of shares to the public market, the SEC can prove fraud by showing that an average investor would find any misstatements that the form contained to be material *because the form was publicly disseminated*.") (emphasis added).  The SEC has not shown that the "in connection with" requirement would be satisfied when the misrepresentation is made in a *non-public* letter to auditors.  *Cf. SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("[T]he statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)....") (citation omitted).  Furman's misrepresentation to the auditors is insufficient to warrant summary judgment on the Section 10(b) and Rule 10b-5 claims.

1    The SEC's Motion for Summary Judgment as to the Section 10(b) and Rule 10b-5

2    claims against Furman is denied.

3    **B.    Section 20(e)**

4    The SEC moves for summary judgment on its claim that Furman aided and abetted

5    Island Pacific's violations of the issuer reporting requirements of Section 13(a) of the

6    Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R.

7    §§ 240.12b-20, 13a-1 & 13a-13.  The SEC brings its aiding and abetting claim pursuant to

8    Section 20(e) of the Exchange Act, which provides: "[A]ny person that knowingly provides

9    substantial assistance to another person in violation of a provision of this chapter, or of any

10   rule or regulation issued under this chapter, shall be deemed to be in violation of such

11   provision to the same extent as the person to whom such assistance is provided."  15 U.S.C.

12   § 78t(e).  "In order to find that [an individual defendant] aided and abetted [a company]'s

13   violation of federal securities laws, it must be found that: (1) [the company] violated the

14   relevant securities laws; (2) [the individual defendant] had knowledge of the primary violation

15   and of his or her own role in furthering it; and (3) [the individual defendant] provided

16   substantial assistance in the primary violation."  *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir.

17   2003) (citations omitted).

18   Issuers of securities registered pursuant to Section 12 of the Exchange Act are required

19   to file annual Forms 10-K and quarterly Forms 10-Q with the Commission.  *See* Section 13(a)

20   of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13a-1 and 13a-13 thereunder, 17 C.F.R.

21   §§ 240.13a-1 & 240.13a-13; *see also* 17 C.F.R. § 240.12b-20 ("In addition to the information

22   expressly required to be included in a statement or report, there shall be added such further

23   material information, if any, as may be necessary to make the required statements, in the light

24   of the circumstances under which they are made not misleading.").  These provisions require

25   that the reports filed be prepared in conformity with GAAP.  *See Ponce*, 345 F.3d at 735.  In

26   order to prove a violation of these provisions by Island Pacific, the SEC does not need to show

27   scienter.  *See id.* at 737 n.10 ("[I]n at least one proceeding the SEC has held that a scienter

28   requirement is not necessary since Section 13(a) violations do not require scienter.") (citing

*In the Matter of WSF Corp.*, 2002 WL 917293, at *6 (SEC, May 8, 2002) ("Violations of Exchange Act Section 13(a) do not require a finding of scienter.")).

Even if Island Pacific's Forms 10-Q and Form 10-K were not prepared in conformity with GAAP, for the reasons discussed above, there is an issue of fact as to whether Furman "had knowledge of the primary violation." *Ponce*, 345 F.3d at 737. The SEC's Motion for Summary Judgment as to the Section 20(e) claim against Furman is denied.

### C.   Books and Records Provisions

#### 1.   Section 13(b)(5)

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account." 15 U.S.C. § 78m(b)(5). Section 13(b)(5) requires a showing of scienter. *See SEC v. Hilsenrath*, No. C03-3252, 2008 U.S. Dist. LEXIS 50021, at *19 (N.D. Cal., May 30, 2008). Evidence showing that a person misled company auditors can support a claim that the person knowingly circumvented a company's system of internal accounting controls. *Cf. SEC v. Shapiro*, No. 4:05cv364, 2008 U.S. Dist. LEXIS 17039, at *15 (E.D. Tex., Mar. 5, 2008) ("[A]llegations that Abbood misled the accountants or auditors about the existence of side agreements sufficiently supports the claim that he knowingly circumvented Fleming's system of internal accounting controls...."); *SEC v. Solucorp Indus.*, 274 F. Supp. 2d 379, 421 (S.D.N.Y. 2003) ("Mantia ... misrepresented the veracity of Solucorp's books and records to Solucorp's auditor during the course of its audit of Solucorp for fiscal year 1997. As a result, Mantia ... violated Section 13(b)(5) of the Exchange Act....").

