# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　Plaintiff,<br>　vs.<br>RETAIL PRO, INC. (fka Island Pacific, Inc.), BARRY M. SCHECHTER, RAN H. FURMAN, and HARVEY BRAUN,<br><br>　　　　　　　　　　Defendants. | CASE NO. 08cv1620-WQH-RBB<br><br>ORDER |

HAYES, Judge:

　　　The matter before the Court is the Motion for Reconsideration of Portions of Order Dated November 18, 2009 ("Motion for Reconsideration"), filed by Defendant Ran H. Furman. (Doc. # 50).

## I.　Background

　　　On September 4, 2008, Plaintiff Securities and Exchange Commission ("SEC") initiated this action by filing a Complaint in this Court. (Doc. # 1). The Complaint alleges:

> 　　　3.　This case involves a fraudulent scheme by Island Pacific, Inc. ('Island Pacific' or the 'Company') and its then senior management to overstate the Company's financial results for the quarters ended September 20, 2003 ('Q2 2004'), and December 31, 2003 ('Q3 2004'), and its fiscal year ended March 31, 2004 ('FY 2004'). The Company's senior management responsible for the fraud were defendants Barry M. Schechter ..., a controlling person and *de facto* officer; Ran H. Furman ..., the Chief Financial Officer; and Harvey Braun ..., the Chief Executive Officer.
>
> 　　　4.　In Q2 2004, Schechter, Furman and Braun caused Island Pacific to improperly record and report $3.9 million in revenue from a sham transaction

| | |
|---|---|
| 1 | with an Australian software company, QQQ Systems Pty Limited ('QQQ'). The transaction had no economic substance or business purpose and instead was entered into in order to artificially inflate Island Pacific's revenues reported in its financial statements. Subsequently, in the third quarter, Island Pacific improperly recorded an offsetting transaction whereby it purchased from QQQ $3.9 million of software. In fact, no contract finalizing this offsetting transaction was signed until the fourth quarter. Island Pacific and QQQ never exchanged any money as a result of these offsetting agreements. In addition, neither Island Pacific nor QQQ made any effort to sell the other's software or to determine the fair market value of their software licensing rights as required by applicable accounting principles. |

5. As a result of improperly recognizing and reporting the $3.9 million as revenue, Island Pacific overstated its revenues by 140% for Q2 2004, 29% for the nine months ending Q3 2004, and 22% for the 2004 fiscal year, and reported a small profit instead of a massive loss for Q2 2004. The defendants also failed to disclose the sham nature of the QQQ transaction and actively concealed their fraud from Island Pacific's outside auditors, and the public, by creating forged and/or fabricated documents which they used in an attempt to demonstrate that the recognition of revenue from the transaction was proper. Additionally, Furman fired a company whistleblower [i.e., Joseph Dietzler] who expressed concern in an email that the offsetting transactions were 'structured in a manner that is intended to inflate revenues for the purpose of boosting the corporation's share price.'

6. As part of the fraudulent scheme, Schechter sold 637,750 shares of Island Pacific stock, receiving $488,410 in ill-gotten gains.

7. By engaging in this conduct, the defendants variously violated and aided and abetted violations of the antifraud, issuer reporting and record-keeping, internal controls, and prohibition against misrepresentations to accountants provisions of the federal securities laws. The Commission seeks to obtain injunctions from future violations, civil penalties, and officer and director bars against Schechter, Furman, and Braun, and additionally to obtain disgorgement of ill-gotten gains from Schechter.

(Doc. # 1 ¶¶ 3-7). The Complaint alleges the following claims against Furman: (1) fraud in connection with the purchase or sale of securities pursuant to 15 U.S.C. § 78j(b); (2) record-keeping violations pursuant to 15 U.S.C. § 78m(b)(2)(A) and related regulations; (3) misrepresentations to accountants pursuant to 17 C.F.R. § 240.13b2-2; (4) internal control violations pursuant to 15 U.S.C. § 78m(b)(2)(B) and related regulations; and (5) false certification violations pursuant to 17 C.F.R. § 240.13a-14.

