FILED

FEB 2 5 2011

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,

            vs.

RAN H. FURMAN,

                                    Defendant.

CASE NO. 08cv1620-WQH-RBB

## JURY INSTRUCTIONS

**Instruction No. 1**

Members of the jury, now that you have heard all of the evidence, it is my duty to instruct you on the law which applies to this case. A copy of these instructions will be available in the jury room for you to consult during your deliberations.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

**Instruction No. 2**

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits which have been received into evidence; and

(3) any facts to which the lawyers have agreed or stipulated.

**Instruction No. 3**

The parties have agreed to certain facts.  You should therefore treat these facts as having been proved.  These facts are:

1.    Ran H. Furman is a resident of San Diego, California.  Furman was the Chief Financial Officer ("CFO") of Retail Pro, Inc., then known as Island Pacific, Inc., from September 2003 to January 2005.

2.    Furman has been a CFO and director of several other public companies. From approximately 2001 to 2003, when he went to work for Island Pacific, Furman was CFO of E-Digital, a public company.  From approximately November 2007 through September 2008, Furman was the CFO and a director of Osage Exploration and Development, Inc. ("Osage"), a publicly traded oil and gas company.  During six or seven months of this same period, from the beginning to the middle of 2008, Furman was also the CFO and a director of Bonanza Oil and Gas, a public oil exploration company.  When this lawsuit was filed by the Commission, Furman and the CEO of Osage decided that Furman should leave Osage.  Since approximately February 2009, Furman has owned a consulting company called Black Rock Management.  Furman performs financial consulting work for Osage consisting of "CFO type of activities that the company needs."

3.    Furman was a CPA in Washington State but allowed his CPA license to expire in 1993.  From 1990 to 1992, Furman worked for the major accounting firm of Deloitte & Touche, where he participated in audits of

public companies.

4.   Furman has an MBA degree from Columbia University, which he received in 1994. He received his Bachelor's Degree cum laude from the University of Washington in accounting and business economics in 1990.

5.   Retail Pro, Inc., formerly known as Island Pacific, Inc. ("Island Pacific"), is a Delaware corporation. At all relevant times, Island Pacific was headquartered in Irvine, California, and also had offices in La Jolla, California. During all relevant times, Island Pacific developed and sold software to the retail industry. During the relevant period, Island Pacific's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the American Stock Exchange.

6.   Barry M. Schechter founded Island Pacific (then known as SVI Solutions, Inc.) in 1994 and, at various times, has been its Chief Executive Officer ("CEO") and its Chairman of the Board of Directors. During the relevant period, Schechter was designated as a consultant to Island Pacific.

7.   Harvey Braun was Island Pacific's CEO from April 2003 to April 2004, and the Chairman of the Board of Directors from July 2003 to February 2004.

8.   Furman was aware that Island Pacific's revenue recognition policies were set forth in its Forms 10-K and 10-Q. Furman was also aware that for revenue to be recognized on a sale of software, and on the sale to QQQ in particular, evidence of an arrangement, assurance of collectability, delivery of product, and certainty of the amount were required.

9.   After the market closed on November 12, 2003, at or about 4:00 p.m.

Eastern Standard Time ("EST"), Island Pacific announced its Q2 2004 financial results in a press release headlined "Company Reports 76% Increase in Revenues," which represented that it earned $6.7 million in revenues - a 76% increase over revenues of $3.8 million for the same period in the previous year.  Island Pacific also reported gross profit (revenues minus cost of goods sold) of $5.6 million, and income from continuing operations of $699,000.  Additionally, the press release stated that the Company reiterated its previous guidance for fiscal 2004.

10.   On November 13, the day following the positive earnings release, Island Pacific's stock closed at $2.25, up 8.2% from the prior day's close, and trading volume increased to 1.75 million shares, up from the prior five day average trading volume of 100,160 shares.

11.   Island Pacific and QQQ negotiated an agreement whereby Island Pacific agreed to purchase a sublicense to market QQQ's "Pyramid" software for $3.9 million.

