# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                Plaintiff,<br><br>        vs.<br><br>RETAIL PRO, INC. (fka Island Pacific, Inc.), BARRY M. SCHECHTER, RAN H. FURMAN, and HARVEY BRAUN,<br><br>                                Defendants. | CASE NO. 08cv1620-WQH-RBB<br><br>ORDER |

HAYES, Judge:

The matters before the Court are the Renewed Motion for Judgment as a Matter of Law (ECF No. 176), and the Motion for New Trial (ECF No. 177), filed by Defendant Ran H. Furman.

## I.    Background

On September 4, 2008, Plaintiff Securities and Exchange Commission ("SEC") filed a Complaint in this Court.  (ECF No. 1).  The Complaint alleged the following claims against Furman: (1) fraud in connection with the purchase or sale of securities pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) aiding and abetting issuer reporting violations pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13; (3) record-keeping violations pursuant to Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A) and Rule 13b2-1 thereunder; (4)

misrepresentations to accountants pursuant to Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2; (5) internal control violations pursuant to Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5); and (6) false certification violations pursuant to Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14.

On November 18, 2009, the Court issued an Order granting in part and denying in part the SEC's Motion for Summary Judgment.  (ECF No. 47).  The Court granted summary judgment in favor of the SEC as to the Rule 13b2-1 claim, the Rule 13b2-2 claim and the Section 13(b)(5) claim.

On April 9, 2010, the Court denied Furman's Motion for Reconsideration of the November 18, 2009 summary judgment Order.  (ECF No. 58).

On February 15, 2011, a jury trial commenced as to the SEC's remaining claims against Furman.  (ECF No. 136).

On February 23, 2011, after the close of the SEC's case, Furman filed a Motion for Directed Verdict pursuant to Federal Rule of Civil Procedure 50(a).  (ECF No. 143).

On February 25, 2011, the jury returned a unanimous Verdict, finding the following: "Furman violate[d] Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder"; "Furman aid[ed] and abet[ted] one or more violations by Island Pacific of Section 13(a) of the Securities Exchange Act of 1934 and Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder"; and "Furman violate[d] Rule 13a-14 promulgated under the Securities Exchange Act of 1934."  (ECF No. 147 at 1-2).

On March 4, 2011, the SEC filed a Motion for Relief.  (ECF No. 160).

On June 23, 2011, the Court issued an Order denying the Motion for Directed Verdict (ECF No. 172), and an Order granting in part and denying in part the Motion for Relief (ECF No. 173).  The June 23, 2011 Orders are incorporated by reference into this Order.

On July 8, 2011, the Court issued Final Judgment of Permanent Injunction and Other Relief Against Ran H. Furman.  (ECF No. 174).

On August 5, 2011, Furman filed a Motion to Stay Execution of Judgment (ECF No. 175), the Renewed Motion for Judgment as a Matter of Law (ECF Nos. 176, 178), and the

Motion for New Trial (ECF Nos. 177, 178).

On August 11, 2011, the Court issued an Order denying the Motion to Stay Execution of Judgment. (ECF No. 179).

On August 23, 2011, the SEC filed oppositions to the Renewed Motion for Judgment as a Matter of Law and the Motion for New Trial. (ECF Nos. 180, 181).

On August 30, 2011, Furman filed replies in support of the Renewed Motion for Judgment as a Matter of Law and the Motion for New Trial. (ECF Nos. 182, 183).

## II.    Renewed Motion for Judgment as a Matter of Law

Furman contends that, pursuant to Federal Rule of Civil Procedure 50(b), judgment as a matter of law should be entered in Furman's favor as to each of the claims at issue in the trial. Furman contends: "Judgment as a matter of law must be entered on the SEC's 10(b) claim because there is insufficient evidence that Furman had the requisite scienter"; "judgment as a matter of law must be entered on the SEC's aiding and abetting claim because there is no evidence from which a reasonable jury could conclude that Furman had actual knowledge of any underlying violation by Island Pacific"; and "judgment as a matter of law must be entered on the SEC's rule 13a-14 claim because there is no evidence from which a reasonable jury could conclude that Furman's certifications were false in light of his knowledge." (ECF No. 176-1 at 3, 10, 12).