Furman testified that he understood that in Dietzler's February 4, 2004 email, Dietzler was "alleging that there was a potential fraud." (Furman Dep. at 78, Pl.'s Ex. 3). On February 12, 2004 and July 11, 2004, Furman signed management representation letters to Island Pacific's auditors, stating that he had "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees." (Pl.'s Ex. 32 at 923-24; Pl.'s Ex. 36 at 951). The SEC has shown, as a matter of

law, that Furman signed the management representation letters knowing they contained a false and/or misleading statement concerning "allegations of ... suspected fraud affecting the Company." (*Id.*) By knowingly submitting false and/or misleading management representation letters to Island Pacific's auditors, Furman "knowingly circumvent[ed] ... a system of internal accounting controls...." 15 U.S.C. § 78m(b)(5). The SEC's Motion for Summary Judgment as to the claim that Furman violated Section 13(b)(5) is granted.

### 2.     Rule 13b2-1

Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account." 17 C.F.R. § 240.13b2-1. The SEC does not need to show that Furman acted with scienter in order to show he violated Rule 13b2-1. *See McConville v. SEC*, 465 F.3d 780, 789 (7th Cir. 2006); *SEC v. Hilsenrath*, No. C03-3252, 2008 U.S. Dist. LEXIS 50021, at *19 (N.D. Cal., May 30, 2008); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865-66 (S.D.N.Y. 1997).

The term "records" includes "correspondence." 15 U.S.C. § 78c(a)(37). As discussed above, on February 12, 2004 and July 11, 2004, Furman signed management representation letters to Island Pacific's auditors, which contained the false statement that Furman had "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees." (Pl.'s Ex. 32 at 923-24; Pl.'s Ex. 36 at 951). Therefore, the SEC has shown, as a matter of law, that Furman falsified a "record" in violation of Rule 13b2-1.

The SEC's Motion for Summary Judgment as to the claim that Furman violated Rule 13b2-1 is granted.

### 3.     Rule 13b2-2

Rule 13b2-2 provides: "No director or officer of an issuer shall, directly or indirectly ... make or cause to be made a materially false or misleading statement to an accountant in connection with ... [a]ny audit, review or examination of the financial statements of the issuer...." 17 C.F.R. § 240.13b2-2.

As discussed above, on February 12, 2004 and July 11, 2004, Furman signed

1  management representation letters to Island Pacific's auditors, which contained the materially

2  false and/or misleading statement that Furman had "no knowledge of any allegations of fraud

3  or suspected fraud affecting the Company received in communications from employees, [or]

4  former employees." (Pl.'s Ex. 32 at 923-24; Pl.'s Ex. 36 at 951). The evidence establishes

5  that, as matter of law, Furman violated Rule 13b2-2. The SEC's Motion for Summary

6  Judgment as to the claim that Furman violated Rule 13b2-2 is granted.

7  **D.     Rule 13a-14**

8         Rule 13a-14 provides: "Each report ... filed on Form 10-Q [or] Form 10-K ... under

9  Section 13(a) of the Act ... must include certifications.... Each principal executive and

10  principal financial officer of the issuer ... must sign a certification." 17 C.F.R. §

11  240.13a-14(a).[8] Among the certifications made by Furman on the Forms 10-Q and the Form

12  10-K was a certification that: "Based on my knowledge," the Forms 10-Q and Form 10-K did

13  not contain any untrue statement of a material fact or omit to state a material fact necessary in

14  order to make the statements made not misleading, and the Forms 10-Q and Form 10-K fairly

15  presented Island Pacific's financial condition and results of operations. (Pl.'s Ex. 15 at 416-17,

16  419; Pl.'s Ex. 16 at 490-91; Pl.'s Ex. 17 at 744-45). For the reasons discussed above, there is

17  an issue of fact as to whether Furman's certifications were false, "[b]ased on [his] knowledge."