On August 10, 2009, the SEC filed a Motion for Summary Judgment against Furman, the sole remaining Defendant. (Doc. # 33).

On November 18, 2009, the Court issued an Order granting in part and denying in part the SEC's Motion for Summary Judgment. (Doc. # 47). The Court ordered: "The SEC's

Motion for Summary Judgment is GRANTED as to the following claims against Furman: Section 13(b)(5), Rule 13b2-1, and Rule 13b2-2. The SEC's Motion for Summary Judgment is DENIED as to the following claims against Furman: Section 10(b), Rule 10b-5, Section 20(e), and Rule 13a-14." (Doc. # 47 at 45). In the Order, the Court addressed evidence of a February 4, 2004 email sent by Joseph Dietzler, who was then Island Pacific's Contract Administrator. The email, which was sent to Furman and others at Island Pacific, stated:

> I have continuing concern[] that certain transactions involving the company QQQ appear to be structured in a manner that is intended to inflate revenues for the purpose of boosting the corporation's share price. The 'sale' to QQQ under the agreement entered into in late September 2003 creates such an appearance for the following reasons:
>
> • Substantial up-front fee for a distribution license, rather than a royalty stream
> • Revenue from the transaction comprises approximately 50% of entire quarter's revenue
> • Entered into at the close of a quarter in which revenues would have been far short of estimates, if not for the single transaction with QQQ
> • Extended payment terms were granted
> • To date, no payments have been received and are well past due
>
> Under another transaction, QQQ is selling product ownership and distribution rights to Island Pacific, and QQQ is to be compensated, in part, through debt forgiveness in amount roughly equal to the amount of the uncollected revenue that was recognized from the September sale to QQQ. Irrespective of the legitimacy of the foregoing transactions, the totality of the surrounding circumstances creates the appearance that the transactions were intended merely to boost the reportable revenue of Island Pacific in the quarter ended September 2003. Further, the timing of the second QQQ transaction is in fact in the current quarter, not the quarter ended December 31, 2003. While the second transaction is not revenue, it must be reported in the current quarter (ending March 31, 2004), as it substantially impacts the corporation's receivables.
>
> To ensure compliance with financial reporting rules, it would seem prudent that revenue recognition policies err on the conservative side, so as to avoid even the appearance of irregularity. Such practices will help ensure that the activities of the company do not precipitate potential allegations of improper accounting. I believe the transactions involving QQQ should be restructured in a manner that makes each entirely independent of the other. As payment has not [been] received for the September 2003 sale, that situation should be dealt with in accordance with routine accounting standards. I recommend that these transactions be given careful reconsideration by both senior management and the company's outside audit firm prior to release of any earnings report for the quarter ended December 31, 2003.

(Pl.'s Ex. 28 at 906).

In the November 18, 2009 Order, the Court stated:

> The SEC has produced uncontroverted evidence establishing that Furman knew that Dietzler had alleged "potential fraud" with regard to the QQQ transactions (Furman Dep. at 78, Pl.'s Ex. 3), but Furman nevertheless represented to the auditors eight days later that he had no knowledge of any allegations of "suspected fraud ... received in communications from employees [or] former employees." (Pl.'s Ex. 32 at 923). This evidence warrants summary judgment on the SEC's books and records claims against Furman, *see infra*, and prevents application of the defense of reliance on professional assistance, *see SEC v. Goldfield Mines*, 758 F.2d 459, 467 (9th Cir. 1985) (in order to establish the defense, a defendant must show he "made complete disclosure" to the professional). However, it is insufficient to establish, as a matter of law, scienter for the SEC's Section 10(b) and Rule 10b-5 claim against Furman.