12.   On February 13, 2004, at or about 9:00 a.m. EST, Island Pacific broadcast an earnings conference call with securities analysts and shareholders over the Internet.  Furman participated in reviewing and editing the earnings conference call script.  Furman and Braun also each was present and spoke during the earnings conference call.  Furman stated, in part:

> We reported revenues of approximately $5.1 million . . . .
>
> We reported a loss from continuing operations of $346,000 . . .

> We reported gross profits of $3.7 million . . .
> As a percentage of revenues, gross profit
> increased to 72.5% from 69.5% in the year
> earlier period.  The increase in gross profit is
> due primarily to a better mix of higher margin
> software sales and a reduction in professional
> services . . . .

> For the 9 months ended December 31, 2003,
> we reported revenues of $17.3 million, a 9.3%
> increase versus the same period in fiscal 2003.
> We reported income from continuing
> operations of $638,000 versus a loss from
> continuing operations of $4 million for the
> same period last year . . . .

In addition, Braun represented:

> In the course of this fiscal year we have
> created a new Island Pacific.  When I spoke to
> you in 2003 I mentioned that we were going
> [t]o launch several new products which would
> likely yield revenues during the second half of
> the calendar year.  We have done that.  We
> remain very confident that we will generate
> significant revenue from new and existing
> products . . . .

> Now I would like to address our financial
> guidance for the balance of our fiscal year.
> We expect to report fourth quarter revenues of
> $7 to $8 million and net income of 2 to 3 cents
> per diluted share . . . .

> In closing, I take responsibility and am
> personally disappointed in the performance of
> the group for the third quarter . . . .  It is
> imperative that you and the stockholders
> understand that this is a bump in the road . . . .
> To put the situation in perspective, Island
> Pacific lost over $40 million during a recent 3
> year period and our performance over the first
> 9 months of this year reflects a $4 million plus
> swing in profitability . . . .

13.    Between Island Pacific's announcements of its Q2 2004 and Q3 2004 financial results, Island Pacific stock had traded between $1.75 and $2.90.  On February 13, the day of the third quarter earnings announcement, Island Pacific's stock closed at $1.43, down 32.5% from the prior day's close of $2.12, and more than 4.8 million shares traded.  On February 17, the stock fell to $1.37, with more than 2.4 million shares traded.  Island Pacific's stock price continued to decline and was trading below $1 by May 2004.

**Instruction No. 4**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition some testimony and exhibits may have been received only for a limited purpose; where I have given a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

**Instruction No. 5**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what the witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

**Instruction No. 6**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness' memory;

(3) the witness' manner while testifying;

(4) the witness' interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness' testimony;

(6) the reasonableness of the witness' testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

**Instruction No. 7**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means, or other tool of technology, including cell phone, Blackberry, iPhone, Skype, e-mail, text messaging, Twitter, Internet chat room, blog, and/or website, including Facebook, MySpace, LinkedIn and/or YouTube.  This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case.  But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any

research, such as consulting dictionaries or reference materials, searching the Internet, websites, blogs, or using any other electronic tools to obtain information about this case; and do not make any investigation or in any other way try to learn about the case on your own.  In sum, please do not try to find out information from any source outside the confines of this courtroom to help you decide this case.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

**Instruction No. 8**

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  The questions and answers are recorded.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

**Instruction No. 9**

You have heard testimony from persons who, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness' education and experience, the reasons given for the opinion, and all the other evidence in the case.

**Instruction No. 10**

Certain charts and summaries that have not been received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

**Instruction No. 11**

When a party has the burden of proof on any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

**Instruction No. 12**

Congress has enacted securities laws designed to protect the integrity of financial markets.  Plaintiff claims that Defendant violated the securities laws. Specifically, Plaintiff claims that Defendant (1) violated the antifraud provisions of the federal securities laws, (2) aided and abetted Island Pacific's violations of the reporting provisions of the federal securities laws, and (3) falsely certified Island Pacific's second and third quarter filings with the Securities and Exchange Commission.