A Rule 50(b) motion is decided under the same "substantial evidence" standard applicable to arguments made in a Rule 50(a) motion. *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 963 (9th Cir. 2009); *see also SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) ("A jury's verdict must be upheld if it is supported by substantial evidence. Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence. The court must not weigh the evidence, but rather should ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.") (quotations omitted).

For the reasons discussed in the Court's June 23, 2011 Order denying the Motion for

1   Directed Verdict, *see* ECF No. 172, the Court finds that substantial evidence supports the

2   jury's Verdict as to each of the claims at issue.  The Renewed Motion for Judgment as a Matter

3   of Law is denied.

**III.    Motion for New Trial**

**A.    Contentions of the Parties**

6   Furman contends that, pursuant to Federal Rule of Civil Procedure 59(a), "Furman is

7   entitled to a new trial because he was substantially prejudiced by several erroneous evidentiary

8   rulings."  (ECF No. 177-1 at 7).  Furman contends that "Furman was prevented from

9   effectively impeaching the SEC's expert witness"; "Furman was prevented from introducing

10  evidence showing that Milberg Weiss did not sue in connection with the accounting for the

11  QQQ transactions"; "[former Island Pacific contract administrator Joseph] Dietzler was

12  permitted to testify as though he were an expert"; and "[outside auditor] Sally Aubury was

13  permitted to testify as to why Singer Lewak resigned even though that testimony was irrelevant

14  and prejudicial."  *Id.* at 7, 13, 15, 17.  Furman contends that he "is entitled to a new trial

15  because of counsel's improper closing argument" and "because the verdict was against the

16  clear weight of the evidence."  *Id.* at 18, 21.

17  The SEC contends:

18      Furman's complaints regarding certain of the Court's evidentiary rulings and the
        Commission's closing argument are ill-founded and, even if the rulings had been
19      erroneous, no prejudice resulted which would warrant a new trial.  Furman's
        final ground for new trial – that the verdict was against the clear weight of the
20      evidence – is similarly ill-founded.  Notably, although Furman's primary
        argument is that the evidence failed to establish his scienter, Furman utterly fails
21      to address the Court's detailed analysis of the evidence regarding Furman's
        knowing behavior set forth in both its Order granting the Commission relief ...
22      (Docket No. 173) and its Order denying Furman's initial motion for a directed
        verdict (Docket No. 172).
23

24  (ECF No. 180 at 5).

**B.    Standard of Review**

26  Federal Rule of Civil Procedure 59 provides that "[t]he court may, on motion, grant a

27  new trial ... for any reason for which a new trial has heretofore been granted in an action at law

28  in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "The trial court may grant a new trial, even

    though the verdict is supported by substantial evidence, if the verdict is contrary to the clear

weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (quotation omitted); *see also Todd*, 642 F.3d at 1225 ("A motion for a new trial is granted if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result.") (quotation omitted). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation omitted).

### C.    Evidentiary Rulings

#### 1.    SEC's Expert Witness

Furman contends: "Two erroneous evidentiary rulings prevented Furman from effectively cross-examining and impeaching the SEC's expert witness, Peter Salomon..., regarding: (1) his opinion in another case [i.e., *SEC v. Jenkins*] that accounting violations and restatements of financial statements were not necessarily the result of fraud; and (2) Salomon's having turned a blind eye to the possibility that Dietzler—the purported whistleblower—was acting for improper motives."  (ECF No. 177-1 at 7).