18  The SEC's Motion for Summary Judgment as to the Rule 13a-14 claim against Furman is

19  denied.

20  **E.     Evidentiary Objections**

21         All objections to evidentiary materials cited in this Order are overruled. All objections

22  to evidentiary materials not cited in this Order are denied as moot.

23  //

24  //

25  

26  _____

        [8]   There is a conflict among courts at to whether a violation of the certification
requirement of Rule 13a-14 supports a separate cause of action. *Compare SEC v. Black*, No.
27  04C7377, 2008 WL 4394891, at *16-17 (N.D. Ill., Sept. 24, 2008) ("[A] false ... certification
does not state an independent violation of the securities law."), *with SEC v. Indigenous Global
Dev. Corp.*, 2008 U.S. Dist. LEXIS 50434 (N.D. Cal., June 30, 2008) (granting summary
28  judgment for the SEC for a defendant's violation of Rule 13a-14 and Section 13(a) of the
Exchange Act). The Court does not decide the issue at this time.

1  //

2  **V.     Conclusion**

3       IT IS HEREBY ORDERED that the SEC's Motion for Summary Judgment against

4  Furman is **GRANTED** in part and **DENIED** in part.  (Doc. # 33).  The SEC's Motion for

5  Summary Judgment is **GRANTED** as to the following claims against Furman: Section

6  13(b)(5), Rule 13b2-1, and Rule 13b2-2.  The SEC's Motion for Summary Judgment is

7  **DENIED** as to the following claims against Furman: Section 10(b), Rule 10b-5, Section 20(e),

8  and Rule 13a-14.

9       IT IS FURTHER ORDERED that all remaining dates in the Case Management

10  Conference Order (Doc. # 22) are reset as follows.

11       No Memoranda of Law or Contentions of Fact are to be filed if this case is tried to a

12  jury.  If this case is tried to the Court, counsel shall serve on each other and file their

13  memoranda of contentions of fact and law in compliance with Local Rule 16.1(f)(2) on or

14  before **January 11, 2010**.  In any event, on or before this date, all parties or their counsel shall

15  also fully comply with the pretrial disclosure requirements of Rule 26(a)(3) of the Federal

16  Rules of Civil Procedure.

17       Counsel shall confer and take the action required by Local Rule 16.1(f)(4) on or before

18  **January 19, 2010**.  The parties shall meet and confer and prepare a proposed pretrial order.

19  At this meeting, counsel shall discuss and attempt to enter into stipulations and agreements

20  resulting in simplification of the triable issues.  Counsel shall exchange copies and/or display

21  all exhibits other than those to be used for impeachment, lists of witnesses and their addresses

22  including experts who will be called to testify, and written contentions of applicable facts and

23  law. The exhibits shall be prepared in accordance with Local Rule 16.1(f)(2)(c). Counsel shall

24  cooperate in the preparation of the proposed final pretrial conference order.

25       The proposed final pretrial conference order, including written objections, if any, to any

26  party's Fed. R. Civ. P. 26(a)(3) pretrial disclosures, shall be prepared, served, and filed on or

27  before **January 25, 2010** and shall be in the form prescribed in and in compliance with Local

28  Rule 16.1(f)(6).  Any objections shall comply with the requirements of Fed. R. Civ. P.

26(a)(3).  The failure to file written objections to a party's pretrial disclosures may result in the waiver of such objections, with the exception of those made pursuant to Rules 402 (relevance) and 403 (prejudice, confusion or waste of time) of the Federal Rules of Evidence.

The Final Pretrial Conference shall be held on **February 1, 2010, at 11:00 a.m.** in Courtroom 4.

DATED:  November 18, 2009

**WILLIAM Q. HAYES**
United States District Judge