(Doc. # 47 at 39). With respect to the claims as to which summary judgment was granted, the Court stated:

> 1. Section 13(b)(5)
>
> Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account." 15 U.S.C. § 78m(b)(5). Section 13(b)(5) requires a showing of scienter. *See SEC v. Hilsenrath*, No. C03-3252, 2008 U.S. Dist. LEXIS 50021, at *19 (N.D. Cal., May 30, 2008). Evidence showing that a person misled company auditors can support a claim that the person knowingly circumvented a company's system of internal accounting controls. *Cf. SEC v. Shapiro*, No. 4:05cv364, 2008 U.S. Dist. LEXIS 17039, at *15 (E.D. Tex., Mar. 5, 2008) ("[A]llegations that Abbood misled the accountants or auditors about the existence of side agreements sufficiently supports the claim that he knowingly circumvented Fleming's system of internal accounting controls...."); *SEC v. Solucorp Indus.*, 274 F. Supp. 2d 379, 421 (S.D.N.Y. 2003) ("Mantia ... misrepresented the veracity of Solucorp's books and records to Solucorp's auditor during the course of its audit of Solucorp for fiscal year 1997. As a result, Mantia ... violated Section 13(b)(5) of the Exchange Act....").
>
> Furman testified that he understood that in Dietzler's February 4, 2004 email, Dietzler was "alleging that there was a potential fraud." (Furman Dep. at 78, Pl.'s Ex. 3). On February 12, 2004 and July 11, 2004, Furman signed management representation letters to Island Pacific's auditors, stating that he had "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees." (Pl.'s Ex. 32 at 923-24; Pl.'s Ex. 36 at 951). The SEC has shown, as a matter of law, that Furman signed the management representation letters knowing they contained a false and/or misleading statement concerning "allegations of ... suspected fraud affecting the Company." (*Id.*) By knowingly submitting false and/or misleading management representation letters to Island Pacific's auditors, Furman "knowingly circumvent[ed] ... a system of internal accounting controls...." 15 U.S.C. § 78m(b)(5). The SEC's Motion for Summary Judgment as to the claim that Furman violated Section 13(b)(5) is granted.
>
> 2. Rule 13b2-1
>
> Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account." 17 C.F.R. § 240.13b2-1. The SEC does not need to show that Furman acted with scienter in order to show

he violated Rule 13b2-1. *See McConville v. SEC*, 465 F.3d 780, 789 (7th Cir. 2006); *SEC v. Hilsenrath*, No. C03-3252, 2008 U.S. Dist. LEXIS 50021, at *19 (N.D. Cal., May 30, 2008); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865-66 (S.D.N.Y. 1997).

The term "records" includes "correspondence." 15 U.S.C. § 78c(a)(37). As discussed above, on February 12, 2004 and July 11, 2004, Furman signed management representation letters to Island Pacific's auditors, which contained the false statement that Furman had "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees." (Pl.'s Ex. 32 at 923-24; Pl.'s Ex. 36 at 951). Therefore, the SEC has shown, as a matter of law, that Furman falsified a "record" in violation of Rule 13b2-1.

The SEC's Motion for Summary Judgment as to the claim that Furman violated Rule 13b2-1 is granted.

3. Rule 13b2-2

Rule 13b2-2 provides: "No director or officer of an issuer shall, directly or indirectly ... make or cause to be made a materially false or misleading statement to an accountant in connection with ... [a]ny audit, review or examination of the financial statements of the issuer...."  17 C.F.R. § 240.13b2-2.

As discussed above, on February 12, 2004 and July 11, 2004, Furman signed management representation letters to Island Pacific's auditors, which contained the materially false and/or misleading statement that Furman had "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees." (Pl.'s Ex. 32 at 923-24; Pl.'s Ex. 36 at 951). The evidence establishes that, as matter of law, Furman violated Rule 13b2-2. The SEC's Motion for Summary Judgment as to the claim that Furman violated Rule 13b2-2 is granted.

(Doc. # 47 at 42-44).