There are terms concerning securities laws that have a specific legal meaning. The following definitions apply throughout these instructions, unless noted otherwise.

A security is an investment of money in a commercial, financial or other business enterprise, with the expectation of profit or other gain produced by the efforts of others. Some common types of securities are stocks.

The buying and selling of securities is controlled by the Securities Laws.  Many of these laws are administered by Plaintiff Securities and Exchange Commission ("SEC").

A "10b-5 Claim" is a claim brought under a federal statute, Section 10(b) of the Securities Exchange Act of 1934, which in essence prohibits acts of deception in connection with the purchase or sale of a security and in violation of rules and regulations that the SEC has the duty and power to issue.  A corresponding SEC Rule, Rule 10b-5, prohibits the misrepresentation of material facts and the omission of material facts in connection with the purchase or sale of securities.

A misrepresentation is a statement of material fact that is false or misleading when it is made.  A statement may be misleading even if it is literally true if the context

in which the statement was made caused the listener or reader to remain unaware of the actual state of affairs.

An omission is a failure to disclose a material fact that had to be disclosed to prevent other statements that were made from being misleading.

"In connection with" means that there was some nexus or relationship between the allegedly fraudulent conduct and the sale or purchase of the securities.

An instrumentality of interstate commerce includes the postal mails, e-mails, telephone, telegraph, telefax, interstate highway system, Internet and similar methods of communication and travel from one state to another within the United States.

**Instruction No. 13**

In the first claim, Plaintiff alleges that Defendant violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Plaintiff alleges that Defendant committed a financial fraud on the investing public by fraudulently manipulating the revenues of Island Pacific during the years 2003 and 2004. Plaintiff alleges that Defendant did so by improperly booking in the second quarter a $3.9 million sale of software to an Australian start-up company, QQQ Systems Pty Limited, and then improperly recording in the third quarter an offsetting transaction, which eliminated a $3.9 million receivable from QQQ. Plaintiff alleges that as a result of improperly recognizing and reporting the $3.9 million as revenue, Island Pacific overstated its second quarter revenues, its third quarter revenues, and its annual revenues. Plaintiff alleges that Defendant caused Island Pacific's false revenues to be reported to the investing public in Island Pacific's earnings releases, in company conference calls with analysts about the company's financial results, and in Island Pacific's filings with the SEC, and omitted to disclose material facts concerning the transactions. This is referred to as Plaintiff's "Rule 10b-5 claim."

On this claim, Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1.      In connection with the purchase or sale of securities, Defendant (a) employed a device, scheme or artifice to defraud, or (b) made an untrue statement of a material fact, (c) or omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading, or (d) engaged in an act, practice or course of business that

operated as a fraud or deceit;

2. Defendant acted with scienter; and

3. Defendant used, or caused the use of, an instrumentality of interstate commerce, such as mail or telephone, or a facility of a national securities exchange in connection with the purchase or sale of securities, regardless whether the instrumentality or facility itself was used to make an untrue statement or a material omission.

If you find that Plaintiff has proved each of the above elements, your verdict should be for Plaintiff as to the Rule 10b-5 claim.  If, on the other hand, you find that Plaintiff has failed to prove any of these elements, your verdict should be for Defendant as to the Rule 10b-5 claim.

**Instruction No. 14**

A device, scheme or artifice to defraud is merely a plan for the accomplishment of any fraudulent objective.

**Instruction No. 15**

Plaintiff must prove by a preponderance of the evidence that the misrepresentation or omission of Defendant was material.

A factual representation concerning a security is material if there is a substantial likelihood a reasonable investor would consider the fact important in deciding whether or not to buy or sell that security.

An omission concerning a security is material if a reasonable investor would have regarded what was not disclosed to him or her as having significantly altered the total mix of information he or she took into account in deciding whether to buy or sell the security.

You must decide whether something was material based on the circumstances as they existed at the time of the statement or omission.

**Instruction No. 16**

To establish that Defendant made a false or misleading statement in connection with an SEC filing, Plaintiff must show that Defendant either: (1) signed a public filing containing a material misstatement; or (2) had substantial participation in the preparation of any materially false or misleading statement contained in a filing.