#### a.    *SEC v. Jenkins*

In *SEC v. Jenkins*, No. CV-09-1510 (D. Ariz.), Salomon submitted an affidavit dated October 29, 2010 in opposition to the SEC's motion for summary judgment, which concluded: "Based upon the information in the materials I reviewed and analyzed, it is my opinion that it is not possible to conclude that the misstated financial statements that were corrected in the Second Restatement were the result of fraud, recklessness, or negligence, as opposed to mistake or inadvertence."  (Piazza Decl., Ex. PP ¶ 34, ECF No. 178-6).

In this case, Furman moved in limine to exclude testimony by Salomon regarding "the mental state of the parties" and "the intent of the parties."  (ECF No. 97 at 2, 5).  The Court issued an Order stating that "'[o]pinion with respect to the subjective intentions of the parties

1   is inappropriate' and 'opinion with respect to legal concepts and conclusions of law are

2   excludable.'" (ECF No. 131 at 9, quoting *SEC v. Leslie*, 2010 WL 2991038, at *8-*9 (N.D.

3   Cal. July 29, 2010) (excluding evidence from an expert regarding references to "fraudulent"

4   conduct and the intentions of the parties)).

5          At trial in this case, Furman's counsel cross-examined Salomon regarding Salomon's

6   affidavit in *Jenkins*.  Feb. 18, 2011 a.m. Tr. at 73-76.  Furman's counsel was permitted to ask,

7   over the SEC's objection, whether "a restatement of a financial statement doesn't necessarily

8   mean that a company has engaged in accounting fraud," to which Salomon responded: "It

9   doesn't necessarily mean that could or could not.  A restatement by itself, that doesn't mean

10  it has to be that." *Id*. at 75.  Furman's counsel asked Salomon about the "bases for [Salomon's]

11  opinion." *Id*.  Salomon answered: "My opinion in the *Jenkins* matter related to the fact that

12  there was very little discovery in the case, there was very little evidence, and that you would

13  need to look at the additional evidence in addition to what the SEC had proferred to make a

14  determination whether it was fraud or not." *Id*. at 76.  After Salomon finished his answer, the

15  Court spoke to the parties at sidebar.

16         At sidebar, Furman's counsel stated that he had only two questions remaining for

17  Salomon. *See id*. at 79.  One question was a "preliminary question" about *Jenkins*, and "then

18  [Furman's counsel] was going to circle back to this case.  [Salomon] previously rendered the

19  opinion that a CFO unintentionally violates general accounting practice, it's not accounting

20  fraud, right." *Id*.  The Court stated: "I don't think he can say that.  [Salomon] can't offer an

21  opinion that this is fraudulent, and he can't offer an opinion that it's not fraudulent.  He can't

22  say that in this case; do you agree?" *Id*.  Furman's counsel responded, "Yes, I agree." *Id*.

23  After further discussion at sidebar, Furman's counsel stated that he had no further questions

24  for Salomon. *Id*. at 81.

25         In the Motion for New Trial, Furman contends: "Furman should ... have been allowed

26  latitude to cross-examine Salomon, one of the SEC's key witnesses, regarding how Salomon

27  had reached his 'no fraud' opinion in the other matter.  The jury, by never learning of that key

28  opinion and Salomon's methodology employed in coming to the opinion, was unable not only

to properly assess Salomon's testimony but also the SEC's case itself." (ECF No. 177-1 at 11).

The Court finds that Salomon did not opine about Furman's mental state, or state a legal conclusion that Furman committed fraud. *See, e.g.*, Feb. 18, 2011 a.m. Tr. at 82.[1]  Furman agreed prior to trial and at trial that it was not proper for Salomon to testify regarding a defendant's mental state or whether he committed fraud. *See* ECF No. 97 at 2, 5; Feb. 18, 2011 a.m. Tr. at 79.  Accordingly, Salomon's opinion regarding a defendant's mental state or lack of fraud in an unrelated case was not relevant or permissible.  To the extent the Court did not permit Furman to continue questioning Salomon regarding his opinions of fraud or "no fraud" in *Jenkins* and/or in Furman's case, the Court does not find that this ruling warrants a new trial.