On December 18, 2009, Furman filed the Motion for Reconsideration. (Doc. # 50). Furman moves for reconsideration of the following portions of the November 18, 2009 Order: (1) "the portion of the Order at page 39, lines 6 through 10, whereby the Court finds that the evidence prevents the application of the defense of reliance on professionals"; (2) "the portion of the Order at page 42, line 8, through page 43, line 6, whereby the Court grants the SEC's Motion for Summary Judgment as to the claim that Furman violated Section 13(b)(5)"; (3) "the portion of the Order at page 43, lines 7 through 22, whereby the Court grants the SEC's Motion for Summary Judgment as to the claim that Furman violated Rule 13b2-1"; and (4) "the portion of the Order at page 43, line 23, through page 44, line 6, whereby the Court grants the SEC's Motion for Summary Judgment as to the claim that Furman violated Rule 13b2-2."

1  (Doc. # 50 at 1). Furman contends that reconsideration is appropriate for two reasons:

2  First, a triable issue of fact exists as to whether Island Pacific, Inc.'s ...
3  independent auditors, SingerLewak, received full disclosure of the information
   contained in the February 4, 2004 e-mail authored by Joseph Dietzler ..., a
4  former employee of Island Pacific. Second, a triable issue of fact exists as to
   whether SingerLewak's trained accounting professionals and experts would
5  consider Dietzler's conclusory and unsubstantiated February 2004 e-mail to be
   of any material value in light of the information the auditors already had
   available to them (the sum of which substantially outweighed the limited amount
6  of information to which Dietzler had access).

7  (Doc. # 50 at 2).

8  On January 22, 2010, the SEC filed an opposition to the Motion for Reconsideration.
9  (Doc. # 55). The SEC contends that the Motion for Reconsideration should be denied because
10 "there is no genuine issue of material fact as to the materiality to a reasonable auditor of
11 Dietzler's allegations," and "Furman has failed to establish that there is a triable issue of fact
12 establishing his reliance on auditors defense." (Doc. # 3, 8).

13 On February 1, 2010, Furman filed a reply brief. (Doc. # 57).

14 **II.    Standard of Review**

15 "Reconsideration is appropriate if the district court (1) is presented with newly
16 discovered evidence, (2) committed clear error or the initial decision was manifestly unjust,
17 or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.*,
18 5 F.3d 1255, 1263 (9th Cir. 1993) (citations omitted). Furman contends: "[T]he
19 reconsideration standard is satisfied because the Court, through its Order, committed clear
20 error and made manifestly unjust decisions by improperly granting summary judgment where
21 triable issues of fact exist." (Doc. # 50-1 at 3).

22 **III.   Discussion**

23     **A.    Dietzler's Email**

24 Furman contends that "the Court erred in ruling that the reliance on professionals
25 defense is inapplicable because there are triable issues of fact as to whether the information
26 contained in Dietzler's February 4, 2004 email was fully disclosed to Island Pacific's
27 auditors." (Doc. # 50-1 at 6).

28 In order to establish the affirmative defense of reliance on professional assistance, a

1  defendant "must show that [he] (1) made a complete disclosure to [the professional]; (2)
2  requested [the professional]'s advice as to the legality of the contemplated action; (3) received
3  advice that it was legal; and (4) relied in good faith on that advice." *SEC v. Goldfield Mines*,
4  758 F.2d 459, 467 (9th Cir. 1985) (citation omitted).