## Instruction No. 17

A defendant acts with scienter when the defendant makes an untrue statement with the knowledge that the statement was false or with reckless disregard for whether the statement was true. A defendant acts with scienter if the defendant omits necessary information with the knowledge that the omission would make the statement false or misleading or with reckless disregard for whether the omission would make the statement false or misleading.

"Reckless" means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it.

**Instruction No. 18**

Defendant asserts that he relied in good faith on professionals (Island Pacific's outside auditors) in taking certain actions.  Reliance on professionals may be considered in your determination whether a defendant acted with scienter.

To establish good faith reliance on the advice of professionals, you must find that Defendant has demonstrated each of the following elements:

1.   Defendant fully disclosed all material facts to the professional;

2.   Defendant requested the professional's advice as to the propriety under Generally Accepted Accounting Principles ("GAAP") of the contemplated action;

3.   Defendant received advice from the professional that the contemplated action was proper under GAAP; and

4.   Defendant relied in good faith on that advice.

However, if Defendant knew or was reckless in not knowing that Island Pacific's financial statements were false or misleading and yet proceeded to cause them to be filed, the willingness of an accountant to give an unqualified opinion with respect to them does not establish good faith reliance.

**Instruction No. 19**

Generally Accepted Accounting Principles, also referred to as GAAP, are the conventions, rules, and procedures that define accepted accounting practices.

**Instruction No. 20**

In the second claim, Plaintiff claims that Defendant aided and abetted Island Pacific's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13, by causing the filing of false reports with the SEC in 2003 and 2004. This is referred to as Plaintiff's "aiding and abetting claim."

Companies must file periodic reports with the SEC, including annual Forms 10-K and quarterly Forms 10-Q. Section 13(a) and Rules 13a-1 and 13a-13 require that companies make those reports factually accurate and not omit information that would otherwise make the information in the reports not misleading. Rule 12b-20 provides that in addition to the information expressly required to be included in a statement or report, the company shall add such further material information as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading. I have previously instructed you on what "material" means. It has the same meaning here.

There is no requirement that the company have acted knowingly or recklessly to violate these provisions.

On this claim, Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1.    Island Pacific committed one or more violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13. This is called the "primary violation." The primary violation may be established by showing that any one of Island Pacific's employees or officers, including Defendant, committed the violative acts;

2.  Defendant had knowledge of the primary violation and of his role in furthering it; and

3.  Defendant provided substantial assistance in the primary violation.

If you find that Plaintiff has proved each of the above elements, your verdict should be for Plaintiff as to the aiding and abetting claim. If, on the other hand, you find that Plaintiff has failed to prove any of these elements, your verdict should be for Defendant as to the aiding and abetting claim.

**Instruction No. 21**

In the third claim, Plaintiff claims that Defendant violated SEC Rule 13a-14 by signing false certifications included with Island Pacific's 2004 second and third quarter Forms 10-Q.  As I previously instructed you, Section 13(a) requires companies to file periodic reports with the SEC, including quarterly reports.  Rule 13a-14 requires that the chief financial officer of the company sign a form certifying that the report fully complies with the requirements of the Exchange Act and fairly presents, in all material respects, the financial condition and results of operations of the company.  This is referred to as Plaintiff's "Rule 13a-14 claim."

On this claim, Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1.    Defendant signed a certification included in a quarterly filing by Island Pacific certifying that the report fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company;

2.    The certification was false; and

3.    When Defendant signed the certification, Defendant knew the certification was false.

If you find that Plaintiff has proved each of the above elements, your verdict should be for Plaintiff as to the Rule 13a-14 claim.  If, on the other hand, you find that Plaintiff has failed to prove any of these elements, your verdict should be for Defendant as to the Rule 13a-14 claim.

**Instruction No. 22**

When you begin your deliberations, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should.  Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

**Instruction No. 23**

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes.

**Instruction No. 24**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing; and I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the court.

**Instruction No. 25**

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.