### b.    Dietzler's Motives

Salomon testified on direct examination at trial that, in his opinion, the Technology Purchase Agreement "should not have been recorded as an asset of $3.9 million as of December 31st, 2003," for two reasons: "[W]e've seen emails that go back and forth that QQQ sent Island Pacific the first draft of the agreement on January 16th, 2004, which is after December 31st, 2004 [sic].  The company sent back a revised draft on January 28th, 2004.  And based on my review of the deposition testimony Joseph Dietzler, the company's contract administrator, he testified that the contract was still not finalized on February 4th, which I think was his last day at the company."  Feb. 18, 2011 a.m. Tr. at 28.  At that point, Furman's counsel objected, and the Court sustained the objection and stated, "[r]ather than have that witness testify about what he recalls other people said, it should be assumptions he is making to arrive at his opinion."  *Id*. at 29.  Salomon then testified:

> Actually I can go on and delete that issue of Mr. Dietzler's testimony.  I did mention the two emails that talked about drafts going back and forth in January, so the agreement was not finalized as of December 31, and that would be a requirement.
>
> But even had—just assume the agreement was finalized as of December 31, it

---

[1]  Salmon was asked on redirect: "Mr. Salomon, in this case, you weren't asked to render an opinion on whether fraud existed; is that correct?"  Feb. 18, 2011 a.m. Tr. at 82. Salomon responded: "That's correct. ...  My understanding as an expert, I'm not allowed to do that."  *Id*.

still would be improper to recognize revenue.  There are accounting rules that would prohibit recognizing revenue on these types of transactions.   And specifically, it's Accounting Principles Board Opinion No. 29, ... that deals with Nonmonetary Transactions....

*Id*. at 29-30.

On cross-examination, Furman's counsel asked Salomon: "And you specifically, in fact, refer to Mr. Dietzler's deposition during the questioning ... [by SEC counsel], correct?"  *Id*. at 62.  Salomon answered "yes," and then Furman's counsel asked Salomon about an article he had written in 2004 "about whistleblowers."  *Id*.  Furman's counsel showed Salomon the article and the following exchange occurred:

Q:    Okay.  And in this article, you discuss whistleblowers, correct?

A:    Yes.

Q:    And in the article, you indicate that you recently learned of an instance in which a terminated employee may have used a whistleblower provision to attempt to obtain additional severance pay.  Do you recall that?

A:    I don't recall it, but if you—I think I see the language here.  Yes.

*Id*. at 63.  Counsel for the SEC objected and requested a sidebar.  At sidebar, the Court told Furman's counsel: "[Salomon]'s assuming facts, and you can ... examine them and say, ... if Dietzler was not telling the truth, then [is] your opinion ... affected by that."  *Id*. at 65; *see also id*. at 68 (At sidebar, the Court told Furman's counsel: "You can ask [Salomon] 'If it's Dietzler you're relying on,' or 'these are the facts that come from him.  And so if these facts aren't right, then your opinion wouldn't be right.'"); 71 (same).  After the sidebar concluded, Furman's counsel did not ask Salomon any further questions about Dietzler, or to what extent Salomon's opinion was based upon the testimony of Dietzler.  *See generally id*. at 73-81.

In the Motion for New Trial, Furman contends:

Furman sought to show that Salomon relied unduly on Dietzler's testimony in formulating his expert opinions, and, separately, that Dietzler's testimony was not reliable as he had a financial motive to lie[.]  Specifically, Furman's counsel sought to question Salomon regarding Dietzler's admission that, during the very time in which he made his 'whistleblower' allegations to Island Pacific executives, he had contacted a prominent securities class action law firm, Milberg Weiss, for the apparent purpose of filing suit and reaping the financial benefits of doing so.  The relevance of such questioning was heightened by the fact that Salomon himself, before testifying, had authored a trade article that admonished companies to be wary of the credibility of whistleblowers who

- 8 -

1    claim accounting irregularities and have a pecuniary interest in the matter, which
2    was precisely what Furman contended had occurred in the present case....