5        Furman has presented no evidence that he—or anyone else—disclosed to Island
6  Pacific's auditors the existence of Dietzler's February 4, 2004 email.  The email states
7  Dietzler's "concern[] that certain transactions involving the company QQQ appear to be
8  structured in a manner that is intended to inflate revenues for the purpose of boosting the
9  corporation's share price....  [T]he timing of the second QQQ transaction is in fact in the
10 current quarter, not the quarter ended December 31, 2003....  [T]he second transaction ... must
11 be reported in the current quarter (ending March 31, 2004)...."  (Pl.'s Ex. 28 at 906).  These
12 allegations are sufficient to be considered allegations of fraud or suspected fraud.  *Cf. In re*
13 *Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("[O]verstating of revenues may state a
14 claim for securities fraud, as under GAAP, revenue must be *earned* before it can be
15 recognized.") (quotation omitted).  More importantly, Furman testified at his deposition that
16 he "underst[oo]d" Dietzler to be "alleging that there was a potential fraud."  (Furman Dep. at
17 78, Pl.'s Ex. 3).  There is no evidence in the record contradicting this testimony.  It is
18 *Furman's* state of mind that is relevant to establishing the defense of reliance on professionals
19 and scienter.  *See Goldfield Mines*, 758 F.2d at 467 ("If a company officer knows that the
20 financial statements are false or misleading and yet proceeds to file them, the willingness of
21 an accountant to give an unqualified opinion with respect to them does not negate the existence
22 of the requisite intent or establish good faith reliance.") (quotation omitted).  The Court
23 concludes that Furman has failed to create an issue of fact as to whether, at least as of February
24 4, 2004, Furman "made a complete disclosure" to Island Pacific's auditors.  *Id*.

25       Furman also contends: "[A] triable issue of fact exists as to whether SingerLewak's
26 trained accounting professionals and experts would consider Dietzler's conclusory and
27 unsubstantiated February 2004 e-mail to be of any material value in light of the information
28 the auditors already had available to them (the sum of which substantially outweighed the

1 limited amount of information to which Dietzler had access)." (Doc. # 50 at 2).

2   The materiality of Dietzler's email to the auditors is relevant to the defense of reliance on professional assistance and to the Court's summary judgment ruling on Rule 13b2-2. *See Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("If it is true that defendants withheld material information from their accountants, defendants will not be able to rely on their accountant's advice as proof of good faith.") (citation omitted); *see also* 17 C.F.R. § 240.13b2-2 ("No director or officer of an issuer shall, directly or indirectly: (1) make or cause to be made a materially false or misleading statement to an accountant in connection with ... (i) [a]ny audit, review or examination of the financial statements of the issuer."); *McConville v. SEC*, 465 F.3d 780 (7th Cir. 2006) (affirming finding that a chief financial officer was in violation of federal securities law for omitting material information from management representation letters issued to auditors). "The ... materiality element is satisfied only if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable [auditor] as having significantly altered the total mix of information made available." *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quotation omitted). "Materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact. However, summary judgment may be granted in appropriate cases." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) (citations omitted).

19   The SEC regulations in effect at the time provide: "Prior to filing, interim financial statements included in quarterly reports on Form 10-Q ... must be reviewed by an independent public accountant using professional standards and procedures for conducting such reviews, as established by generally accepted auditing standards, as may be modified or supplemented by the Commission." 17 C.F.R. § 210.10-01(d). The relevant generally accepted auditing standards at the time instructed accountants to inquire of management "who have responsibility for financial and accounting matters concerning ... [w]hether they are aware of allegations of fraud or suspected fraud affecting the entity, for example, received in communications from employees [or] former employees...." AICPA Professional Standards (Jan. 2004), Auditing ("AU") § 722.18(c); *see* Moser Decl., Ex. 1, Doc. # 55. An auditor was also instructed to

1  obtain written representations from management relating to, among other matters, "knowledge
2  of any allegations of fraud or suspected fraud affecting the entity received in communications
3  from employees [or] former employees...." *Id.* at § 722.24(f); *see also* AU § 316.19, 316.20,
4  316.24 (same). Because independent auditors were required to inquire and obtain written
5  representations concerning employee allegations of fraud or suspected fraud, the Court
6  concludes that there is no issue of fact as to whether Dietzler's allegations in the February 4,
7  2004 email would have been material to the independent auditors.

8  Furman contends that the materiality determination should be influenced by the fact that
9  Dietzler "held a lower level position." (Doc. # 50-1 at 5). The generally accepted auditing
10 standards cited above do not identify an employee's job title as being a relevant consideration.
11 Even if it is a relevant consideration, it is undisputed that Dietzler was Island Pacific's
12 Contracts Administrator, and he reported directly to Furman. (Dietzler Test. at 17-18, 22, Pl.'s
13 Ex. 30; Furman Test. at 155, Pl.'s Ex. 5). The Court concludes that Dietzler's job title does
14 not create an issue of fact as to materiality.