3    Furman, had he been permitted to use the impeachment evidence at issue, would
     have been able to demonstrate through the SEC's own expert witness that
3    Dietzler's allegations of accounting fraud, based as they were on the hope of
4    pecuniary benefit, were not to be trusted.

5    (ECF No. 177-1 at 12-13).

6         The Court finds that Furman's counsel was given further opportunity to question

7    Salomon regarding the basis for his opinion, and to what extent his opinion was dependant

8    upon Deitzler's testimony.  Furman's counsel declined to avail himself of that opportunity.

9    Later during the trial, Furman's counsel examined Dietzler regarding Dietzler's "financial

10   motive to lie."  *Id.*; *see* Feb. 18, 2011 p.m. Tr. at 170-71 (Furman's counsel asked Dietzler:

11   "Isn't it true that you wrote this memo so you could try and convince Milberg Weiss to file a

12   case or a lawsuit against Island Pacific?"), 175-76 (Furman's counsel asked Dietzler: "And

13   that's what you told Milberg Weiss, right, that there was no customer with an actual need, and

14   that's why you thought that there might be a case that they might want to bring[?]").  To the

15   extent the Court did not permit Furman's counsel to continue questioning Salomon regarding

16   Dietzler's possible motives or Salomon's article, the Court does not find that this ruling

17   warrants a new trial.

18              **2.    Milberg Weiss**

19        Dietzler testified on direct examination: "I consulted with another attorney about my

20   views of these transactions, who confirmed my views."  Feb. 18, 2011 p.m. Tr. at 137.

21   Furman's counsel objected to this testimony, and the Court sustained the objection and

22   instructed the jury to "disregard the last portion of the answer where the witness stated that

23   somebody confirmed his views."  *Id.*  Dietzler testified that he contacted law firm Milberg

24   Weiss because "[t]hey were known for an expertise in securities regulation and, in particular,

25   class action suits for securities fraud."  *Id.* at 138.  Deitzler testified that he was not "planning

26   on suing Island Pacific," and he did not identify Island Pacific to Milberg Weiss, and he did

27   not believe he identified himself to Milberg Weiss.  *Id.*  On cross-examination, Furman's

28   counsel questioned Dietzler regarding his contact with Milberg Weiss and whether Deitzler

1   intended to sue Island Pacific.  *See id*. at 170-71, 174-76.

2         At sidebar, the Court and Furman's counsel engaged in the following exchange:

3         The Court:  Do you intend to go into the fact that ... Milberg Weiss didn't file
          a lawsuit?
4
          [Furman's counsel]:  That was my next question.
5
          The Court:  Does the fact that a lawsuit was filed mean something?  Does it
6         mean that there's responsibility? ....  [The SEC] filed a lawsuit in this case.
          Does the fact that the SEC filed a lawsuit mean that there must be something
7         there?

8         [Furman's counsel]:  No.