15 In the Motion for Reconsideration, Furman contends that an issue of fact as to
16 materiality exists because Dietzler's opinions were "uninformed" and "the auditors had access
17 to substantially more information than Dietzler regarding the two transactions." (Doc. # 50-1
18 at 4). Furman's testimony contradicts this assertion. Furman testified that, "based on" the
19 documentary evidence, it does not "seem possible that there could have been a final agreement
20 [as to the second transaction with QQQ] on December 31, 2003." (Furman Test. at 143, Pl.'s
21 Ex. 5). The documentary evidence is contrary to Furman's "belie[f]" at the time that the
22 second QQQ transaction "was finalized prior to December 31, 2003." (Furman Decl. ¶ 18,
23 Doc. # 36-3). Dietzler's February 4, 2004 email states: "[T]he timing of the second QQQ
24 transaction is in fact in the current quarter, not the quarter ended December 31, 2003.... [T]he
25 second transaction ... must be reported in the current quarter (ending March 31, 2004)...."
26 (Pl.'s Ex. 28 at 906). Furman has presented no evidence that the auditors were informed that
27 "the timing of the second QQQ transaction is in fact in the [quarter ending March 31, 2004],
28 not the quarter ended December 31, 2003." (*Id.*) Instead, the evidence indicates that the

1  auditors were told on February 11, 2004—a week after Dietzler's email—that the second QQQ
2  transaction occurred "[o]n 12/31/03." (Furman Ex. 25 at 482; Aubury Dep. at 108-11, Furman
3  Ex. 13). The undisputed evidence indicates that, in February of 2004, Dietzler was better
4  informed than either the auditors or Furman concerning the timing of the second QQQ
5  transaction.

6  The Court concludes that Furman has failed to show that the Court committed clear
7  error or made manifestly unjust decisions regarding the reliance on professionals defense or
8  the materiality of Dietzler's February 4, 2004 email.

9  In the Motion for Reconsideration, "Furman requests that the Court clarify its Order to
10 make clear that the reliance of professionals defense is available to Furman with respect to all
11 of the Commission's claims pertaining to Furman's conduct prior to his receipt of Dietzler's
12 email (e.g., prior to February 4, 2004)." (Doc. # 50-1 at 2). The Court declines to rule on this
13 request at this time. Either party may raise this issue in a motion in limine.

14 **B.    Scienter**

15 Furman contends that "[t]he Court's scienter rulings with respect to Section 10(b) and
16 Rule 10b-5, on the one hand, and Section 13(b)(5), on the other hand, are contradictory. Given
17 the Court's scienter conclusions with respect to Section 10(b) and Rule 10b-5, the Court should
18 have denied the Commission's Motion for Summary Judgment with respect to Section
19 13(b)(5)." (Doc. # 50-1 at 5 n.3).

20 Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly
21 circumvent or knowingly fail to implement a system of internal accounting controls or
22 knowingly falsify any book, record, or account." 15 U.S.C. § 78m(b)(5).

23 There is significant authority that Section 13(b)(5) does not impose a scienter
24 requirement. *See Ponce v. SEC*, 345 F.3d 722, 737 n.10 (9th Cir. 2003) ("A plain reading of
25 section 13(b) reveals that it ... does not impose a scienter requirement."); *McConville v. SEC*,
26 465 F.3d 780, 789-90 (7th Cir. 2006) (finding no scienter requirement under Section 13 or
27 regulations thereunder); *SEC v. McNulty*, 137 F.3d 732, 740 (2d Cir. 1998) (explaining that
28 the legislative history of Section 13(b) "plainly impl[ies]" that the word "knowing" does not

impose a scienter requirement in civil actions); *SEC v. Leslie*, No. C07-3444, 2008 WL 4183939, at *1 (N.D. Cal., Sept. 9, 2008) (collecting cases); *but see SEC v. Hilsenrath*, No. C03-3252, 2008 WL 2225709, at *5 (N.D. Cal., May 30, 2008) ("In contrast to Section 13(b)(5), [Rule 13b2-1] does not require a showing of scienter.").