9         The Court:  Okay....  The fact that any lawsuit is not filed I don't find to be
          relevant anymore than the fact that the SEC can stand up and say, 'We filed a
10        lawsuit against Mr. Furman, so that means something....  We've looked at it, and
          you can draw an inference that he must have done something because the
11        lawsuit was filed.'  The fact that somebody else elected not to file a lawsuit, you
          can't draw the inference that, therefore, there must not be any case....  Under
12        403, at best there would have to be some analysis as to ... what information did
          they have?  What was the financial stake?  What was the potential gain?  How
13        much insurance was there?  There may be a whole host of things that any firm
          would look at in deciding whether to file a lawsuit, and the fact that no lawsuit
14        was filed does not mean that there's no case or suggestion of wrongdoing any
          more than it means if there were five lawsuits filed individually against your
15        client, that doesn't mean that he did anything wrong....  That's what the trial is
          for....
16
    *Id*. at 178-79.
17
          In the Motion for New Trial, Furman contends: "The Court ... erroneously prevented
18
    Furman from eliciting evidence that Milberg Weiss, despite being alerted by whistleblower
19
    Dietzler to purported improper accounting in Island Pacific's financial statements, never filed
20
    suit against the company.  This evidence was relevant both to impeaching Dietzler and to the
21
    materiality of the allegedly improper accounting.  Its exclusion substantially prejudiced
22
    Furman's ability to present his case."  (ECF No. 177-1 at 13-14).
23
          Even if evidence was introduced at trial indicating that Milberg Weiss learned the
24
    identity of Island Pacific, the Court finds that evidence that Milberg Weiss did not file suit
25
    against Island Pacific was not relevant, for the reasons stated by the Court at sidebar.  *See* Feb.
26
    18, 2011 Tr. at 178-79.  Even if evidence that no suit was filed by Milberg Weiss was relevant,
27
    the Court finds that any probative value of such evidence is substantially outweighed by the
28
    danger of unfair prejudice, confusion of the issues, and considerations of waste of time.  *See*

Fed. R. Evid. 403.  To the extent the Court did not permit Furman's counsel to introduce evidence that Milberg Weiss did not file suit against Island Pacific, the Court does not find that this ruling warrants a new trial.

### 3.   Dietzler's Testimony

During direct examination, counsel for the SEC asked Dietzler "whether there was anything unusual about this deal with QQQ," and Dietzler answered:

> There were a number of factors that I was curious about, based on my experience, as to why a company would be paying an upfront license fee in multi millions of dollars for simply the right to market versus the actual need – QQQ was not an end user of the software, they wouldn't have any need for it. They were going to go out and try to market that software to parties that would have use for it.

Feb. 18, 2011 p.m. Tr. at 100.  Furman's counsel objected on the basis of "speculation," and the Court overruled the objection.  *Id*.  Dietzler continued:

> So the other aspect was that QQQ was an unknown entity or certainly not – I worked in the technology and software industry before and I had never heard of them, so you would think you would do a financial background check, at least that much, to see if they had the wherewithal to make the payment of $3 million, particularly if you're going to book the revenue.  Those are some of the aspects that seemed unique with respect to the transaction itself.

*Id*. at 100-01.  The SEC counsel showed Dietzler an exhibit from one of the QQQ contracts, and Dietzler testified:

> Yes, this calls for both an upfront fee and a royalty, and you would expect to pay a royalty fee, and maybe some small upfront fee, but when you're going out to try to market a product, essentially becoming a sales rep for that company, you wouldn't expect to pay $3 million upfront.

*Id*. at 101.  At this point, Furman's counsel stated, "Same objection [i.e., speculation], also lack of foundation."  *Id*.

At sidebar, Furman's counsel stated that he "move[d] to strike," and Dietzler was "testifying as an expert ... without any foundation whatsoever."  *Id*.  The Court told SEC counsel, "[Dietzler]'s not here as an expert to say whether it's a good transaction or a bad transaction, but ... he said this is what he found to be unusual, so I overruled the objection just so we could get background to get up to the [February 4, 2004] e-mail."  *Id*. at 102.  The Court cautioned SEC counsel that "[l]et's be clear that he's not here as sort of a contracts expert."  *Id*. at 103.  Then the following exchanged occurred at sidebar:

1    The Court:  It's fair to explain that he had some concerns, but ... we want to
     make sure it's not a situation where he's ... giving expert opinion.
2
     [SEC counsel]:  I understand.
3
     [Furman's counsel]:  The other thing I would think is fair if he articulated those
4    specific concerns that I could see how that might be, but not anymore of this.

5    The Court:  It sounds like you've gotten out what you need to ... lay the
     foundation for his concerns.
6
     [SEC counsel]:  Yes.
7
     The Court:  All right.
8
     (Sidebar concluded.)
9
     The Court:  Your objection's overruled at this point, counsel.
10
*Id.* at 103-04.
11
        In the Motion for New Trial, Furman contends that the Court's failure to strike the
12
above-quoted testimony from Dietzler warrants a new trial because "the Court did not undo
13
the damage already wrought by the purported whistleblower feigning expertise in an area about
14
which he was not an expert."  (ECF No. 177-1 at 16).
15
        At trial, both the SEC and Furman questioned Dietzler at length regarding the February
16
4, 2004 email authored and sent by Dietzler to Furman and others.  The testimony quoted
17
above constituted foundational testimony, which was "based on [Dietzler's] experience," Feb.
18
18, 2011 p.m. Tr. at 100, and "helpful to a clear understanding of [Dietzler's] testimony"
19
concerning the February 4, 2004 email and Dietzler's other efforts to raise the issues addressed
20
in the email with Furman.  Fed. R. Evid. 701.  The Court finds that, to the extent Dietzler
21
offered opinions, they were within the bounds proscribed by Rule 701.  *See id.* ("If the witness
22
is not testifying as an expert, the witness' testimony in the form of opinions or inferences is
23
limited to those opinions or inferences which are (a) rationally based on the perception of the
24
witness, (b) helpful to a clear understanding of the witness' testimony or the determination of
25
a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within
26
the scope of Rule 702."); *see also United States v. Rigas*, 490 F.3d 208, 224-25 (2d Cir. 2007).
27
Even if the Court erred in failing to strike the testimony at issue, the Court finds that the
28
testimony at issue was not prejudicial to Furman.  The Court does not find that the failure to

1    strike Dietzler's testimony quoted above warrants a new trial.

2                        **4.    Aubury's Testimony**

3           Furman contends that a new trial is warranted because "[outside auditor] Sally Aubury

4    was permitted to testify as to why [outside auditing firm] Singer Lewak resigned even though

5    that testimony was irrelevant and prejudicial." (ECF No. 177-1 at 17). Furman contends that

6    "[p]ermitting Aubury to testify about Singer Lewak's 2007 resignation from the Island Pacific

7    account which occurred two years after Furman left the company caused substantial prejudice

8    to him with the jury." *Id*.

9           Aubury testified that Singer Lewak resigned because "information was presented to

10   [Singer Lewak] ... during [Aubury's] testimony" during the SEC investigation. Feb. 15, 2010

11   a.m. Tr. at 6. Aubury testified that, as related to the QQQ transaction, the "information ...

12   presented" was: "For example, the different contract that was presented to ... me during the

13   testimony. There was some other documentation, a piece of paper, from memory, which was

14   from Harvey Braun saying that the agreement, the license agreement was going to be tied to

15   the sale of a subsidiary division, that kind of thing." *Id*. Aubury testified that she "hadn't seen

16   those documents before," and that "ultimately we called Island Pacific and told them that we

17   were going to resign, and the response ... was, 'Well, actually, we were going to call you

18   because we're going to fire you.'" *Id*. at 7.

19          The Court finds that Aubury's testimony regarding Singer Lewak's decision to resign

20   based upon Island Pacific failing to show the auditors, *inter alia*, a "different contract" related

21   to the QQQ transaction is relevant to Furman's defense of reliance on auditors. *Cf. SEC v.

22   Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 467 (9th Cir. 1985) ("[I]n order to establish

23   good faith reliance on the advice of counsel, appellants must show that they (1) made a

24   complete disclosure to counsel...."). Similarly, this evidence was relevant to rebutting the

25   deposition testimony designated by Furman prior to trial, and admitted at trial, of Island Pacific

26   Board and Audit Committee member Michael Silverman indicating that it was Singer Lewak's

27   fault that Island Pacific had to issue restatements concerning the QQQ transactions. *See*

28   Silverman Dep. at 129-30, ECF No. 162. The Court does not find that the admission of

1   Aubury's testimony regarding Singer Lewak's decision to resign warrants a new trial.

2       **D.    SEC Closing Argument**

3       Furman contends that "Furman is entitled to a new trial because counsel for the SEC

4   improperly prefaced several of her key closing arguments with 'we know,' thus improperly

5   conveying to the jury that the SEC and its investigators knew of facts supporting her arguments

6   beyond the evidence at trial."  (ECF No. 177-1 at 18).

7       "'[P]rosecutors should not use 'we know' statements in closing argument.'

8   Nonetheless, the use of the phrase [is] not improper [if] it [is] employed 'to marshal evidence

9   actually admitted at trial and [to offer] reasonable inferences from that evidence, not to vouch

10  for witness veracity or suggest that evidence not produced would support a witness's

11  statements.'" *United States v. Inzunza*, 638 F.3d 1006, 1024 (9th Cir. 2011) (quoting *United*

12  *States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005)); *cf. id*. at 1023 ("The government may

13  not vouch for the credibility of its witnesses, either by putting its own prestige behind the

14  witness, or by indicating that extrinsic information not presented in court supports the witness'

15  testimony.") (quotation omitted).

16      During closing argument, SEC counsel used the phrase, "we know."  *See* Feb. 24, 2011

17  a.m. Tr. at 32, 42, 67-68, 83.  The Court addressed the issue outside the presence of the jury.

18  *See id*. at 51-55, 68-69.  As the Court stated at the time, *see id*. at 51-52, although use of the

19  phrase, "we know," by counsel for the government should be avoided, the Court finds that the

20  SEC counsel's use of the phrase in the instances at issue were used to "to marshal evidence

21  actually admitted at trial and [to offer] reasonable inferences from that evidence, not to vouch

22  for witness veracity or suggest that evidence not produced would support a witness's

23  statements." *Younger*, 398 F.3d at 1191.  The Court further finds that, "in the context of the

24  entire trial, ... the [SEC counsel]' use of 'we know' did not materially affect the verdict."  *Id*.

25  (citation omitted).

26      **E.    Clear Weight of the Evidence**

27      Furman contends that he is entitled to a new trial "because the verdict was against the

28  clear weight of the evidence."  (ECF No. 177-1 at 21).  Furman bases this contention on

1   reasons "fully described in Furman's Rule 50 Motions and their supporting materials," and
2   based upon "the relative credibility of the key witnesses." *Id*. at 22.

3          "Upon the Rule 59 motion of the party against whom a verdict has been returned, the
4   district court has the duty to weigh the evidence as the court saw it, and to set aside the verdict
5   of the jury, even though supported by substantial evidence, where, in the court's conscientious
6   opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729
7   (quotation omitted).  In ruling on a motion for new trial, the trial court "judge can weigh the
8   evidence and assess the credibility of witnesses, and need not view the evidence from the
9   perspective most favorable to the prevailing party." *Landes Constr. Co., Inc. v. Royal Bank*
10  *of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citations omitted).

11         For the reasons described in the Court's post-trial Orders, and based upon the Court's
12  weighing of the evidence and assessing the credibility of the witnesses, the Court finds that the
13  Verdict is not contrary to the clear weight of the evidence.  The Court finds that the jury did
14  not "reach[] a seriously erroneous result." *Todd*, 642 F.3d at 1225 ("A motion for a new trial
15  is granted if the verdict is against the great weight of the evidence, or it is quite clear that the
16  jury has reached a seriously erroneous result.") (quotation omitted).  Based upon the applicable
17  standard of review, and considering all the grounds asserted by Furman in the Motion for New
18  Trial, alone and in combination, the Court finds that a new trial is not warranted.  The Motion
19  for New Trial is denied.

20  **IV.   Conclusion**

21         IT IS HEREBY ORDERED that the Renewed Motion for Judgment as a Matter of Law
22  (ECF No. 176) is DENIED, and the Motion for New Trial is DENIED (ECF No. 177).
23  DATED:  September 27, 2011

**WILLIAM Q. HAYES**
United States District Judge