But even if scienter is required to prove a violation of Section 13(b)(5), the 13(b)(5) scienter requirement would involve a different showing than the scienter requirement to prove violations of Section 10(b) and Rule 10b-5. *Compare* 15 U.S.C. § 78m(b)(5) (Section 13(b)(5)), *with* 15 U.S.C. § 78j(b) (Section 10(b)), *and* 17 C.F.R. § 240.10b-5 (Rule 10b-5). As the Court stated in the November 18, 2009 Order:

> A reasonable jury could find that, despite Furman's misrepresentation to the auditors regarding Dietzler's email, Furman did not make misrepresentations with scienter in Island Pacific's annual and quarterly reports (Forms 10-K and 10-Q), press releases and conference calls.... The 'in connection with the purchase or sale of any security' requirement for Section 10(b) and Rule 10b-5 liability can [be] satisfied by 'fraud ... involv[ing] *public* dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely....' The SEC has not shown that the 'in connection with' requirement would be satisfied when the misrepresentation is made in a *non-public* letter to auditors.

(Doc. # 47 at 40 (citations omitted)).

As set forth in the November 18, 2009 Order, the SEC has produced uncontroverted evidence that Furman "knowingly circumvent[ed] ... a system of internal accounting controls" by knowingly submitting a false and/or misleading management representation letter to Island Pacific's auditors. 15 U.S.C. § 78m(b)(5); *see* Doc. # 47 at 42-43. The undisputed evidence shows that Furman "underst[oo]d" Dietzler to have alleged "potential fraud" on February 4, 2004. (Furman Dep. at 78, Pl's Ex. 3). On February 12, 2004, Furman signed a management representation letter to Island Pacific's auditors, stating that he had "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, [or] former employees." (Pl.'s Ex. 32 at 923-24; Pl.'s Ex. 36 at 951). The undisputed evidence shows that Furman signed the management representation letter with a knowing or at least reckless "intent to deceive" the auditors. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (defining "reckless" in the Section 10(b) context).

**IV. Conclusion**

IT IS HEREBY ORDERED that the Motion for Reconsideration is **DENIED**. (Doc. # 50).

IT IS FURTHER ORDERED that all remaining dates set the November 18, 2009 Order (Doc. # 47 at 45-46) are reset as follows.

Counsel shall serve and file their memoranda of contentions of fact and law in compliance with Local Rule 16.1(f)(2) on or before **June 11, 2010**. On or before **June 11, 2010**, all parties or their counsel shall also fully comply with the pretrial disclosure requirements of Rule 26(a)(3) of the Federal Rules of Civil Procedure.

Counsel shall confer and take the action required by Local Rule 16.1(f)(4) on or before **June 18, 2010**. The parties shall meet and confer and prepare a proposed pretrial order. At this meeting, counsel shall discuss and attempt to enter into stipulations and agreements resulting in simplification of the triable issues. Counsel shall cooperate in the preparation of the proposed final pretrial conference order.

The proposed final pretrial conference order, including written objections, if any, to any party's Federal Rule of Civil Procedure 26(a)(3) pretrial disclosures, shall be prepared, served, and filed on or before **July 2, 2010** and shall be in the form prescribed in and in compliance with Local Rule 16.1(f)(6). Any objections shall comply with the requirements of Federal Rule of Civil Procedure 26(a)(3). The failure to file written objections to a party's pretrial disclosures may result in the waiver of such objections, with the exception of those made pursuant to Rules 402 and 403 of the Federal Rules of Evidence.

The Final Pretrial Conference shall be held on **July 9, 2010, at 10:00 a.m.** in Courtroom 4.

DATED: April 9, 2010

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge